SCANNED at
and Emailed          MWCI
3/3/21    by   /M    46 pages
date        initials    No.

United States District Court

District of Connecticut

James E. Cunningham Sr.
Inmate # 233982
1153 East st. south
Suffield, CT. 06080

Civil No.: unassigned

vs

Dated: 2-22-21

Jury Trial Demanded

Dr. Francesco Lupis
1153 East st. south
Suffield, CT. 06080

A Complaint In Damages

Ned Lamont
capitol Building
55 Elm st.
Hartford, CT. 06106

Department of Correction
24 Wolcott Hill Rd
Wethersfield, CT. 06109

Tewanna Furtick
1153 East st. south
Suffield, CT. 06080

Dr. Kennedy
1153 East st. south
Suffield, CT. 06080

Colleen Gallagher
24 Wolcott Hill Rd
Wethersfield, CT. 06109

William Mulligan
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

Kristine Barone
1153 East st. south
Suffield, CT. 06109

Deputy Warden Doran
1153 East st. south
Suffield, CT. 06080

Deputy Warden Snyder
1153 East st. south
Suffield, CT. 06080

Mary Ellen Castro
24 Wolcott Hill Rd
Wethersfield, CT. 06109

Kristen Shea
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

Angel Quiros
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

Rollin Cook
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

APRN Barbara
1153 East St. South
Suffield, CT. 06080

RN Joe
1153 East St. South
Suffield, CT. 06080

Frank Querres
1153 East St. South
Suffield, CT. 06080

Nicole Anker
24 Wolcott Hill Rd
Wethersfield, CT. 06109

Rudy Alvarez
1153 East St. South
Suffield, CT. 06080

Sal Diaz
1153 East St. South
Suffield, CT. 06080

Rose Walker
1153 East St. South
Suffield, CT. 06080

Rikel Lightner
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

Cheng McPherson
1153 East St. South
Suffield, CT. 06080

Dr. Carson Wright
1153 East St. South
Suffield, CT. 06080

Dr. Freston
24 Wolcott Hill Rd
Wethersfield, CT. 06109

John Poe1 UConn Pediatrist
263 Farmington Ave.
Farmington, CT.

Monica Farinella
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

Meriam Grant
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

Gary Fresten
24 Wolcott Hill Rd,
Wethersfield, CT. 06109

Samantha Lockery
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

John Poe 2 - DOC Habeas Legal Liaison
24 Wolcott Hill Rd.
Wethersfield, CT. 06109

Parties:

1.  At all times herein mentioned the plaintiff, James E. Cunningham Sr. (Cunningham), is and was
    an inmate, #233982; incarcerated within and for the State of Connecticut (the state), in
    the custody and care of the Department of Correction (D.O.C.) for the state, and being
    housed at the MacDougall Correctional Institute (MacDougall).

2.  At all times herein mentioned the defendant, Dr. Francesco Lupis (Lupis), is and was a
    doctor for the D.O.C. providing medical care services to inmates at MacDougall, as a
    primary care provider; and is sued herein in an individual and official capacity.

3.  At all times herein mentioned the defendant, Ned Lamont (Lamont), is and was the
    governor of the state, bearing duties and obligations to ensure the proper and
    constitutionally mandated care of inmates within the state and is sued herein in an official
    and individual capacity.

4. At all times herein mentioned the defendant, Department of Correction (D.O.C., the department), is and was a department of the state organized and operated for the purpose of incarcerating and detaining convicted inmates and pretrial detainees in a constitutionally conforming manner and is sued herein in an official capacity only for injunctive and declaratory relief.

5. At all times herein mentioned the defendant, Tawanna Furtick (Furtick), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a nurse; and is sued herein in an individual and official capacity.

6. At all times herein mentioned the defendant, Dr. Kennedy (Kennedy), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a doctor; and is sued herein in an individual and official capacity.

7. At all times herein mentioned the defendant, Colleen Gallagher (Gallagher), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a Program Director, Quality Improvement of Health and Addiction services; and is sued herein in an individual and official capacity.

8. At all times herein mentioned the defendant, William Mulligan (Mulligan), is and was the Warden, Commissioner of Correction and District Administrator for the department, with duties and obligations to ensure constitutionally adequate medical care for inmates of the dartment, and is sued herein in an individual and official capacity.

9. At all times herein mentioned the defendant, Kristine Barone (Barone), is and was a correctional officer (C.O.), holding rank, duties and obligations as warden, at MacDougall, and is sued herein in an individual and official capacity.

10. At all times herein mentioned the defendant, Deputy Warden Doran (Doran), is and was a C.O. holding rank, duties and obligations as a Deputy Warden, at MacDougall, and oversight of the MacDougall medical services; and is sued herein in an individual and official capacity.

11. At all times herein mentioned the defendant, Deputy Warden Snyder (Snyder), is and was a C.O. holding rank, duties and obligations as a deputy warden, at MacDougall; and is sued

herein in an individual and official capacity.

12. At all times herein mentioned the defendant, Mary Ellen Castro (Castro), is and was a D.O.C. staff member for medical, providing medical care services to inmates at MacDougall, as a Medical liaison between the department and UConn John Dempsey Hospital, and is sued herein in an individual and official capacity.

13. At all times herein mentioned the defendant, Kirsten Shea (Shea), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a Regional Corporate operations officer (RCOO), for the department's medical; and is sued herein in an individual and official capacity.

14. At all times herein mentioned the defendant Angel Quires (Quira) is and was a C.O. of the department holding rank, duties and obligations as District Administrator and Commissioner, and is sued herein in an individual and official capacity.

15. At all times herein mentioned the defendant, Rollin Cook (Cook), is and was the Commissioner of Correction for the department and is sued herein in an individual and official capacity.

16. At all times herein mentioned the defendant, APRN Barbara (Barbara), is and was a medical staff member of the D.O.C., providing Mental health services to inmates at MacDougall, as a Clinical Social Worker (CSW), and is sued herein in an individual and official capacity.

17. At all times herein mentioned the defendant, RN Joe (Joe), is and was a medical staff member of the D.O.C., providing medical services to inmates at MacDougall, as a nurse; and is sued herein in an individual and official capacity.

18. At all times herein mentioned the defendant, Frank Querves (Querves), is and was a medical staff member of the D.O.C., providing dental care services to inmates at MacDougall, as a dentist; and is sued herein in an individual and official capacity.

19. At all times herein mentioned the defendant, Nicole Anker (Anker), is and was an Assistant Attorney General (A.A.G.) for the state, and is sued herein in an individual and official capacity.

20. At all times herein mentioned the defendant, Rudy Alvarez (Alvarez), is and was the gym teacher at MacDougall, and is sued herein in an individual and official capacity.

21. At all times herein mentioned the defendant, Sal Diaz (Diaz), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, and is sued herein in an individual and official capacity.

22. At all times herein mentioned the defendant, Rose Walker (Walker), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a nurse and Health Services Review Coordinator (HSRC), and is sued herein in an individual and official capacity.

23. At all times herein mentioned the defendant, Rikel Lightner (Lightner), is and was a medical staff member of the D.O.C., providing medical care administrative services to inmates at MacDougall, as Health Services Administrator (HSA), and is sued herein in an individual and official capacity.

24. At all times herein mentioned the defendant, Chena McPherson (McPherson), is and was a medical staff member of the D.O.C. providing medical care services to inmates at MacDougall, and is sued herein in an individual and official capacity.

25. At all times herein mentioned the defendant, Dr. Carson Wright (Wright), is and was a medical staff member providing medical care services to inmates at MacDougall, as a doctor; and is sued herein in an individual capacity and official capacity.

26. At all times herein mentioned the defendant, Dr. Freston (Freston), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a doctor; and is sued herein in an individual and official capacity.

27. At all times herein mentioned the defendant, John Doe 1 (Doe), is and was a medical staff member of the Uconn John Dempsey Hospital, providing medical care services to inmates at MacDougall, as a podiatrist; and is sued herein in an individual and official capacity.

28. At all times herein mentioned the defendant, Monica Farinella (Farinella), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, and is sued herein in an individual and official capacity.

29. At all times herein mentioned the defendant, Meriam Grant (Grant), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a panel member of the Patient Prioritization and Transportation (P.P.T.) team; and is sued

30. At all times herein mentioned the defendant, Gary Fresten (Fresten), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a panel member of the P.P.T. Team; and is sued herein in an individual and official capacity.

31. At all times herein mentioned the defendant, Samantha Lockery (Lockery), is and was a medical staff member of the D.O.C., providing medical care services to inmates at MacDougall, as a panel member of the P.P.T. team; and is sued herein in an individual and official capacity.

32. At all times herein mentioned the defendant, John Doe 2 - Doc Habeas Liaison (Doe 2), is and was a staff member of the D.O.C., providing services as the Habeas Legal Liaison for inmate medical habeas actions and is sued herein in an individual and official capacity.

<u>Count One:</u>

1-33. Paragraphs numbering 1-32 of the foregoing are incorporated here by reference as if set forth at length and made a part here of this the First Count

35. The D.O.C. has suffered a systemic deficiency in the provision of medical care to inmates within its custody for many years.

36. The state and D.O.C. has allowed the medical care services of the D.O.C. to remain underfunded, short staffed and improperly managed affecting the care available to inmates, including plaintiff.

37. Under the guise of fixing the broken system, the state and D.O.C. dissolved any relationship with the Correctional Managed Healthcare (CMHC), which previously managed the provision of medical care services to inmates

38. However, the D.O.C., now responsible for the provision of medical care to inmates; has taken little to no corrective measures to enhance or otherwise improve the healthcare being provided to the inmate population.

38. Instead, the D.O.C. simply hired the same medical staff members to do the same poor, haphazard and constitutionally infirm jobs they were already doing without any type of oversight, management or improved reporting guidelines.

40. Some of the individuals who have failed to maintain constitutional levels of care include, but are not limited to Lupis, Furtick, Gallagher, Doran, Castro, Shea, Quiros, Walker, McPherson,

Lightner, Anker, Dee2, Farinella, Grant, Fresten and Lackery, Cook and D.O.C.

41. Lamont has known of these systemic deficiencies causing the denial of constitutionally adequate medical care to inmates within the state and has failed and refused to take corrective measures to provide greater funding, better oversight and adequate care.

42. Inmates, including Cunningham, have been being denied necessary prescriptions, pain management regimens, physical therapy, proper specialist care, specialty diagnostic imaging and testing to diagnose and treat ailments, in an effort to save money off inmate care and maintenance.

43. Instead of correcting these deficiencies, the D.O.C. staff have instead begun to work with the state's assistant attorney generals to encourage medical staff on tactics to impede inmate access to medical services, impede inmate ability to use and exhaust D.O.C. administrative remedies, and intentionally ignoring and failing to diagnose medical ailments in an attempt to justify and take advantage of legal loopholes, to deny care; including, by falsely alleging staff failed to perceive serious medical needs and inmate failure to exhaust administrative remedies.

44. Defendants knew or should have known that their actions, or lack thereof, would cause plaintiff harm and injury.

45. Plaintiff has been harmed and injured as a direct and proximate result of the defendants actions, or lack thereof; as alleged herein below, including, but not limited to:

a) discontinuing prescription regimens for treating chronic ailments, and;

b) denied adequate and meaningful diabetic care, maintenance and management, and;

c) denied adequate and meaningful therapeutic and rehabilitative physical therapy, and;

d) denied adequate and meaningful prescriptive treatments for chronic ailments, and;

e) denied proper, adequate and meaningful specialist care and treatment, including, but not limited to; orthopedic, vascular, endocrinology and neurologic care, diagnosis and treatment, and; nep frediagist;

f) denied adequate, effective, proper and meaningful prosthetics, including ambulatory and rehabilitative aids, including, but not limited to, braces, crutches, wheel chairs, Repmac support devices, breathing aids and sterility controls thereof, and; maintenance.

g) reducing and limiting prescription therapy regimens, or eliminating outright; without regard for the effects on the inmate health, pain etc.

46. Therefore, plaintiff prays this court grant the following relief:

a) compensatory damages of $250,000°°, in addition to other damages herein alleged, and;

b) punitive damages of $250,000°°, in addition to other damages alleged herein, and;

c) injunctive relief commanding the implementation of corrective measures to provide constitutionally mandated care, including, greater funding for inmate care, proper prescriptive treatments, proper specialist care, and proper diagnostic services, and;

d) costs and attorney fees, and;

e) such other relief as this court deems just and equitable.

## Legal Claims

47. Defendants conduct in failing to maintain a medical system that provides meaningful, effective and constitutionally adequate level of medical care to inmates constitutes as cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and the intentional infliction of emotional distress under pendente state law.

### Count Two:

1-48. Paragraphs numbering 1-47 of the foregoing are incorporated here by reference as if set forth at length and made a part here of this the second count.

48. Cunningham is an approximately 50 year old male inmate who can be described as being morbidly obese.

50. Cunningham is afflicted with numerous medical conditions, and comorbidities that are aggravated and worsened by the attempts of Lupis, Lamont, D.O.C., Furtick, Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Castro, Shea, Aviros, Cook, Berbara, Joe, Quaver, Anker, Diaz, Walker, Lightner, McPherson, Wright, Freston, Doe I, Farinella, Grant, Freston, Lockery and Doe 2, to save money off the medical care budget for inmates, by minimizing, reducing, and outright refusing to diagnose and/or treat plaintiff's medical conditions,

up to and including the point of being dangerous, up to potentially life threatening.

51. Each of Cunningham's many conditions and afflictions are dependent on the proper treatment and maintenance of each condition and ailment due to the long-term negative impact that each medical condition, uncontrolled, has on each of the other conditions.

52. One of these conditions, which existed prior to plaintiff's incarceration; Cunningham was diagnosed and treated as suffering from hypogonadism, presenting as low testosterone.

53. Since that time, the American Urological Association (AUA) has differentiated the distinction between "hypogonadism: a state of low testosterone production", and, "to be scientifically accurate, the panel chose the term 'testosterone deficiency'; to have low testosterone levels combined with symptoms or signs that are associated with low serum total testosterone" (some emphasis added, some emphasis in original), to describe the two different conditions, and diagnose which should be treated with testosterone therapy.

54. Under the AUA's current guidelines, Cunningham would be classified as an individual suffering "testosterone deficiency", not hypogonadism; and requiring testosterone therapy to maintain proper health, and lower the risks of death.

55. The AUA uses the term testosterone therapy which refers to all forms of treatment that are aimed at increasing serum testosterone, including exogenous testosterone as well as alternative strategies, such as selective estrogen receptor modulators (SERMs), human chorionic gonadotropin (hCG) or aromatase inhibitors (AIs)(the therapy).

56. In February, 2018, the AUA board of directors approved a set of guidelines for the "Evaluation And Management of Testosterone Deficiency" (the guidelines), with the goals to

a) guide clinicians in how to assess patients for testosterone deficiency and manage them with testosterone products, and;

b) educate clinicians in key areas of testosterone in which many clinicians are deficient (e.g., interpreting the testosterone literature, understanding testosterone laboratory testing), ... [and];

[c)] were committed to creating a Guideline that ensures that men in need of testosterone therapy are treated effectively and safely."

57. The symptoms that have been associated with testosterone deficiency are very non-specific and can be manifestations of other conditions, e.g., chronic fatigue, chronic stress, and a depressed state, among others.

58. Instead, testosterone deficiency is measured against the mean total testosterone levels from two early morning draws using the same assay and expressed as nanograms per deciliter (ng/dl).

59. In establishing clinical testosterone deficiency the AUA guideline sets the cut-off of 300 ng/dl, with a view to maximizing the potential benefit from prescribing testosterone therapy while minimizing the risks of such treatment.

60. The guidelines defines success of the therapy, as the achievement of therapeutic testosterone levels to the normal physiologic range of 450 - 600 ng/dl, the middle tertile of the reference range for most labs; accompanied by symptom, sign improvement and resolution.

61. The guidelines also establish that low testosterone is also a risk factor for cardiovascular disease, anemia, bone mineral density, lean body mass, depressive symptoms, insulin level fluctuations and many others, like low thyroid production or high production of thyroid.

62. Cunningham's total serum testosterone level has been found to be 47 ng/dl, less than that of the average female; as recently as October 2, 2020.

63. At the time of Cunningham's initial incarceration, D.O.C. medical staff refused to continue the testosterone therapy he had been receiving prior to his arrest, and instead made him suffer an extended period, hoping plaintiff's body would magically begin to produce the testosterone it had not produced for years.

64. After years of back and forth battles with the D.O.C. and several habeas proceedings; Cunningham entered into an agreement with the state, the D.O.C., and warden in the habeas that, in exchange for considerations of testosterone therapy, inter alia, Cunningham would withdraw his habeas petition, (the habeas agreement).

65. Both parties to that agreement met their obligations in good faith of the terms of the agreement.

66. For an extended period Cunningham received the proper testosterone therapy in the form of intramuscular injections of 200 milligrams per milliliter (mg/ml) of testosterone therapy regimen every bi-weekly period.

67. Even at these high doses of intramuscular testosterone, for extended time, Cunningham's total serum testosterone only measured 292 ng/dl, well below the cut-off for defining testosterone deficiency set by the AUA guidelines, and nearly half that of the normal acceptable physiological range set by the guidelines as 450-600 ng/dl.

68. On December 6, 2019, Cunningham's testosterone count of 292 ng/dl, while receiving his routine therapy, which took time in therapy to achieve; was drastically impaired by the callous indifference of Lupis, Lamont, D.O.C., Furtick, Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Castro, Shea, Quiros, Cook, Barbara, Joe, Anker, Diaz, Walker, Lightner, McPherson, Wright, Freston, Farinella, Grant, Fresten, Lockery, and Doe 2; who conspired together to save money off the D.O.C.'s medical budget, at the expense of Cunningham; by ignoring the habeas agreement and stopping Cunningham's testosterone therapy regimen, causing his total serum count to crash to the 47 ng/dl tested on October 2, 2020.

69. The defendants callous indifference to Cunningham's physical and mental well being, in disregarding the impact of sudden cessation of the testosterone therapy on plaintiff's many other ailments and conditions, as discussed in greater detail infra.; has caused Cunningham severe physical and mental pain and suffering, as it affects so many aspects of a Male's normal life functions.

70. A 2008 study on low testosterone and it association with type 2 diabetes, a condition afflicting Cunningham; reported that androgen deficiency is a "clinically under-diagnosed endocrine disorder affecting ... up to 50 percent of men diagnosed with type 2 diabetes."

71. However, Lupis, and the other stated defendants; know that Cunningham is both diabetic and testosterone deficient, and how each condition negatively impacts the other.

72. "Metabolic syndrome," which includes obesity, which afflicts Cunningham; especially abdominal obesity, diabetes, high blood pressure, and cholesterol problems have a common denominator: testosterone deficiency.

73. Correcting testosterone deficiencies, along with other hormone deficiencies in men, can reverse metabolic syndromes and greatly improve health in many ways, from improving bone mineral density and body fat composition, to reducing risk for heart disease, diabetes, cancer, stroke, and Alzheimer's disease.

74. Testosterone is necessary for maintaining high energy levels and vitality, increasing muscle mass and overall strength, men simply can't build muscle without it; enhancing the ability to burn body fat, especially around the waist and inside the abdomen; improving mood and emotional well-being, preventing bone loss, mental acuity, and protecting the heart.

75. Low testosterone level is an independent risk factor for metabolic syndromes and Type II diabetes, as well as thyroid problems

76. In addition to the sexual functions most people associate with testosterone levels, symptoms of low testosterone include declining physical energy, disturbed sleep, emotional swings, irritability, anxiety, depression, foggy thinking and memory lapses, increased cardiovascular issues, loss of strength, poor skin tone, saggy and wrinkled skin, reduced lean muscle with higher body fat, weaker bones, osteopenia and osteoporosis.

77. A man with low testosterone could face a greater risk for heart disease, Alzheimer's, prostate cancer, frailty, and sarcopenia, as well as face a 33 percent greater risk of death over the next 18 years of life compared with men who have higher, normal, testosterone levels.

78. The heart (myocardium) is the organ with the highest concentration of testosterone receptors. Testosterone has been linked with reducing coronary artery disease (CAD) and hypertension risks, as well as improving cardiac function.

79. Low testosterone levels are associated with increased risk of atherosclerotic cardiac disease; Older men treated with testosterone therapy experience decreases in total cholesterol and LDL.

80. The brain is second only to the heart in terms of abundance of testosterone receptors. Testosterone is associated with maintaining cognitive function, lowered dementia risk, and decreasing symptoms of depression, anxiety, and panic disorders.

81. Each time Cunningham learned of Lupis's cessation of his medical care, Cunningham wrote Inmate Request Forms and Health Service Reviews trying to correct the deficiency in care, only to receive written responses from Lupis, including, but not limited to: "I'm not sending you for a specialist, you'll just have to get use to it"; and; "if we don't know about it, we don't have to treat it", that he said directly to Cunningham in response to requests for diagnostic testing; which evidence his clear disregard for the plaintiff's suffering.

82. Lupis has repeatedly referred to Cunningham derogatorily as a "needy inmate" and a "nuisance", without any recognition that the state takes its inmates as it incarcerates them.

83. In fact, Lupis has intentionally and maliciously ignored the recommendations of the specialist in endocrinology, Emily Davis (Davis), at Trinity Health of New England, Medical Group; refusing to restart the recommended testosterone therapy and conduct the specialty testing necessary to completely evaluate Cunningham's medical needs.

84. Instead, Lupis, unhappy that Davis wanted to adequately test and diagnose Cunningham; discontinued the follow-up care scheduled, cancelling and refusing to reinstate the treatment by Davis, simply to save money at the expense of Cunningham's well being.

85. Further, in most instances where Cunningham begged, pleading that his "body is falling apart... [and Lupis is] killing [his] soul...", as occurred on November 8, 2020; Lupis was more concerned that plaintiff wrote into some of the "response" section of the Inmate Request Form, saying "Please do not compose in the response area", without ever addressing Cunningham's plea for care and treatment; despite the forms clear instruction that Lupis could "Continue on back if necessary", and without calling plaintiff to medical to discuss his pleas, for treatment.

86. On October 11, 2020, Cunningham wrote attempting to explain his long history of dealing with testosterone deficiency and his knowledge that the "osteoporosis is only partially [r]evers[i]ble" (emphasis in original), and Lupis sarcastically replied "You do not qualify for AMA membership but I will look into it for you if you want", without a single word

for the issues presented by Cunningham's writing, including that he needed an increase in his "Vitamin D [r]eplacement [because] even with the pill [he was receiving,] it is [at a] Rock Bottom Low."

87. On August 13, 2020, Lupis responded to Cunningham's pleas by stating "... your testosterone is not medically indicated due to multiple comorbidities," basically saying that because he knows Cunningham is dying from multiple ailments, there is no reasons to treat him for low testosterone, despite the AUA guidelines establishing that proper testosterone therapy can slow, retard and even cure some of those comorbidities.

88. In actually responding to a request on October 16, 2020, Lupis's indifference to Cunningham's condition was on clear display when he stated "⑤ this month is a blue moon (Oct 2020) so you are lucky that I am dealing with it."

89. No inmate should be relegated to praying for a "blue moon" for their primary care provider to "dealing with" any of their comorbidity issues.

90. On October 1, 2020, Lupis exhausted Cunningham's administrative remedies regarding his need for testosterone therapy by disposition of his Health Services Review # 137-28933-20 as "No Further Action", improperly finding that Cunningham was "... not medically indicated for testosterone administration".

91. Walker repeatedly remained deliberately indifferent to plaintiff's need for care and impeded and delayed the receipt of that care by maliciously returning plaintiff's Health Services Reviews (HSRs) to Cunningham, improperly as Returned Without Disposition, without any basis, and in violation of Administrative Directive 8.9, governing HSR's.

92. In the 6 months between Lupis's discontinuance of the testosterone therapy, from June 2020 through December 2020; plaintiff gained 27 pounds, and more since; just from the cessation of the therapy.

93. Defendants knew or should have known that their actions, or lack thereof; would cause plaintiff harm, injury and mental and physical suffering; as herein described.

94. Cunningham was harmed and injured as a direct and proximate cause of the defendants actions, or lack thereof; as herein described above, and below, including but not limited to: upon information and belief, plaintiff reasonably believes and thereby alleges that

defendants actions, or lack thereof, has caused:

a) Muscle and Joint degradation whereas:

    i. low testosterone slows the bodies ability to repair itself following injury and exercise, and;

    ii. tendon and ligaments become less pliable and injured more readily, and;

b) aggravation of plaintiff's Type II diabetes, whereas:

    i. testosterone therapy helps lower blood sugar, also known as causing hypoglycemia; and elimination of that therapy can cause hyperglycemia and greater insulin resistance, and;

    ii. required Cunningham to take higher doses of insulin

    iii. slowed the healing process in plaintiff's lower extremities, and;

    iv. increased plaintiff's peripheral artery disease or clogging of his veins, and;

    v. increased plaintiff's arterial sclerosis or cracking of his veins, and;

    vi. caused greater vision blurring and a faster rate of occular degeneration, and;

    vii. dizziness and loss of coordination as plaintiff's sugar levels increase, and;

    viii. the loss of focus, concentration and mental accuity, and;

    ix. excessive dry eyes and skin, and;

    x. excessive thirst, dry mouth and excessive urination, and;

    xi. increased loss of sensation in plaintiff's extremities from loss of blood flow, also known as venous insufficiency, and;

    xii. increased diabetic neuropathy, pain, tingling and prickly sensations in plaintiff's extremities, and;

    xiii. rapid loss of body hair, to include balding; and;

    xiv. lower extremity edema (swelling), and;

    xv. increased degeneration of tissue and loss of collagen in the extremities, and;

c) Bone Demineralization (osteoporosis); whereby:

    i. plaintiff's bones have become more brittle and weaker, and;

    ii. plaintiff has suffered bone chipping in his right elbow leaving free floating foreign bodies in the joint and impairing his movement, and;

    iii. plaintiff has suffered greater expansion of his joints and bone splitting, and;

    iv. muscle atrophy and muscle degradation, and;

v. increase in body fat and decrease in muscle composition, and;

vi. suffered acceleration and aggravation of his degenerative joint disease (arthritis), and (DJD)

d). Impaired plaintiff's Manly Mindset and mental accuity, causing:

i. extreme depression, and;

ii. penile shrinkage due to loss of testosterone for long periods, and;

iii. fatigue, and;

iv. lack of motivation, and;

v. loss of activity and daily functions, and;

vi. lethargy forcing Cunningham to sleep nearly the entire day, and;

vii. loss of energy, and;

viii. loss of endurance, and;

ix. loss of sexual arousal or attraction to female (or male) stimulus or visual stimuli, and;

x. no morning erections and overall emotions of feeling castrated, and;

xi. no concentration, and;

xii. negatively affected plaintiff's cognitive and reasoning functions, including, short-term-memory, and;

xiii. highly irritable and frustrated, and;

xiv. uncontrolled weight gain and slowed metabolism, and;

xv. hot flashes and hot sweats, and;

xvi. gynecomastia, the benign enlargement of male breast tissue, and

xviii. migraine headaches, and;

e) Cardiac Muscle Weakness, that:

i. requires the heart to work harder, and;

ii. reduced blood flow within the body which is excessively detrimental for diabetics, and;

iii. increased the risk of heart attacks and stroke

95. Therefore, plaintiff prays this court grant the following relief:

a) compensatory damages of $100,000⁰⁰, in addition to further damages pled herein,

b) punitive damages of $100,000⁰⁰, in addition to further damages pled herein,

c) costs and attorney fees

d) injunctive relief commanding defendants to reinstate plaintiff's testosterone therapy

and continue and maintain the provision of such therapy through the end of plaintiff's sentence of incarceration, and any future incarcerations, if any, and;

e) such other relief as this court deems just and equitable.

## Legal Claims

96. Defendants actions, or lack thereof, in remaining deliberately indifferent to plaintiff's serious medical need for testosterone therapy, and the serious health consequences of the denial thereof; constitutes as Cruel and unusual punishment in violation of the Eighth Amendment to the United States constitution and negligent and intentional infliction of emotional distress under the laws of the State of Connecticut, and breach of contract, and violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act.

Count Three:

1-97. Paragraphs numbering 1-96 of the foregoing are incorporated here by reference as if set forth at length and made a part hereof this the Third Count.

98. Cunningham is a type II diabetic who is reliant on insulin for his very survival.

99. His diabetic condition, as well as his testosterone levels, and many other conditions; are interdependent on each other, for maintenance and control of the others, and add to his fat and salt retention, and overall obesity, which itself affects everything else; including causing thyroid problems. now

100. These metabolic syndrome conditions are so inter-related as to be insepperable when considering the medical care necessary to treat a patient, like cunningham.

101. Intra-abdominal fat produces not only harmful hormones but also free fatty acids. These free fatty acids are directly transported to the liver, where they can interfere with insulin metabolism and create a state of hyper insulinemia (high insulin levels), insulin resistance, poor blood sugar control, salt retention, high blood pressure, and silent inflammation - all major causes of disease and hormone deficencies.

102. Insulin not only regulates blood sugar, it also plays a very important role in fat metabolism by increasing the secretion of lipoprotein lipase, which increases the uptake of fat from your blood stream into the body cells.

103. The major cause of insulin resistance is poor nutrition and lack of exercise, as are at issue in this action below. As body fat increases, an individuals insulin receptor sensitivity plummets.

104. As insulin sensitivity drops, insulin secretion from your pancreas increases, triggering a multitude of changes, which include, but may not be limited to: damage to the lining of the heart's blood vessels (endothelial dysfunction), interference with the enzymes that break down fats in your blood, and interference with the kidney's ability to get rid of sodium causing high blood pressure.

105. Both aerobic and resistance training have been shown to reverse insulin resistance, as discussed further below.

106. Controlling insulin levels, can best be achieved by eating small meals and carefully controlling the intake of carbohydrates, limiting your choices to those with a low glycemic index, including most fruits and vegetables, and a few of the whole grains; as part of a well rounded diet.

107. It is also important to always eat a high-quality, low-fat source of protein with any carbohydrate that is consumed. The ratio of gram-to-gram of protein to carbohydrate needed to achieve ideal insulin control is between 0.5 and 1.0.

108. A recent study in the American Journal of Nutrition compared diets with the same number of calories but different protein to carbohydrate ratios. The diets with a protein-to-carbohydrate ratios of 0.6 and higher, keeps insulin levels low and maintains a positive nitrogen balance.

109. The diet higher in carbohydrates and lower in protein, such as the American Heart Association Diet, with a protein-to-carbohydrate ratio of 0.25; tends to increase insulin secretion and a negative nitrogen balance.

110. A negative nitrogen balance means the individual is breaking down muscles to provide energy for the body, which is bad for the body, because it is so hard to build muscles, and takes a long time; and muscles aid the body in burning calories and body fat.

111. Plaintiff believes and thereby alleges that the p.or master menu plan has a protein-to-carbohydrate ratio of 0.25, or lower, causing muscle degradation, aggravating diabetic conditions, and, in some cases, causing diabetes, and obesity.

112. Elevated blood sugars is called glycation, or glycosylation; the process in which sugar molecules floating around within the bloodstream become attached to proteins and nucleic acids, producing new, and very dangerous, chemical structures.

113. Ninety-nine percent of all cellular activities depend on a vast array of proteins in our bodies, and when sugars bind to them they become dysfunctional and create major problems for diabetics, like Cunningham.

114. These glycated proteins are called advanced glycation end-products (AGE's) and they attack collagen, which is used to make, repair or rebuild; ligaments, tendons and other connective tissue vital for muscle strength and growth; and nucleic acids, which are vital to the synthesis of new proteins.

115. Glycated proteins become very "sticky" and adhere to the inside walls of blood vessels, causing endothelial dysfunction, which leads to vascular dysfunction; the inability of the artery to properly dilate and constrict.

116. This causes the build up of venous plaque, which obstructs blood flow to our hearts, brains, hands, feet, eyes, muscles, the penis, and other vital organs. Over time the function of all of a diabetics cells and arteries becomes seriously compromised, with significant health consequences, including both mental and physical deterioration, even to the point of requiring amputations of the extremities, hands and feet; of diabetics.

117. Glycation is an entirely passive process and does not require any chemical reaction. It is simply dependent on the number of sugar molecules in an individuals bloodstream – the more there are, the more AGE's that are formed, and the more we pollute our bodies.

118. Most authorities agree that glycation is most responsible for the development of degenerative disease. Glycation is also associated with chronically elevated insulin levels.

119. Insulin not only promotes central obesity (big bellies), but also prevents the fat cells from converting their stored fat into the free fatty acids that are required for the body's energy needs.

120. Because diabetics are unable to tap into this huge energy reserve, they get tired and hungry in between meals when their blood sugars are low, including Cunningham.

121. Glycation can be measured by the Hemaglobin A1C test, with an optimal value between 4.0 and 5.5 percent.

122. Typical levels seen in Type II diabetics are between 8 and 11 percent, like Cunningham.

123. If a diabetics A1c level is between 8 and 11 percent, the individual is usually described as being insulin resistant, requiring heightened monitoring and greater levels of fluxuating insulin therapy regimens.

124. Plaintiff believes and thereby alleges he is insulin resistant.

125. When glycation rates are controlled and kept low by the right nutrition and exercise programs, insulin levels are also kept low.

126. Rather than providing Cunningham with adequate, proper and meaningful, management and care for his diabetic condition, the defendant, Lupis, in conspiracy and concert with defendants Lamont, D.O.C., Furtick, Kennedy, Gallagher, Mulligan, Barone, Poran, Snyder, Castro, Shea, Quiros, Cook, Barbara, Doe, Anker, Alvarez, Diaz, Walker, Lightner, McPherson, Wright, Freston, Doe 1, Farinelle, Grant, Fresten, Lockery and Doe 2; have denied, minimized, refused and eliminated such care and management to save money, for staff convenience or simply to punish Cunningham.

127. Defendants have refused to provide Cunningham sufficient daily insulin, commensurate with his blood sugar levels; to safely manage and regulate his blood sugar, causing:

a) defendants fail to consider that Cunningham is severely insulin resistant and requires higher doses of insulin, than may be average; where no one size fits all, and;

b) as a result Cunningham's blood sugar remains higher causing greater damage to the plaintiffs veins, tissue, muscles, joints and vision, among others, and;

c) defendants actions, or lack thereof, has increased Cunningham's diabetic neuropathy and the pain associated therewith, and;

d) caused the decrease of blood flow to Cunningham's extremities, and;

e) affected Cunningham's cognitive functions, and short term memory leaving him

disoriented and confused, and;

f) caused greater dehydration leaving Cunningham suffering dry mouth, extreme thirst and more frequent urination, and;

g) causes Cunningham to remain lethargic, tired, and constantly napping throughout the day,

h) left Cunningham constantly hungry and feeling the need to snack frequently throughout the day because his fluxuating sugar levels do not allow proper use of the plaintiff's body's energy reserves.

128. Defendants have failed and refused to provide Cunningham the proper diet, as discussed further below, even after recommendation by the endocrinologist specialist, that Cunningham receive a low residue, high fiber, high protein, low simple carbohydrate (e.g., no potatoes, no pasta, no white rice), and high in leafy green vegetable diet; because the D.O.C.'s Master menu plan is high in complex carbohydrates, which can be deadly for diabetics in that they break down in the body into complex sugars that the average person has a harder time processing, requiring greater insulin production; versus simple sugars.

128. Defendants have failed and refused to provide Cunningham proper, adequate and meaningful care and management of his diabetic pain by:

a) providing inadequate Gabapentin dosages to manage the subjective pain to a bearable and tolerable level for Cunningham, and;

b) maliciously reduced Cunningham's prior Gabapentin levels, which more adequately treated plaintiff's pain, and;

c) maliciously eliminated plaintiff's a.m. dosage of Gabapentin and;

d) placed Cunningham on an improper dosing cycle, simply for staff convenience; leaving plaintiff to suffer for longer periods in between doses than normal or tolerable, and;

e) failed to moderate and increase dosages to account for Cunningham's developed and natural tolerance to the medication, and;

f) failed to account for the progression of plaintiff's diabetic condition and the increased subjective levels of pain caused by the worsening tissue and vascular damage, and;

g) refusing to regularly and continuously provide replacement compression socks and sleeves to manage Cunningham's venous insufficiency, and; edma and

h) Failed and refused to provide adjunctive pain management therapy, combined medications at lower doses (including Cymbalta); to manage plaintiff's subjective levels of pain to a tolerable level.

130. Defendants have failed and refused to provide proper, effective and meaningful care and treatment for plaintiff's heightened risk of blood clots (Deep Vein Thrombosis), by :

a) failing to recognize the increased risks for diabetic, peripheral artery disease, presenting as the thinning or constriction of the veins, and;

b) failed to treat or test for any of these diabetic conditions in an attempt to monitor and regulate the advancement of the diabetic condition, and;

c) failed and refused to provide any necessary blood thinners or anti-coagulation therapy, and;

d) refused to provide adequate ambulatory means to alleviate risks, including properly sized knee braces, Upright walker or arm crutches, as discussed further below, and;

e) intervened to prevent and hinder plaintiff's gym access and exercise opportunities, as discussed further below; despite diagnosing Cunningham as being at high risk of Deep Vein Thrombosis (DVT).

131. Defendants have failed and refused to provide proper, effective and meaningful care and treatment for plaintiff's Venous insufficiency, the cracking and splitting of the plaintiff's Veins, including, but may not be limited to:

a) arterial sclerosis, and;

b) the rapid progression of the venous insufficiency due to the inadequate insulin level maintenance, and;

c) refused to provide diagnostic testing to assess the plaintiff's current condition and to monitor the progression of the disease, and;

d) inadequate treatment to prevent the progression of the disease by the provision of 20-30 mm compression socks and sleeves and blood thinners.

132. Defendants have completely eliminated all routine podiatric foot care and maintenance for diabetics, including, but not limited to, bi-annual podiatric examinations for evaluating and management of care needs, no toe nail clippings as were necessary because the D.O.C does not sell toe nail clippers and most diabetics cannot perform their own toe nail care for varying reasons, and no other routine foot care management.

133. Defendants have eliminated all of Cunningham's diabetic dry skin care regimens, including, but not limited to:

a) eliminated plaintiff's Gold Bond powder, and;

b) eliminated plaintiff's Eucerin skin cream, and;

c) eliminated plaintiff's anti-fungal cream

134. Defendants have failed and refused to provide proper, effective and meaningful care and treatment for diabetic optical needs, by:

a) eliminating diabetic optical care services that were routine, and;

b) refusing to issue new eye glass prescriptions, except every 26 months, even when the eyeglasses are broken or the prescription changes, and even when D.O.C. staff mistakenly discard or destroy the glasses, and;

c) refusing to treat the condition known as photophobia or light sensitivity.

135. Defendants have failed and refused to treat the edema associated with diabetics, including:

a) failing to provide routine kidney functions testing, and;

b) failing to monitor and treat the tissue degradation and collagen loss caused by the swelling, and;

c) failing and refusing to provide any edema treatment regimen beyond the provision of compression stockings. and [illegible] level of diuretic and [illegible]

136. Defendants have also failed and refused to monitor Cunningham's high blood pressure by failing to perform regular blood pressure checks.

137. Plaintiff's frustrations in the improper care and treatment of his diabetes, culminated in an Inmate Request Form to Shea, dated December 18, 2020, wherein Cunningham,

after exhaustive attempts to have defendants provide care; wrote:

"Now this _____ !? has canceled my Diabetic pain med I'm now letting you know I'm listing you in state civil suite (sic) and federal suit I'm tired of _____ like you and him _____ with peoples health and well being you have never Done anything for inmates but _____ and that's not Right Civil Rights Violation Corpral Punnishment What is wrong with you people". (Blank spaces in original, spelling is consistent).

138. Rather than expressing any concern for Cunningham's obvious suffering, or asking how she may be of service; Shea sought to intimidate plaintiff writing: "... I would like to remind you that threatening and offensive language is inappropriate in these correspondences.", when no threat or offensive language was used in plaintiff's writing.

139. Prior to this, Cunningham suffered years of deficiency in his medical care, writing daily to the defendants begging, unsuccessfuly for adequate care and treatment.

140. As just a limited example of the defendants indifference, on or about November, 2018, Cunningham was under the care and supervision of McPherson as his primary care provider, including his diabetic condition, and had been under her care for epproximately 8 months.

141. However, McPherson failed and refused to adequately monitor, manage or treat Cunningham's diabetes, despite plaintiff's near daily written requests and HSR's begging for care.

142. In fact, Cunningham became so desperate for care, because of the symptoms he was experiencing; he began begging other staff to provide him diabetic care, including Viktoriya Stork APRN, who ordered blood testing.

143. On November 29, 2019, Cunningham received a "Notification of Test Results", from APRN Stork; informing plaintiff that his A1C was the life threatening "10.4%, which was increased from the previous test... 7.6%", which itself was above and well beyond the maximum safe threshhold as evidenced by APRN Stork's statement that "well-controlled diabetes is when the level of HgB A1C is less than 7.0%."

144. This "previous test [of] 7.6%" put McPherson on clear notice that Cunningham's diabetic condition was in a state of distress and out of control, requiring immediate care and monitoring.

145. APRN Stark informed Cunningham that "Decreasing HgB A1C levels by every 1% may reduce your risk of micro-vascular complications such as diabetic eye, nerve, or kidney complications by 60%.", recommending Cunningham be on insulin and monitor his glucose "4 times per day."

146. However, on or about January 24, 2020, Cunningham was forced to write Shea informing her that "McPherson is [still] Refusing to monitor [and] adjust insulin to lower blood sugar" because his daily glucose was "in the 300 Range [when] its supposed to be 80 to 120."

147. Despite a policy of the D.O.C. that Inmate Request Forms be responded to within 15 days, it was not until February 25, 2020 that Shea finally decided to respond to Cunningham, leaving him to suffer continuing damage from the diabetic high sugar; writing that she "ha[s] spoken with APRN McPherson, she is aware of your condition and is monitoring you appropriately."

148. It does no good for McPherson or Shea to be "Monitoring" a 300 plus, glucose number, reoccurring up to 4 times per day; and do nothing to adjust insulin levels to reduce the number to one that is not life threatening.

149. On January 30, 2020, in response to a separate writing Pica informed Cunningham that Furtick referred plaintiff to follow-up with provider, ignoring plaintiffs pleas for care, ignored by McPherson.

150. On or about March 29, 2020, still begging McPherson for care, Cunningham wrote describing his diabetic symptoms, including excessive thirst; informing her that he had been seen at "Prompt Care", however, instead of taking action, McPherson responded by affixing a sticker to the request saying "... Sign up for Prompt Care ...".

151. On April 29, 2020, Walker interfered with plaintiff's attempts to address his "Health Problems Due to high Blood Sugar"(sic)*, by returning Cunningham's HSR as Returned Without Disposition in direct violation of A.D. 8.9, governing the HSR; thereby delaying and preventing plaintiff's receipt of care.

152. On August 3, 2020, RN Ostheimer informed Cunningham that he had been scheduled for Endocrinology and Vascular Surgery, inter alia, consults; which Lupis, Furtick, Freston, Luckery and Grant conspired to cancel, despite plaintiff's continued high sugar.

153. After cancelling the specialist care, Lupis began mocking Cunningham, ignorantly playing like he couldn't understand why a diabetic patient should see a vascular or urological specialist or endocrinologist.

154. Lupis continuously ignored plaintiff's pleas for insulin-adjustments, instead, evidencing more concern for whether Cunningham had written into the response section of the Inmate Request Form, and repeatedly sending them back to Cunningham with the notation "Please leave space for response", written large enough to cover multiple lines of the form, including, inter alia, on or about October 24, 2020; November 8, 2020; leading to greater physical and emotional injury

155. Instead, Lupis would suggest, on multiple occasions that include November 13, 2020; that "I am current [ly] treating youre (sic) for your diabetes and other endocrine concerns", despite his failures and inability to address many of plaintiff's physical deterioration, and increasingly fluctuating glucose levels. and other endocrine issues and

156. In fact, in a separate response to Cunningham's complaints of insulin resistance and concern that he was not receiving high enough doseges, saying: "look enough is enough my # was 309 [at] 4 am this morning, I got 954 [antir] N[PH]50 N[ova]Log 23 [and at] 10 a.m. with no food my # 301 ... This is crazy! ... Please Do something Raise my Insulin Before I Loose (sic) my Feet or Die..."; Lupis responds, acknowledging many of plaintiff's issues herein raised; saying: "At this time, your insulin Resistance is complicated by your poor dietary habits [,] lack of exercise, chronic use of your wheel chair and decreased use of oral hypo glycemics. Raising insulin is not the immediate Answer."

157. However, so many problems are exhibited by this one response by Lupis that evidences his deliberate indifference to Cunningham's care, and supports the position that in fact insulin is the only "immediate answer" to plaintiff's glucose numbers, including:

a) the "poor dietary habits" referenced by Lupis were caused by Lupis who rejected the endocrinologists recommendation for a high protein, high fiber, low residue diet, and, even were the proper diet instituted it would take time to affect plaintiff's glucose levels, and;

b) the "lack of exercise", as discussed further infra; referenced by Lupis, was caused by Lupis, in conspiracy with McPherson, Anker, Gallagher, Alvarez, Kennedy, Barone, Snyder,

and Doran; to impede and discontinue the gym pass awarded to Cunningham, in resolution of the habeas; allowing plaintiff to go to the gym and exercise one hour a day, five days per week, for diabetic, dietary and orthopedic rehabilitation, and, even were the defendants to reinstate that pass, it would take significant time for the exercise to have any therapeutic effect on plaintiff's glucose levels, and;

c) the "chronic use of your wheelchair", discussed further infra; referenced by Lupis, was caused by Lupis, in a conspiracy with McPherson, Anker, Gallagher, Kennedy, Barone, Snyder and Doran; to deny Cunningham a replacement, properly sized knee brace, arm crutches and/or upright walker, despite repeated requests; and, even were the defendants to finally allow these ambulatory aids, it would still take considerable time for the added ambulation afforded by the devices, to be realized in plaintiff's daily glucose levels, and;

d) the decreased use of oral hypoglycemics, referenced by Lupis, is caused by Lupis who has conspired with McPherson, Anker, Gallagher, Kennedy, Barone, Snyder and Doran to save money by reducing or eliminating plaintiff's medications. Plaintiff cannot write his own prescriptions after all. and is allergic to some, others cause kidney damage (ing)

158. Despite the extreme lengths that Lupis and the remaining defendants have gone to impede Cunningham's diabetic care and maintenance, to include vascular and endocrinologist specialty care, among many, many others; on January 21, 2021, in response to plaintiff's continued pleas for care and treatment for blood clots, to avoid DVT; Lupis responds that: "Non mobility can lead to development of DVT. Signs and symptoms of these have not been seen at this moment.", despite the fact that (a) defendants are denying, and preventing plaintiff's ambulation, and; (b) Cunningham has repeatedly described symptoms of DVT to Lupis, in writing; and, Cunningham's many conditions place him at extremely high risk of DVT, and he need not await a thrombosis event to require preventive care, and maintenance.

159. The defendants knew or should have known plaintiff would be harmed and injured as a direct and proximate cause of their actions, or lack thereof.

160. Cunningham was harmed and injured as a direct result of defendants actions or lack thereof, suffering permanent and irreparable physical harm, pain, suffering and mental anguish as

herein alleged above, and below.

161. Therefore, plaintiff prays this court grant the following relief:

a) Compensatory damages of $356,000°°, in addition to further damages alleged herein, and;

b) Punitive damages of $350,000°°, in addition to further damages alleged herein, and;

c) injunctive relief commanding defendants to provide plaintiff proper, effective and meaningful diabetic care, including, but not limited to:

(i) insulin control of daily glucose levels

(ii) treatment and monitoring by specialist in endocrinology, urology, and vascular treatments for diabetics, and;

(iii) proper exercise, diet and ambulatory care, and;

(iv) proper, adequate, effective and meaningful diabetic pain management to a bearable level consistent with the subjective needs of Cunningham,

through to the plaintiff's end of sentence, and any future incarcerations, if any, and;

d) costs and attorney fees

e) such other relief this court deems just and equitable

## Legal Claims

162. Defendants conduct, actions and lack thereof, in failing to provide plaintiff with proper, meaningful and effective management and treatment for plaintiff's diabetic condition constitutes as cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, intentional and negligent infliction of emotional distress under pendente state law, breach of contract and violations of the ADA and Rehabilitation Act.

## Count Four:

1-163. Paragraphs numbering 1-162 of the foregoing are incorporated here by reference as if set forth at length and made a part hereof this the Fourth Count.

164. As part of the medical problems suffered by Cunningham, which defendants are obliged to treat as part of plaintiff's incarceration; is numerous varying orthopedic problems associated with plaintiff's joints, bones and ligaments.

165. Each of these orthopedic issues is aggravated by, and dependent on the proper care and maintenance of the other orthopedic conditions, as well as plaintiff's testosterone deficiency and diabetes, and the other issues herein below

166. On or about 1989, prior to his incarceration, Cunningham injured his right knee, tearing the ACL, requiring that part of his cartilage and miniscus be removed.

167. After extensive therapy, plaintiff was able to recover his ability to walk, because of his youth; regaining approximately 80% range of motion, but only through the use of a heavy-duty-hinged, custom made, knee brace (the brace)

168. Absent the brace, Cunningham cannot stand or walk safely, and is at an extreme risk of the knee popping out of place spilling plaintiff onto the floor.

168. Any shift of body weight, bearing over the right knee, causes the knee joint to begin to dislocate, and shift forward out of place; including for minor activities like reaching for items with his right arm.

170. Cunningham's knee frequently dislocates, even while sitting on the toilet the joint slides out of place sitting normally, and plaintiff must manipulate the knee back into place prior to standing up.

171. The knee causes plaintiff extreme and constant pain at a level 4-5 while sitting, and 6-8 while walking, out of a 1-10 pain scale; even while wearing the brace.

172. Walking with the brace for one (1) hour; broken up over a 2 day period of recreation opportunities; causes plaintiff's knee to swell beyond the capacity of the brace and prevents Cunningham from ambulating for as much as 7 to 10 days.

173. However, Cunningham's current knee brace that is improperly sized for plaintiff's knee, due to a variety of reasons including, but may not be limited to: osteoarthritic growth of the knee joint and, edema of the leg, and diabetic weight gain; and the defendant, Lupis, in a conspiracy with Lamont, Furtick, Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Castro, Shea, Quiros, Cook, Barbara, Doe, Anker, Diaz, Walker, Lightner, McPherson, Wright, Freston, Farinella, Grant, Freston, Lockery, and Doe 2; to save money off the medical care budget, and costs of care for Cunningham; have failed and refused to provide plaintiff a new brace that fits.

174. Instead, plaintiff has been left unable to ambulate, confined to the cage and reliance on a wheelchair for all his ambulation, simply because he cannot place his immense weight on his knee without causing severe damage.

175. Cunningham's inability to ambulate greatly affects, and is aggravated by, the plaintiff's testosterone deficiency and diabetic sugar levels, and is a source of ridicule and mocking by Lupis.

176. In addition to refusing to provide a properly sized knee brace, defendants are:

a) refusing to provide pain management, including a low dose pain reliever opioids and cortisone shots in the knee joint twice yearly, limiting plaintiff to a low dose of tylenol, and;

b) defendants discontinued the plaintiff's Tylenol 3 pain medication that provided at least some relief, and;

c) refused to prescribe any anti-inflammatory, and;

d) refused to provide any supportive walking aids, such as forearm crutches or an upright walker, to aid in ambulation and ensure safe mobility and prevent the micro-dislocations during ambulation that cause damage to the knee joint and increase risks of falling.

177. Instead, Lupis has belittled Cunningham telling him to "just get up and walk" without any knowledge or understanding of the disability and extent of the injury.

178. Cunningham also suffers from untreated orthopedic conditions in his right elbow.

179. On or about July, 2020, Cunningham fell attempting to sit down on his bunk, due to the lack of ADA compliant handholds; striking his elbow on the bunkbeds steel ladder and wrenching his arm up behind his back causing pain to the right shoulder.

180. In 1987, prior to his incarceration, Cunningham had injured this same elbow, but it healed without lasting complications.

181. As a result of plaintiff's fall, the elbow now has multiple loose - free floating - foreign bodies in the elbow joint that plaintiff believes and thereby alleges to be bone chips.

182. Plaintiff experiences a constant, unmitigated pain, at a level 7 out of 10; without movement, that increases to more than a level ten (10) out of 10 with movement.

183. The pain is sharp, shooting, with a grinding sensation as if the bones are being forced apart, within the elbow joint.

184. At times, the foreign bodies are positioned such as to prohibit even minor movements of the joint and may last from 3 to 8 days at a time.

185. Upon shift of the foreign bodies from this restrictive position, Cunningham may regain limited movement for as little as 1 day and as long as several weeks.

186. Any movement of the elbow joint feels like the elbow is trying to dislocate, and while the foreign bodies are in the joint plaintiff loses approximately 45° range of motion, when the foreign bodies are not in the joint the loss of range of motion is about 30°.

187. Cunningham is unable to use any force in his right arm, while the foreign bodies are within the joint; being relegated to pushing his wheel chair backwards, by using his feet; because using his arm to roll the wheelchairs large wheel will cause the foreign bodies to enter the joint, if they are not already in the joint; and when the foreign bodies are not within the elbow joint, Cunningham can only exert approximately 60% of his force on the elbow, which causes extreme and debilitating pain.

188. On or about July 31, 2020, Cunningham underwent an x-ray which identified the presence of these multiple loose foreign bodies, and evidence the change in plaintiff's condition since the x-rays performed in 2015, by the D.O.C.; on that same elbow, with no foreign bodies.

189. Since the injury, the only treatment undertaken by Lupis was to provide Cunningham an arm sling that was too small for plaintiff.

180. Lupis offered no pain management and in fact eliminated pain medications plaintiff was receiving for his other conditions that may have provided some limited relief.

191. Cunningham believes and thereby alleges that the elimination of his testosterone therapy, likely made his bones brittle leading to the injury, but for defendants actions, or lack thereof; would not have occurred.

192. Lupis was clearly indifferent to Cunningham's suffering, when, prior to the July 31, 2020, x-ray; Lupis told Cunningham he was "just faking to get his testosterone therapy".

193. Lupis completely dismissed outright Cunningham's requests that Lupis review the 2015

X-ray radiologic reports together, with the 2020 radiologic report, to compare the differential changes; so that he could maliciously allege the new injury was the same as the old injury and use that "old injury" analysis as the basis upon which to deny cunningham any and all treatment.

184. Lupis also rejected outright Cunningham's requests that an orthopedist be consulted to determine the necessary treatment, simply to save money off the costs of providing medical care to the plaintiff, not until they found out about this law suite

195. Another orthopedic issue afflicting Cunningham, that remains untreated by the defendants and is aggravated by the denial of testosterone therapy and defendants failure to provide effective and meaningful care and mitigation of plaintiff's diabetes is a torn right rotator cuff and tendon.

196. On or about 2013 the injury originally occurred when a C.O. was cuffing Cunningham behind his back, through the cell-door-trap, and yanked the arm out through the trap, and upwards; because Cunningham shear size in his arms prevented the arm from safely extending out of the waist-level, small trap door-way, while plaintiff's arms were behind his back.

197. The injury remained essentially untreated by defendants, and, during the fall on or about July 2020; the injury was re-injured and made worse when plaintiff's arm was again yanked forcefully up behind his back after striking his elbow.

198. An X-ray and subsequent MRI confirmed Cunningham suffered a torn supraspineatis tendon in the right rotator cuff, which helps hold the ball and socket in place.

199. This injury causes plaintiff constant pain at a level 2 out of 10 pain scale, and at a level 5 when it pops out of place, feeling like it is dislocating; and is most severe when plaintiff reaches behind himself to wipe following bowel movements.

200. Cunningham experiences a grinding sensation lowering and raising his arm and during bouts of his bursitis flare-ups, plaintiff's shoulder will suffer a constant throbbing pain of 8 out of 10, that may last from 8-14 days at a time.

201. Cunningham suffers from a varying reduction in his range of motion, that is incalculable, because it depends on the activity he is performing, and the degree to which his elbow

is aggravated.

202. Lupis, in a conspiracy with Lamont, Furtick, Kennedy, Gallagher, Mulligan, Barone, Peron, Snyder, Castro, Shea, Quiros, Cook, Barbara, Joe, Anker, Diaz, Walker, Lightner, McPherson, Wright, Freston, Farinella, Grant, Fraston, Lockery and Ruez; to save money off the medical care budget, and costs of care for Cunningham; have failed and refused to provide Cunningham any meaningful or effective care for his shoulder.

203. Defendants have provided no treatment whatsoever, except to give Cunningham a simple neoprene strap-brace, that is not properly sized to fit Cunningham's morbid obesity; when the type of injury normally requires the use of a shoulder harness, designed to alleviate the stress on the ball-joint and avoid seperation; that is properly fitted and sized for the patient.

204. Said defendants have refused to provide Cunningham with any pain management options, including, but not limited to: cortizone shots usually recommended for treatment of similar injuries, or low doses of Tylenol 3 or comparable alternative.

205. In fact, instead of providing treatment, Lupis attempted to interfere with Cunningham's use of the improperly sized strap-brace, that was given to him by another doctor; who was trying to prevent further injury to the rotator-cuff, and despite Lupis being on clear notice the strap-brace does not fit properly, he still refuses to provide a properly sized strap-brace or a shoulder harness.

206. On November 13, 2020, in response to Cunningham's pleas that he be evaluated for his treatment of his orthopedic ailments, including pain management; of his "Hip, Shoulder, Elbows", Lupis mocked him responding: "I am not inclined to set up an appointment with a specialist before I have ... treated you for your condition..." and then simply continued to refuse to treat these conditions.

207. Lupis' response on November 5, 2020, was "Please leave [more] room to respond."

208. On October 26, 2020, Lupis feigned ignorance of plaintiff's medical condition responding "why do you need that appointment?", despite plaintiff's quite frequently and near daily descriptions of his orthopedic injuries requiring treatment.

209. On August 3, 2020, plaintiff received written confirmation from CN Ostheimer that he had been approved for his orthopedic consult and was only awaiting scheduling, then Lupis cancelled that appointment.

210. In his December 25, 2020, writing to Shea, Cunningham begged for orthopedic consult saying he felt like he was "loosing use of [his] arm" which hurt so bad that he "want[s] to cry at night", and Shea, despite having the ability and duty to make sure plaintiff was receiving care, ignored plaintiff's pleas and instead responded to a different writing falsely alleging it contained "threats" and "obscene language", see above.

211. Also on December 25, 2020, Cunningham wrote the "Commissioner of Correction", again, who, in an attempt to avoid liability, intentionally ignored Cunninghams pleas.

212. Lupis callously dismissed Cunningham's "foreign loose bodies", within his elbow x-rays saying "because your x-ray was non impressive..." denying the orthopedic consult he initially stated needed to be performed.

213. On August 13, 2020, Lupis mocked Cunningham's complaints of pain, writing " Bone inflammation / pain improves with weight loss", while preventing the very testosterone therapy, glucose control and exercise capabilities essential to that weight loss.

214. On May 18, 2020, Walker impeded Cunningham's access to medical care to address his orthopedic needs by improperly returning HSR #137-22850-20 as "Returned Without Disposition", in violation of A.P. 8.9; referring Cunningham back to sick call, for a referral to see his provider; despite her clear knowledge that Cunningham has been seen by sick call and his providers repeatedly for the same issues.

215. On October 1, 2020, Lupis exhausted Cunningham's orthopedic issues by disposition of HSR #137-28934-2020 as "No Further Action" claiming "I am currently treating, assessing, evaluating your orthopedic medical concerns.", without ever actually doing any such thing; and despite the continued inaction of prior providers.

216. Defendants improperly believe that if they simply change an inmate like Cunningham's provider, the new provider can milk out another period encompassing years of inaction and refusals to provide medical care premised on this "assessing and evaluating" scape goat.

217. Defendants knew or should have known that their actions, or lack thereof, would cause plaintiff harm and injury severe pain;

218. Plaintiff was harmed and injured as a direct and proximate cause of the defendants actions, or lack thereof; as herein described above and below.

219. Therefore, plaintiff prays this court grant the following relief:

   a) Compensatory damages of $250,000.00 in addition to further damages alleged herein, and;

   b) Punitive damages of $250,000.00 in addition to further damages alleged herein, and;

   c) injunctive relief commanding defendants provide Cunningham proper orthopedic care and management, including; but not limited to; proper braces, support devices, ambulatory aids and pain management, and;

   d) Costs and attorney fees, and;

   e) such other relief as this court deems just and equitable

## Legal Claims

220. Defendants failures to provide plaintiff adequate, effective and meaningful care and treatment for his orthopedic injuries constitutes as cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, violations of the ADA and Rehabilitation Act, as well as intentional and negligent infliction of emotional distress under state pendente law.

## Count Five:

1-221. Paragraphs numbering 1-220 of the foregoing are incorporated here by reference as if set forth at length and made a part hereof this the Fifth Count.

222. Virtually every doctor treating Cunningham for any of his many medical conditions have recommended daily exercise as a part of plaintiff's treatment plan, whether as part of the testosterone therapy plan to encourage the body to produce its own testosterone; as part of plaintiff's diabetic care to reduce glucose levels, reduce calories and burn fat; and for orthopedic care and rehabilitation of the plaintiff's bones, muscles, tendons and joints.

223. In attempting to meet these treatment goals, Cunningham has expended exhaustive time and energy advocating for the gym access to achieve that ends.

224. The D.O.C. describes these opportunities, in relevant part:

"The ... D.O.C. **Shall** provide ... physical therapy, ... and rehabilitation therapy to inmates in D.O.C. facilities. Physical ... therapy ... services that assist the inmate to **achieve** and **maintain** self-care and improved functioning in activities of daily living". (emphasis added) (see A.D. 8.1, entitled "Scope of Health Services Care").

225. D.O.C. custody and medical staff continuously impeded access to these rehabilitative physical therapy opportunities, requiring that Cunningham file a habeas in the state court system to correct these deficiencies.

226. On or about September 18, 2015, Cunningham entered into a settlement agreement with the state and D.O.C., in which plaintiff was promised, inter alia, 5 days per week gym access, to achieve and maintain his rehabilitative needs; if he withdrew the habeas.

227. Although the D.O.C. custody and medical staff would initially comply with the terms of the habeas agreement, that cooperation was short lived requiring Cunningham to file a second habeas, # TSR-CV-17-4009131-S, and following yet another agreement, defendants soon breached the terms of that agreement necessitating the filing of a federal lawsuit.

228. Cunningham's federal action, docketed as Cunningham vs Knapp, et al, 3:16-cv-1335 (VLB) was resolved between the parties, on or about March, 5, 2019; resulting in yet another agreement between the parties to provide Cunningham a continuous 5 day per week gym access.

229. In reporting on the settlement terms to the court, defense counsel wrote:

"... Anna Jorgensen, M.D., a resident in orthopedic surgery at UConn Health ... prescribed: ... Patient with multiple orthopedic complaints that we will treat ... [with] a physical therapy regimen that the patient can complete with daily gym access that should include resistance bands and kettle weights."

230. The purpose of the gym pass was intended to facilitate the continuous physical therapy regimen necessary for orthopedic rehabilitation of plaintiff's knee, elbow, shoulder, hip, back and arms; to control weight, reduce daily glucose levels, burn calories, burn fat and provide proper vascular health.

231. However, in order to facilitate the agreement, D.o.c. staff relied on medical staff to enter the gym pass as a medical order, in an effort to justify the issuance of a physically created, laminated pass, for Cunningham to show to custody staff to ensure staff knew plaintiff was allowed to leave his housing unit and go to the gym; and the medical staff, so adapted to issuing prescriptions with expiration dates; would issue the gym pass with an expiration date requiring that Cunningham bicker for its renewal.

232. The gym pass was supposed to be consisted of: *No expire date in agreement*

a) continuous gym access, 5 days per week Monday through Friday, one hour per day, and;

b) was to be in addition to plaintiff's routine wellness program activities, and;

c) included access to all gym equipment and activities, including, but may not be limited to:

(i) universal weights

(ii) free weights

(iii) rowing machine

(iv) hack squat

(v) spinner bikes

(vi) kettle bells

(vii) resistance bands

(viii) medicine balls

(ix) chin up bars

(x) tread mill

(xi) stepper

(xii) abdominal roller, and

(xiii) court activities: hand ball, basketball, volley ball, kick ball, ping pong;

but, Barone attempted to maintain that the gym pass was connected to his housing units recreation,

233. Following the Settlement agreement in Cunningham v Knapp, supra., (the settlement), the plaintiff's gym pass was again short lived, lasting little more than 90 days.

234. On or about June 2019, Cunningham wrote several grievances about the equipment in the gym not receiving proper maintenance from Alvarez.

235. On or about July, 2019, Alvarez sought to retaliate against Cunningham and enlisted Furtick to coax Dr. Omprekesh Pillai, plaintiff's provider at the time, to discontinue the gym pass.

236. On or about August, 2019, Alvarez, the gym teacher responsible for the exercise programs at MacDougall, to further retaliate against Cunningham, maliciously discontinued plaintiff from the "Wellness Program", because Cunningham could not jump rope or perform jumping jacks, with the disability in his knees, hip, shoulder and

237. On or about December 5, 2019, after Furtick, Kennedy, Mulligan, Snyder, Castro, Shea, Quiros, Cook, Barbara, Doe, Diaz, Walker, Lightner, McPherson, Wright, Freston, Farinella, Fresten, Grant, Lockery and Doe 2, failed and refused to take any action to restore plaintiff's gym pass, Cunningham wrote Gallagher to inform her, again, that no one had taken any action to restore his gym pass.

238. On or about January 28, 2020, plaintiff received a response from Gallagher acknowledging plaintiff's "pre-habeas settlement", but, she took no actions to restore the gym pass.

239. Cunningham nonetheless showed Gallagher's correspondence to Alvarez, who maliciously told Cunningham "I don't give a shit what that says until someone tells me in person, you don't have a gym pass"!

240. Each of the defendants refused to correct the gym pass by ordering its renewal.

241. Plaintiff begged Lupis to re-instate the gym pass, explaining the many benefits from the workouts, and the settlement agreement; and even after seeing the letter from Gallagher, acknowledging the settlement; Lupis refused to issue the gym pass.

242. Defendants knew or should have known plaintiff would be harmed and injured as a direct and proximate result of their actions, or lack thereof

243. Plaintiff was harmed and injured as a direct and proximate result of defendants actions, or lack thereof; as herein described above and below, including, but not limited to:

a) muscle atrophy, including loss of range of motion and muscle composition, and;

b) increased body fat and weight of 60 pounds, and;

c) increased daily glucose levels causing greater body tissue, nerve and hair damage, and;

d) added to the loss of testosterone levels which dropped to below that of a female, and;

e) Cunningham has remained depressed and lethargic sleeping most of the day, and;

f) plaintiff has been required to take higher doses of insulin to deal with the increased blood sugar levels, and the insulin causes greater tissue, nerve and hair damage, and;

g) Cunningham has experienced an uncontrolled advancement of his arthritis, including the swelling of plaintiff's knee to the point Cunningham's customized knee brace no longer fits, impairing his ambulation, and;

h) bone loss, and;

i) failure to produce the exercise induced endorphins, and;

j) stress, anxiety and hair loss, and;

k) loss of the benefit of his agreement, and;

l) higher cholesterol, and;

m) intentional infliction of extreme emotional distress, and;

n) severely reduced cardiovascular endurance, and;

o) penile shrinkage from loss of his natural testosterone production

244. Therefore, plaintiff prays this court grant the following relief:

a) compensatory damages of $150,000.00, including further damages pled herein, and

b) punitive damages of $150,000.00, in addition to further damages pled herein, and;

c) injunctive relief commanding defendants reinstate Cunningham's gym pass, for the remaining duration of his incarceration, and;

d) costs and attorney fees, and;

e) such other relief as this court deems just and equitable.

<u>Legal Claims</u>

245. The defendants actions, or lack thereof; subjects plaintiff to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and constitutes as violations of the APA and Rehabilitation Act, constitutes as breach of contract and negligent and intentional infliction of emotional distress

246. The actions of Alvarez in conspiring and orchestrating the discontinuance of the gym pass to punish plaintiff for filing grievances about the gym equipment maintenance, constitutes as retaliation in violation of the First Amendments right to Freedom of Speech, right to redress of grievances and access to the courts, and under Article First, §1,4,5,10 and 14.

<u>Count Six</u>:

1-247. Paragraphs numbering 1-246 are incorporated here by reference as if set forth at length and made a part hereof this the Sixth Count.

248. In eliminating and reducing plaintiff's medications, in an attempt to save money; like Cunningham's insulin, Lupis, Lamont, Furtick, Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Castro, Shea, Quiros, Cook, Barbara, Doe, Anker, Diaz, Walker, Lightner, McPherson, Wright, Freston, Farinella, Grant, Fresten, Lackery and Doe 2; are creating other conditions, which they then fail to treat; causing greater aggravation and damage.

249. As just one limited example of these issues, plaintiff reasonably believes and thereby alleges that defendants reduction of insulin, and failure to properly treat his diabetes has caused him to suffer chronic constipation and potential thyroid disorder.

250. Cunningham's chronic constipation, and defendant's failures to properly treat the constipation led to plaintiff suffering a severe case of hemorrhoids.

251. Initially, plaintiff was receiving medications to treat the constipation and the hemorrhoids which began to resolve itself with the proper maintenance of the conditions, using:

   a) Lactulose

   b) hydrocortisone, anusol acetate suppositories

   c) Metamucil, 2 packs tid

252. However, defendants, attempting to save money, altered, reduced or eliminated the

regimen from one that worked, to one that does not, causing plaintiff to suffer anal fissures, which defendants now refuse to treat, in favor of allowing the condition to fester.

253. The defendants failure to provide sufficient insulin to control plaintiff's blood sugars, has also caused plaintiff greater diabetic skin problems, including, but not limited to:

a) dry, cracked and bleeding areas, and;

b) staph and fungal infections in the genital and anal regions, and;

c) facial dermatitis, and;

d) dry scalp - psoriasis, and;

e) dry mouth.

254. The medications needed to treat these conditions, which have been eliminated and/or denied by defendants, in conspiracy one with the other, include, but may not be limited to:

a) Clotrimazole,

b) doxycycline

c) triamcinolone cream,

d) Biotene dry mouth rinse,

e) seabex medicated dandruff shampoo,

f) Eucerin diabetic skin cream, and;

g) Gold Bond medicated powder (Blue Bottle, antifungal/antibacterial)

h) Tucks medicated wipes or baby wipes

255. Defendants have also conspired to prevent other medical practitioners from prescribing the proper care and treatment, including:

a) ordering Barbara not to order the plaintiff Biotene, and;

b) ordering that Querves not prescribe the plaintiff Biotene, and;

c) ordering that the optometrist not prescribe glasses to treat diabetic photophobia, and;

d) On January 22, 2019, the defendant, Doe 1; refused to even look at Cunningham's feet, in an attempt to maliciously ignore the medical degradation of plaintiff's severe

diabetic foot maladies and thereby deny any treatment for those maladies, including:

a) hammer toes

b) arches

c) toe nail care

256. Defendants have failed and refused to provide adequate pain management alternatives, care or safe, effective and meaningful treatment, including; but not limited to:

a) eliminating and reducing pain management regimens that worked, for those that don't, and

b) denying low doses of Tylenol 3, amounting to 80 pills per month, which works; in favor of a therapy of 336 regular Tylenol per month, which does not work; and risks life threatening damage to the plaintiff's already at risk kidneys, and;

c) Failing to timely renew prescriptions, and;

d) stopped plaintiff's Cymbalta, as well as mental health medications for Prozac; to punish plaintiff, and;

e) Refused to provide proper pain management schedule

257. Defendants have failed and refused to provide routine maintenance, management and service, equipment, repair and replacements, including, but not limited to:

a) insufficient and improper sterilization of plaintiff's Variable Pressure Air Pump (VPAP), for treating sleep apnea; including, face shield, hose and Filter changes as needed, and;

b) improper resizing and repair of braces, and; including Knee, elbow, shoulder, back braces, and;

c) refusing replacement nightguards, and;

d) refusing to provide sterile blue pads for use in the handicapped showers, on the bench seat used by multiple inmates; for sterility, and;

e) refusing to replace eye glasses, and; fix prescription to stronger lenses

f) refusing to replace orthotics, including heel lifts, insoles and compression socks

g) refusing to replace abdominal binder and wrist splints, and;

h) refusing to replace resistance bands and stretching straps taken by malicious custody staff.

258. Defendants have failed and refused to allow plaintiff proper care and treatment by specialists, either by preventing examinations, failing to schedule and refusing to comply with recommendations of the specialists whom Cunningham has seen, including:

a) endocrinologist,

b) orthopedist

c) podiatrist

d) neurologist, and

e) vascular specialist.

259. Defendants knew or should have known plaintiff would be harmed and injured as a direct and proximate cause of their actions, or lack thereof.

260. Plaintiff was harmed and injured as a direct and proximate cause of their actions, or lack thereof.

261. Therefore, plaintiff prays this court grant the following relief:

a) Compensatory damages of $250,000.00

b) punitive damages of $250,000.00

c) injunctive relief commanding defendants provide the medical care necessary to cure the deficiencies herein alleged

d) Costs and attorney fees

e) Such other relief as this court deems just and equitable

## Legal Claims

262. Defendants conduct in failing to provide plaintiff meaningful medical care for his serious medical needs constitutes as cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and intentional and negligent infliction of emotional distress in violation of state statutes.

## Count Seven:

1-263. Paragraphs numbering 1-262 of the foregoing are incorporated here by reference as if set forth at length and made a part hereof this the Seventh Count.

264. On or about August, 2020, plaintiff wrote a multi-page letter to Lupis addressing some of the many deficencies in the care being provided to Cunningham and citing to sources in a medical text book.

265. Rather than correcting the deficencies in the treatment being provided, Lupis issued Cunningham a Disciplinary Report for threatening, when not a single phrase, twisted to its most extreme, could be seen as or misconstrued to be "threatening" in nature.

266. Defendants conduct was intended solely to punish Cunningham for continually writing staff about Lupis's deficencies in care and having plaintiff's family members call senior staff within the D.O.C. to complain of that care.

267. As a result, plaintiff was placed into the Restrictive Housing Unit (RHU) for 15 days under investigation for the DR, which was improperly "deferred", in contradiction to the specific language of A.D. 9.5, entitled "Code of Penal Discipline", when it should have been dismissed outright.

268. As a result, plaintiff lost hundreds of dollars in commissery items by staff who gave the items to other inmates.

269. Therefore, plaintiff prays this court grant the following relief:

a) compensatory damages of $50,000⁰⁰

b) punitive damages of $50,000⁰⁰

c) costs and attorney fees

d) such other relief as this court deems just and equitable

## Legal Claims

270. The defendants conduct constitutes as Retaliation in violation of the First Amendments right to redress of grievances, freedom of speech and access to the courts, as well as intentional infliction of emotional distress under state tort laws and violations of Article First, §§ 1, 4, 5, 10 and 14 of the state of Connecticut Constitutions right to freedom of speech, redress of grievances and access to the courts,

## Statement of Past Actions

270. Plaintiff has not brought any past actions based on this same set of facts.

## Previously Dismissed Actions or Appeals

271. Plaintiff has not brought any past actions that were dismissed as frivolous, malicious or for failure to state a claim.

## Jurisdiction And Venue

273. Plaintiff brings this action pursuant to 42 U.S.C. §1983, 28 U.S.C. §§2201 and 2202, and 22 U.S.C. §2241; to redress constitutional violations under the color of state law, and violate the Eighth, Fourteenth and First Amendments.

274. This court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §1651, (All writs Act), 28 U.S.C. §1343(a)(civil rights), and 28 U.S.C. §1331 (Federal question).

275. This court is the appropriate venue pursuant to 28 U.S.C, §1391 (b)(a) because the events and omissions giving rise to the claims occurred in the District of Connecticut.

## Statement of Personal Involvement

276. Plaintiff hereby avers that, wherein not specifically alleged, clearly or succintly in an attempt to minimize the length of this complaint; the plaintiff hereby alleges he has communicated directly with each named defendant, excluding only Lamont, Doe1 and Doe 2; of the issues presented hereinabove in relation to plaintiff's direct medical care, and each defendant has ignored their duty to provide the care.

## Declaration Under Penalty of Perjury

277. I hereby declare under penalty of perjury that I am the plaintiff in the above complaint, that I have read the foregoing and the contents thereof are true and correct to the best of my knowledge and belief and to those facts alleged upon information and belief I believe them to be true. I understand that if I lie in this complaint I may be prosecuted for perjury and punished with as much as Five (5) years in prison and/or fined up to $250,000°°. I therefore set forth my hand this 22 nd day of February, 2021. executed at Suffield, Connecticut

By James E. Cunningham #283883
1153 East St. South
Suffield, CT. 06080