### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES E. CUNNINGHAM SR., *Plaintiff*, | |
| v. | No. 3:21-cv-00273 (JAM) |
| FRANCESCO LUPIS *et al.*, *Defendants*. | |

### INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff James E. Cunningham, Sr., is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983. Cunningham alleges multiple claims of deliberate indifference to his serious medical needs under the Eighth Amendment, violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, retaliation against his right to free speech under the First Amendment, as well as several state law claims. Upon my initial review pursuant to 28 U.S.C. § 1915A, I will allow some claims to proceed against some defendants but will dismiss the remaining claims against other defendants.

### BACKGROUND

Cunningham has filed a 46-page complaint that names some 31 defendants: Dr. Francesco Lupis, Connecticut Governor Ned Lamont, the DOC, Tawanna Furtick, Dr. Kennedy, Colleen Gallagher, Warden William Mulligan, Correctional Officer Kristine Barone, Deputy Warden Doran, Deputy Warden Snyder, Mary Ellen Castro, Kirsten Shea, DOC Commissioner Angel Quiros, former DOC Commissioner Rollin Cook, APRN Barbara, RN Joe, Frank Querves, Connecticut Assistant Attorney General Nicole Anker, Rudy Alvarez, Sal Diaz, Rose Walker, Rikel Lightner, Chena McPherson, Dr. Carson Wright, Dr. Freston, UConn Podiatrist John Doe 1, Monica Farinella, Meriam Grant, Gary Fresten, Samantha Lockery, and DOC Habeas Legal

Liaison John Doe 2.[1]

The events underlying this action occurred while Cunningham was housed at MacDougall-Walker Correctional Institution ("MacDougall").[2] All individual defendants are sued in their individual and official capacities.[3]

The following facts are alleged in the complaint and are accepted as true for purposes of initial review only. Cunningham is a 50-year-old male inmate and is morbidly obese.[4] Cunningham alleges that he has several medical conditions and comorbidities.[5] Cunningham divides up his factual allegations by each of his seven counts, making a number of federal and state law claims in each count.[6]

### Count One - systemic lack of medical care

In Count One, Cunningham brings an Eighth Amendment deliberate indifference claim.[7] Cunningham alleges that the DOC has "suffered a systemic deficiency in the provision of medical care to inmates within its custody for many years," and that the State of Connecticut and the DOC have allowed the DOC's medical care services to "remain underfunded, short staffed and improperly managed."[8] According to Cunningham, the DOC has dissolved its relationship

---

[1] Doc. #1 at 1-7.

[2] *Id.* at 3 (¶ 1).

[3] *Id.* at 3-7.

[4] *Id.* at 9 (¶ 50).

[5] *Ibid.*

[6] For each of Cunningham's seven counts, he makes both federal and state law claims, including a number of breach of contract and intentional and negligent infliction of emotional distress state tort claims. The Court limits its review for purposes of 28 U.S.C. § 1915A to Cunningham's federal law claims. That is because one of the purposes of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there are no facially plausible federal law claims against any of the named defendants, then the Court would likely decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims against such defendants against whom there is a valid federal claim may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. *See Hamlin v. City of Waterbury, et al.*, 2017 WL 4869116, at *1 n.1 (D. Conn. 2017).

[7] *Id.* at 9 (¶ 47).

[8] *Id.* at 7 (¶¶ 35-36).

with the Correctional Managed Healthcare ("CMHC") system but has taken "no corrective measures" to improve the healthcare provided to inmates, allowing the DOC medical staff to continue to do the "same poor, haphazard and constitutionally infirm jobs that they were already doing without any type of oversight, management or improved reporting guidelines.[9] Cunningham specifically names defendants Dr. Lupis, Furtick, Gallagher, Doran, Castro, Shea, Quiros, Walker, McPherson, Lightner, Anker, Doe 2, Farinella, Grant, Fresten, Lockery, Cook and the DOC as having failed to maintain constitutional levels of medical care.[10] Cunningham asserts that Governor Lamont in particular is aware of the systemic deficiencies in the DOC's medical care system but has failed to take any corrective measures.[11]

Cunningham further alleges that, under the DOC's medical care system, he and other inmates have been denied "necessary prescriptions, pain management regimens, physical therapy, proper specialist care, [and] specialty diagnostic imaging and testing to diagnose and treat ailments."[12] In particular, Cunningham alleges that defendants have injured him by discontinuing prescription regimens or failing to prescribe treatments for chronic ailments, failing to treat his diabetes, failing to provide therapeutic and rehabilitative physical therapy, denying specialist care and treatment for a variety of ailments, denying prosthetics, and reducing and limiting the prescription of certain therapy regimens.[13] Cunningham believes that the DOC medical staff is working with Connecticut's Assistant Attorneys General to "encourage medical staff on tactics to impede inmate access to medical services, impede inmate ability to use and exhaust D.O.C. administrative remedies, and intentionally ignor[e] and fail[] to diagnose medical

---

[9] *Id.* at 7 (¶¶ 37-39).
[10] *Id.* at 7-8 (¶ 40).
[11] *Id.* at 8 (¶ 41).
[12] *Id.* at 8 (¶ 42).
[13] *Id.* at 8-9 (¶ 45).

ailments," and that they have "falsely alleg[ed] staff failed to perceive serious medical needs and inmate failure to exhaust administrative remedies."[14]

### Count Two - testosterone disorder

In Count Two, Cunningham brings claims for violations of the Eighth Amendment, the ADA, the Rehabilitation Act, and conspiracy claims related to his testosterone disorder.[15] Cunningham alleges that prior to his incarceration, he was diagnosed with hypogonadism, presenting as low testosterone,[16] though Cunningham alleges that under the current guidelines, he is suffering from a testosterone deficiency and requires testosterone therapy.[17] Cunningham's total serum testosterone level has been found to be 47 ng/dl as of October 2020, which Cunningham asserts is less than that of the average female.[18] Cunningham asserts that the symptoms associated with this condition are "very non-specific and can be manifestations of other conditions, e.g., chronic fatigue, chronic stress, and a depressed state, among others."[19] Cunningham also states that current guidelines establish that low testosterone is a "risk factor for cardiovascular disease, anemia, bone mineral density, lean body mass, depressive symptoms, insulin level flu[ct]uations, and many others."[20] Cunningham also asserts that his testosterone deficiency affects and is affected by several of his other conditions, including his diabetes, obesity, and other metabolic syndromes.[21]

Cunningham alleges that when he was first incarcerated, unnamed DOC medical staff "refused to continue the testosterone therapy he had been receiving prior to his arrest" and

---

[14] *Id.* at 8 (¶ 43).
[15] *Id.* at 18 (¶ 96).
[16] *Id.* at 10 (¶ 52).
[17] *Id.* at 10 (¶¶ 53-54).
[18] *Id.* at 11 (¶ 62).
[19] *Id.* at 11 (¶ 57).
[20] *Id.* at 11 (¶ 61).
[21] *Id.* at 12-14 (¶¶ 71-75).

instead "made him suffer an extended period, hoping [his] body would magically begin to produce the testosterone it had not produced for years."[22] After years of habeas litigation, Cunningham reached an agreement with the state, the DOC, and the warden that he would receive testosterone therapy in exchange for withdrawing his habeas petition.[23] But while Cunningham received the proper testosterone therapy "[f]or an extended period," his total serum testosterone levels still only measured 292 ng/dl, well below the guidelines.[24]

On December 6, 2019, Cunningham states that his testosterone count was "drastically impaired by the callous indifference" of defendants Dr. Lupis, Lamont, the DOC, Furtick, Dr. Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Castro, Shea, Quiros, Cook, Barbara, Joe, Anker, Diaz, Walker, Lightner, McPherson, Dr. Wright, Dr. Freston, Farinella, Grant, Fresten, Lockery, and Doe 2, who Cunningham alleges were all in a conspiracy together to ignore the habeas agreement and stop his testosterone regimen, causing his total serum count to crash.[25] Cunningham asserts that the cessation of the testosterone therapy has caused him severe physical and mental pain and suffering, "as it affects so many aspects of a male's normal life functions."[26] Cunningham asserts that in the six months since Dr. Lupis ended his testosterone therapy, from June 2020 through December 2020, Cunningham gained at least 27 pounds.[27] Cunningham alleges that the cessation of the testosterone therapy has caused "muscle and joint degradation," "aggravation of [his] Type II diabetes," "bone demineralization (osteoporosis)," "impair[ment of his] manly mindset and mental a[]cuity," and "cardiac muscle weakness," listing a large number of sub-effects for each condition.[28] Cunningham also recounts in general terms a

---

[22] *Id.* at 11 (¶ 63).
[23] *Id.* at 11 (¶ 64).
[24] *Id.* at 12 (¶¶ 66-67).
[25] *Id.* at 12 (¶ 68).
[26] *Id.* at 12 (¶ 69).
[27] *Id.* at 15 (¶ 92).
[28] *Id.* at 15-17 (¶ 94).

number of potential health risks men with low testosterone face.[29]

Cunningham alleges that each time he learned of Dr. Lupis's "cessations of his medical care," he filed Inmate Request Forms and Health Services reviews to correct the issue—pleading on at least one occasion that his "body is falling apart . . . [and Dr. Lupis is] killing [his] soul"—and yet only received dismissive responses from Dr. Lupis that included, "I'm not sending you for a specialist, you'll just have to get used to it," and "if we don't know about it, we don't have to treat it," and otherwise ignoring Cunningham's requests.[30] Dr. Lupis has also referred to Cunningham as a "needy inmate" and as a "nuisance."[31] Dr. Lupis has ignored the recommendations of an endocrinology specialist to restart Cunningham's testosterone therapy and was unhappy that Davis wanted to resume Cunningham's care, instead choosing to discontinue follow-up care that was already scheduled and cancelling and failing to reinstate the specialist's recommended treatment.[32]

On August 13, 2020, Dr. Lupis responded to Cunningham's pleas by stating, ". . . your testosterone is not medically indicated due to multiple comorbidities."[33] On October 1, 2020, Dr. Lupis disposed of Cunningham's submitted Health Services Review with "No Further Action," which Cunningham asserts was made with an improper finding that Cunningham was "not medically indicated for testosterone administration."[34] On October 11, 2020, after Cunningham wrote to Dr. Lupis explaining his history of testosterone deficiency and his worries about osteoporosis and his request for an increase in Vitamin D due to low levels, Dr. Lupis replied, "You do not qualify for AMA membership but I will look into it for you if you want," without

---

[29] *Id.* at 13 (¶¶ 77-80).
[30] *Id.* at 14 (¶¶ 81, 85).
[31] *Id.* at 14 (¶ 82).
[32] *Id.* at 14 (¶¶ 83-84).
[33] *Id.* at 15 (¶ 87).
[34] *Id.* at 15 (¶ 90).

addressing the issues Cunningham raised.[35] On October 16, 2020, in response to a request from Cunningham, Dr. Lupis stated, "(2) this month is a blue moon (Oct 2020) so you are lucky that I am dealing with it."[36]

Cunningham also asserts that defendant Walker "repeatedly remained deliberately indifferent to [his] need for care and impeded and delayed the receipt of that care by maliciously returning [his] Health Services Reviews" to Cunningham as "Returned Without Disposition, "without any basis" and in violation of Administrative Directive ("AD") 8.9.[37]

### Count Three - diabetes

In Count Three, Cunningham brings Eighth Amendment deliberate indifference, ADA, Rehabilitation Act, and conspiracy claims related to his diabetes.[38] Cunningham alleges that he is a Type II diabetic and relies on insulin "for his very survival."[39] Cunningham also alleges that he is insulin resistant.[40]

Cunningham asserts that Dr. Lupis, in "conspiracy and concert" with defendants Lamont, the DOC, Furtick, Dr. Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Castro, Shea, Quiros, Cook, Barbara, Joe, Anker, Alvarez, Diaz, Walker, Lightner, McPherson, Wright, Dr. Freston, Doe 1, Farinella, Grant, Fresten, Lockery, and Doe 2, have all "denied, minimized, refuse and eliminated" care and management for Cunningham's diabetes to "save money, for staff convenience to simply to punish [him]."[41] Cunningham asserts that defendants have refused to provide him with sufficient daily insulin, resulting in a higher blood sugar level that may cause damage to Cunningham's veins, tissue, muscles, joints and vision, increase his diabetic

---

[35] *Id.* at 14-15 (¶ 86).
[36] *Id.* at 15 (¶ 88).
[37] *Id.* at 15 (¶ 91).
[38] *Id.* at 29 (¶ 162).
[39] *Id.* at 18 (¶ 98).
[40] *Id.* at 21 (¶ 124).
[41] *Id.* at 21 (¶ 126).

neuropathy and the pain associated with it, decrease the flow of blood to his extremities, affect his cognitive functions and short term memory, cause greater dehydration, and cause him to remain lethargic, tired, and constantly hungry.[42]

Cunningham also alleges that the DOC meal plan has a protein-to-carbohydrate ratio of 0.25 or lower, which he believes causes muscle degradation and obesity and aggravates his diabetic condition.[43] Cunningham asserts that defendants have failed to provide him with the proper diet, even with recommendations from an endocrinology specialist that Cunningham receive a "low residue, high fiber, high protein, low simple carbohydrate (e.g., no potatoes, no pasta, no white rice), and high in leafy green vegetable diet," as the DOC's menu plan is high in complex carbohydrates which can be dangerous for diabetics.[44]

Cunningham also asserts that defendants have failed to provide care and management for his diabetic pain, namely by failing to provide adequate Gabapentin dosages for the pain.[45] Cunningham further asserts that defendants have failed to provide proper care and treatment for his heightened risk of blood clots, i.e., deep vein thrombosis,[46] for his venous insufficiency, i.e., the "cracking and splitting of [Cunningham's] veins,"[47] for his diabetic optical needs,[48] for the edema associated with diabetics,[49] and for his high blood pressure.[50] Cunningham alleges that defendants have also eliminated "all routine podiatric foot care and maintenance for diabetics," and all "diabetic dry skin care regimens."[51]

---

[42] *Id.* at 21-22 (¶ 127).
[43] *Id.* at 20 (¶ 111).
[44] *Id.* at 22 (¶ 128).
[45] *Id.* at 22-23 (¶ 129).
[46] *Id.* at 23 (¶ 130).
[47] *Id.* at 23 (¶ 131).
[48] *Id.* at 24 (¶ 134).
[49] *Id.* at 24 (¶ 135).
[50] *Id.* at 24 (¶ 136).
[51] *Id.* at 24 (¶¶ 132-33).

Cunningham asserts that prior to December 2020, he "suffered years of deficiency in his medical care" and that he "wr[ote] daily to the defendants begging, unsuccessfully for adequate care and treatment,"[52] particularly to McPherson. Cunningham states that by November 2019, he had been under defendant McPherson's care for approximately eight months.[53] Cunningham alleges that McPherson "failed and refused to adequately monitor, manage or treat Cunningham's diabetes, despite [his] near daily written requests and HSRs begging for care."[54] Cunningham instead "began begging" other DOC staff, including APRN Stork, who ordered blood testing.[55] Cunningham received those test results on November 29, 2019, which states that his A1C was "the life threatening '10.4%, which was increased from the previous test [of] . . . 7.6%.'"[56] While Stork recommended that Cunningham receive insulin and monitor his glucose levels four times per day, around January 24, 2020, Cunningham states that he was "forced to write Shea informing her that 'McPherson is [still] refusing to monitor [and] adjust insulin to lower blood sugar.'"[57]

Shea did not respond to Cunningham until February 25, 2020, when she informed Cunningham that she "ha[s] spoken with APRN McPherson. She is aware of your condition and is monitoring you appropriately."[58] Meanwhile, on January 30, 2020, in response to a separate request Cunningham submitted, Diaz told Cunningham that Furtick had referred him to a follow-up with a provider, which Cunningham asserts "ignore[ed his] pleas for care, ignored by McPherson."[59]

---

[52] *Id.* at 25 (¶ 139).
[53] *Id.* at 25 (¶ 140).
[54] *Id.* at 25 (¶ 141).
[55] *Id.* at 25 (¶ 142).
[56] *Id.* at 25 (¶ 143).
[57] *Id.* at 26 (¶¶ 145-46).
[58] *Id.* at 26 (¶ 147).
[59] *Id.* at 26 (¶ 149).

On March 29, 2020, Cunningham submitted a request describing his diabetic symptoms, including excessive thirst, and told McPherson that he had been seen at "Prompt Care."[60] Cunningham asserts that McPherson did not "tak[e] action" and instead responded by putting a sticker that read "…sign up for Prompt Care…" on Cunningham's request.[61]

On April 29, 2020, Walker "interfered with plaintiff's attempts to address his 'Health Problems due to high blood sug[ar],'" by returning Cunningham's HSR as Returned Without Disposition," which Cunningham alleges is a "direct violation of AD 8.9," and resulted in the delay and prevention of Cunningham's receipt of care.[62]

On August 3, 2020, RN Ostheimer told Cunningham he had been rescheduled for consultations for endocrinology and vascular surgery.[63] According to Cunningham, Dr. Lupis, Furtick, Dr. Freston, Lackery, and Grant "conspired to cancel" these consultations, though Cunningham does not elaborate on the nature of this conspiracy or what happened.[64] Instead, Cunningham states that Dr. Lupis "mock[ed] Cunningham" after cancelling the consultations, by "ignorantly playing like he couldn't understand why a diabetic patient should see a vascular or urological specialist or endocrinologist."[65] Cunningham asserts that Dr. Lupis "continuously ignored his pleas for insulin adjustments," and instead sent Cunningham's Inmate Request Forms back to Cunningham, telling Cunningham to "Please leave space for response" on the form or by telling Cunningham that Dr. Lupis was "current[ly] treating [you] for your diabetes and other endocrine concerns."[66]

In one Inmate Request Form, Cunningham wrote, "look enough is enough[,] my # was

---

[60] Id. at 26 (¶ 150).
[61] Ibid.
[62] Id. at 26 (¶ 151).
[63] Id. at 26 (¶ 152).
[64] Ibid.
[65] Id. at 26 (¶ 153).
[66] Id. at 27 (¶¶ 154-55).

309 [at] 4am this morning, I got 95 L[antus] N[PH] 50 N[ova] Log 23 [and at] 10am with no

food my # 301 . . . This is crazy! . . . Please do something[,] raise my insulin before I [lose] my

feet or die . . ."[67] In response, Dr. Lupis wrote, "At this time, your insulin resistance is

complicated by your poor dietary habits[,] lack of exercise, chronic use of your wheelchair and

decreased use of oral hypoglycemics. Raising insulin is not the immediate answer."[68]

Cunningham contests Dr. Lupis's response, asserting that these issues with his diet, exercise, and

wheelchair were caused by Dr. Lupis himself, acting in conspiracy with several other defendants,

including McPherson, Anker, Gallagher, Kennedy, Barone, Snyder, and Doran.[69]

On December 18, 2020, Cunningham submitted an Inmate Request Form in which he

wrote, "Now this _____!? has cancelled my diabetic pain med I'm now letting you know I'm

listing you in state civil suite [*sic*] and federal suit I'm tired of _____ like you and him _____

with people[']s health and well being you have never done anything for inmates but _____ and

that's not right Civil Right Violation Corp[o]ral Punishment what is wrong with you people[?]"[70]

Defendant Shea wrote back, ". . . I would like to remind you that threatening and offensive

language is inappropriate in these correspondences," though Cunningham asserts that his

submission did not contain any such language.[71]

On January 21, 2021, Dr. Lupis responded to one of Cunningham's requests for treatment

for blood clots and deep vein thrombosis ("DVT"), writing, "Nonmobility can lead to

development of DVT. Signs and symptoms of these have not been seen at this moment," even

though Cunningham had repeatedly described DVT-related symptoms to Dr. Lupis and his

---

[67] *Id.* at 27 (¶ 156).
[68] *Ibid.*
[69] *Id.* at 27-28 (¶ 157).
[70] *Id.* at 24-25 (¶ 137). Cunningham included the blank spaces in his complaint, and states that these blank spaces were also in the original Inmate Request Form. *Ibid.*
[71] *Id.* at 25 (¶ 138).

conditions place him at a high risk of DVT.[72]

### Count Four - orthopedic issues

In Count Four, Cunningham brings Eighth Amendment deliberate indifference, ADA, and Rehabilitation Act claims regarding his various orthopedic problems.[73] Around 1989, Cunningham injured his right knee by tearing his ACL and had part of his knee cartilage and meniscus removed.[74] Cunningham regained his ability to walk through physical therapy, but only had approximately 80% of his previous range of motion and had to use a "heavy-duty-hinged, custom made, knee brace."[75] Without the brace, Cunningham cannot walk or stand safely and faces an "extreme risk of the knee popping out of place[,] spilling [him] onto the floor."[76] If Cunningham shifts his body weight over his right knee—even if only for "minor activities like reaching for items with his right arm"—it can cause his knee joint to dislocate and shift forward out of place.[77] According to Cunningham, his knee "frequently dislocates," even while sitting normally, and Cunningham is forced to put his knee back into place before standing up.[78] His knee—even while wearing the brace—causes him "extreme and constant pain at a level 4-5 while sitting, and 6-8 while walking," on a pain scale of 1-10.[79] Further, walking with the brace for only an hour over the course of a two-day period causes Cunningham's knee "to swell beyond the capacity of the brace," which "prevents Cunningham from ambulating for as much as 7 to 10 days."[80] This is allegedly because his current knee brace is "improperly sized," for a number of reasons, including "osteoarthritic growth of the knee joint," "edema of the leg," and

---

[72] *Id.* at 28 (¶ 158).
[73] *Id.* at 36 (¶ 220).
[74] *Id.* at 30 (¶ 166).
[75] *Id.* at 30 (¶ 167).
[76] *Id.* at 30 (¶ 168).
[77] *Id.* at 30 (¶ 169).
[78] *Id.* at 30 (¶ 170).
[79] *Id.* at 30 (¶ 171).
[80] *Id.* at 30 (¶ 172).

"diabetic weight gain."[81] Because Cunningham cannot use his current knee brace to walk, he must rely on a wheelchair to get around.[82]

Cunningham alleges that Dr. Lupis has operated in a conspiracy with defendants Lamont, Furtick, Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Castro, Shea, Quiros, Cook, Barbara, Joe, Anker, Diaz, Walker, Lightner, McPherson, Wright, Dr. Freston, Farinella, Grant, Fresten, Lockery, and Doe 2 to "save money off the medical care budget" by refusing to provide Cunningham with a properly sized brace.[83] Cunningham further asserts that defendants have refused to provide pain management, such as a low dose pain reliever and cortisone shots in the knee joint two times a year; discontinued his Tylenol 3 pain medication; refused to prescribe an anti-inflammatory drug; and refused to provide any other walking aids, such as an upright walker or forearm crutches.[84] Instead of helping Cunningham, Dr. Lupis only "belittle[s]" him by telling him to "just get up and walk."[85] According to Cunningham, Dr. Lupis behaves in this way "without any knowledge or understanding of the disability and extent of the injury."[86]

In addition to his knee problems, Cunningham also alleges that he suffers from "orthopedic conditions in his right elbow."[87] Cunningham had previously injured his elbow in 1987, but asserts that it "healed without lasting complications."[88] In July 2020, Cunningham fell while attempting to sit on his bunk, hitting his elbow on the bunk's steel ladder and "wrenching his arm up behind his back causing pain to his right shoulder."[89] Cunningham asserts that this

---

[81] *Id.* at 30 (¶ 173).
[82] *Id.* at 31 (¶ 174).
[83] *Id.* at 30 (¶ 173).
[84] *Id.* at 31 (¶ 176).
[85] *Id.* at 31 (¶ 177).
[86] *Ibid.*
[87] *Id.* at 31 (¶ 178).
[88] *Id.* at 31 (¶ 180).
[89] *Id.* at 31 (¶ 179).

happened because of the "lack of ADA compliant handholds" in his cell.[90] The fall caused "multiple loose—free floating—foreign bodies" in Cunningham's elbow joint that Cunningham believes are bone chips.[91] These foreign bodies are sometimes "positioned such as to prohibit even minor movements of the joint," which "may last from 3 to 5 days at a time," and further lead Cunningham to lose "approximately 45° range of motion" versus the 30° loss of range of motion Cunningham asserts he experiences when the foreign bodies are not in the joint.[92]

As a result of the injury, Cunningham experiences "a constant, unmitigated," "sharp, shooting" pain "at a level 7 out of 10" without movement, which increases to "more than a level ten (10) out of 10" with movement of the elbow, and feels like a "grinding sensation as if the bones are being forced apart, within the elbow joint."[93] Movement causes Cunningham to feel like his elbow is "trying to dislocate," and Cunningham cannot use "any force in his right arm, while the foreign bodies are in the joint."[94] In order to use his wheelchair, Cunningham must push his wheelchair backwards using his feet, as he cannot use his arm to manipulate the chair's wheels.[95]

At some point in July 2020 after the fall, Dr. Lupis told Cunningham that he was "just faking to get testosterone therapy."[96] On July 31, 2020, Cunningham's elbow was X-rayed, demonstrating the presence of the foreign bodies.[97] Rather than treat Cunningham's elbow, Dr. Lupis only offered an arm sling that was too small for Cunningham.[98] Dr. Lupis gave Cunningham no pain management and instead removed the medications Cunningham received

---

[90] *Ibid.*
[91] *Id.* at 31 (¶ 181).
[92] *Id.* at 32 (¶¶ 184, 186).
[93] *Id.* at 31-32 (¶¶ 182-83).
[94] *Id.* at 32 (¶¶ 186-87).
[95] *Id.* at 32 (¶ 187).
[96] *Id.* at 32 (¶ 192).
[97] *Id.* at 32 (¶ 188).
[98] *Id.* at 32 (¶ 189).

for the pain from his other conditions.[99] Cunningham believes that the defendants' removal of his testosterone therapy "likely made his bones brittle leading to the injury" and that the injury otherwise would not have occurred.[100]

Cunningham also asserts that Dr. Lupis ignored his requests to review the 2020 X-ray in conjunction with an earlier X-ray Cunningham had in 2015 that did not show the presence of any foreign bodies, in a ploy to claim that the 2020 injury was "the same as the old injury and use that 'old injury' analysis as the basis upon which to deny Cunningham any and all treatment."[101] Dr. Lupis told Cunningham that his X-ray was "non-impressive."[102] Dr. Lupis also ignored Cunningham's requests for a consultation with an orthopedic specialist "simply to save money off the costs of providing medical care" to Cunningham "until they found out about this law suit[]."[103]

Cunningham has also experienced a third orthopedic issue while incarcerated that he alleges remains untreated. In 2013, while a correctional officer was handcuffing Cunningham behind his back through the "cell-door-trap," the officer yanked Cunningham's arm through the trap and upwards.[104] Cunningham asserts that his injury "remained essentially untreated by defendants," and that he re-injured his arm in July 2020 when he fell in his cell.[105] An X-ray and MRI revealed that Cunningham had a torn supraspinatus tendon in his right rotator cuff.[106]

The torn tendon causes Cunningham "constant pain at a level 2 out of 10 pain scale, and at a level 5 when it pops out of place," which "feels like it is dislocating."[107] According to

---

[99] *Id.* at 32 (¶ 190).
[100] *Id.* at 32 (¶ 191).
[101] *Id.* at 32-33 (¶ 193).
[102] *Id.* at 35 (¶ 212).
[103] *Id.* at 33 (¶ 194).
[104] *Id.* at 33 (¶ 196).
[105] *Id.* at 33 (¶ 197).
[106] *Id.* at 33 (¶ 198).
[107] *Id.* at 33 (¶ 199).

Cunningham, the pain is at its most severe when he "reaches behind himself to wipe following bowel movements."[108] He also experiences a "grinding sensation" when "lowering and raising his arm," that during "bouts of his bursitis flare-ups," his shoulder has a "constant throbbing pain of 8 out of 10," that can last between eight and fourteen days at a time.[109] Like his elbow injury, Cunningham's shoulder injury also limits his range of motion to a degree that he states is "incalculable, because it depends on the activity he is performing, and the degree to which his elbow is aggravated."[110]

Cunningham again asserts that Dr. Lupis, acting in conspiracy with defendants Lamont, Furtick, Kennedy, Gallagher, Mulligan, Barone, Doran, Snyder, Shea, Quiros, Cook, Barbara, Joe, Anker, Diaz, Walker, Lightner, McPherson, Wright, Dr. Freston, Farinella, Grant, Fresten, Lockery, and Doe 2, have failed and refused to treat his shoulder in order to save money.[111] Defendants' only treatment for Cunningham's shoulder has been a "simple neoprene strap-brace," that does not fit Cunningham's "morbid obesity."[112] Cunningham asserts that this type of injury requires a properly fitted shoulder harness.[113] Defendants have not provided Cunningham with any pain medication and Cunningham asserts that Dr. Lupis "attempted to interfere with Cunningham's use" of the strap-brace, but does not elaborate on what Dr. Lupis actually did.[114]

Cunningham does describe a series of instances in 2020 when Dr. Lupis refused to treat him or interfered with his treatment. On August 3, 2020, after Ostheimer told Cunningham that an orthopedic consultation was approved and awaiting scheduling, Dr. Lupis cancelled the

---

[108] *Ibid.*
[109] *Id.* at 33 (¶ 200).
[110] *Id.* at 33-34 (¶ 201).
[111] *Id.* at 34 (¶ 202).
[112] *Id.* at 34 (¶ 203).
[113] *Ibid.*
[114] *Id.* at 34 (¶¶ 204-05).

appointment.[115] On August 13, 2020, Cunningham alleges that Dr. Lupis "mocked Cunningham's complaints of pain, writing, 'Bone inflammation/pain improves with weight loss,'" while continuing to prevent Cunningham's access to treatments to help with that weight loss.[116] On October 1, 2020, Dr. Lupis returned Cunningham's Health Services Review as "No Further Action," writing, "I am currently treating, assessing, evaluating your orthopedic medical concerns," which Cunningham asserts Dr. Lupis never actually did.[117] On October 26, 2020, Dr. Lupis "feigned ignorance" of Cunningham's conditions, asking him, "Why do you need that appointment?" even though Cunningham asserts that he "quite frequently and near daily" described his orthopedic injuries.[118] On November 8, 2020, after Cunningham requested evaluation and treatment of his hip, shoulder, and elbows, Dr. Lupis told Cunningham to "leave [more] room [for Dr. Lupis] to respond."[119] On November 13, 2020, Dr. Lupis "mocked him[,] responding: 'I am not inclined to set up an appointment with a specialist before I have . . . treated you for your condition," but nevertheless refused to treat Cunningham's conditions.[120]

Cunningham also alleges that other defendants were deliberately indifferent to his orthopedic conditions and pain. On May 18, 2020, Cunningham asserts that Walker "improperly return[ed]" his request for a Health Services Review by returning it as "Returned Without Disposition," and told Cunningham to go back to sick call for a referral to see his provider.[121] According to Cunningham, Walker had "clear knowledge" that Cunningham had already been seen by sick call and his providers "repeatedly for the same issues."[122]

---

[115] *Id.* at 35 (¶ 209).
[116] *Id.* at 35 (¶ 213).
[117] *Id.* at 35 (¶ 215).
[118] *Id.* at 34 (¶ 208).
[119] *Id.* at 34 (¶ 207).
[120] *Id.* at 34 (¶ 206).
[121] *Id.* at 35 (¶ 214).
[122] *Ibid.*

On December 25, 2020, Cunningham wrote to Shea requesting an orthopedic consultation, writing that he felt like he was "lo[]sing use of [his] arm" and that the pain made him "want[] to cry at night," but Shea ignored Cunningham.[123] That same day, Cunningham also wrote to the "Commissioner of Correction," who Cunningham asserts "intentionally ignored Cunningham's pleas" in "an attempt to avoid liability."[124] According to Cunningham, defendants "improperly believe that if they simply change an inmate like Cunningham's provider, the new provider can milk out another period encompassing years of inaction and refusals to provide medical care premised on this 'assessing and evaluating' scapegoat."[125]

### Count Five - gym access

In Count Five, Cunningham brings claims under the Eighth Amendment, the ADA, the Rehabilitation Act, and for First Amendment retaliation against defendant Alvarez.[126] Cunningham alleges that certain defendants have prevented him from gaining access to physical and rehabilitative therapy by withholding or preventing his access to the gym. Cunningham asserts that "[v]irtually every doctor" has recommended daily exercises as part of his treatment plan for his testosterone condition, his diabetes, and for his orthopedic care.[127] Cunningham quotes AD 8.1 as saying that the DOC shall provide physical and rehabilitative therapy to inmates.[128] However, DOC custody and medical staff "continuously impeded access to this rehabilitative physical therapy opportunities," and Cunningham ultimately filed a habeas petition in state court to address the issue.[129] As part of that proceeding, Cunningham entered into a settlement agreement with the state and the DOC on September 18, 2015 in which the state

---

[123] *Id.* at 35 (¶ 210).
[124] *Id.* at 35 (¶ 211).
[125] *Id.* at 35 (¶ 216).
[126] *Id.* at 41 (¶¶ 245-46).
[127] *Id.* at 36 (¶ 222).
[128] *Id.* at 37 (¶ 224).
[129] *Id.* at 37 (¶ 225).

promised to provide him with gym access five days a week.[130]

Cunningham asserts that while DOC staff initially complied with the settlement agreement, that "cooperation was short lived," and Cunningham was soon forced to file a second habeas petition that also resulted in a settlement agreement.[131] However, defendants soon breached that second settlement agreement, and Cunningham filed a federal lawsuit in this district, *Cunningham v. Knapp et al.*, Dkt. No. 3:16-cv-01235 (VLB).[132] That lawsuit was resolved by a third settlement agreement on March 5, 2019, that required the defendants to give Cunningham continuous gym access five days a week.[133] Part of the settlement agreement terms included a statement from defense counsel that Cunningham had multiple orthopedic complaints that the DOC planned to treat with a "physical therapy regimen that the patient can complete with daily gym access that should include resistance bands and kettle weights."[134]

According to Cunningham, the medical staff had to enter his gym access as a medical order "in an effort to justify the issuance of a physically created, laminated pass" that Cunningham could show to DOC custody staff as proof that he was permitted to leave his housing unit and go to the gym.[135] These passes were issued as prescriptions with expiration dates, which Cunningham asserts "require[ed] that [he] bicker for [their] renewal."[136] But Cunningham asserts that the settlement agreement had no expiration date and, per the terms of the agreement, Cunningham was supposed to have "continuous gym access, 5 days per week[,] Monday through Friday, one hour per day" that was in addition to his "routine wellness program

---

[130] *Id.* at 37 (¶ 226).
[131] *Id.* at 37 (¶ 227).
[132] *Id.* at 37 (¶ 228).
[133] *Ibid.*
[134] *Id.* at 37-38 (¶ 229).
[135] *Id.* at 38 (¶ 231).
[136] *Ibid.*

activities," and was to include access to "all gym equipment and activities."[137] Cunningham states that Barone "attempted to maintain that the gym pass was connected to [Cunningham's] housing unit[']s recreation."[138]

But after Cunningham's federal lawsuit was resolved on March 5, 2019, Cunningham's gym pass only lasted little more than 90 days.[139] In June 2019, Cunningham filed several grievances alleging that the gym equipment was not receiving proper maintenance from Alvarez, a gym teacher at MacDougall who was responsible for the exercise programs.[140] The next month, Alvarez began to retaliate against Cunningham for his complaints by getting Furtick to "coax" Dr. Omprekash Pillai, who at the time was Cunningham's provider, to discontinue the gym pass.[141] In August 2019, Alvarez "maliciously discounted" Cunningham from the "wellness program" because he "could not jump rope or perform jumping jacks" due to his knee, hip, and shoulder disabilities.[142]

Cunningham claims that on December 5, 2019, after defendants Furtick, Kennedy, Mulligan, Snyder, Castro, Shea, Quiros, Cook, Barbara, Joe, Diaz, Walker, Lightner, McPherson, Wright, Dr. Freston, Farinella, Fresten, Grant, Lockery, and Doe 2 "failed and refused" to address Cunningham's gym pass issues, Cunningham again wrote to Gallagher to tell her that no one had taken action to restore his gym pass.[143] Cunningham does not, however, state how any of these defendants first became aware of his gym pass issues, whether he filed grievances about the issues, or whether he spoke with any of the defendants. On January 28, 2020, Gallagher responded to Cunningham, acknowledging his "pre-habeas settlement," but did

---

[137] *Id.* at 38 (¶ 232).
[138] *Ibid.*
[139] *Id.* at 39 (¶ 233).
[140] *Id.* at 39 (¶¶ 235-36).
[141] *Id.* at 39 (¶ 235).
[142] *Id.* at 39 (¶ 236).
[143] *Id.* at 39 (¶ 237).

not take any further action.[144] Cunningham took Gallagher's response to Alvarez, who told Cunningham, "I don't give a shit what that says[;] until someone tells me in person, you don't have a gym pass!"[145] Cunningham also asked Dr. Lupis to reinstate the gym pass, but even after showing Dr. Lupis the letter from Gallagher and after describing the benefits Cunningham received from exercise, Dr. Lupis refused to restore the gym pass.[146]

### Count Six - miscellaneous medical complaints

In Count Six, Cunningham asserts an additional Eighth Amendment deliberate indifference claim by making what amounts to a grab-bag of different allegations that mostly unnamed defendants either refused or denied him treatment for his various conditions.[147]

Cunningham first alleges that defendants' reduction of his insulin and failure to give proper treatment for his diabetes has led to chronic constipation, which in turn has led to a severe case of hemorrhoids, and a potential thyroid disorder.[148] While Cunningham initially received successful treatment for the constipation and hemorrhoids, defendants "altered, reduced, or eliminated" this treatment regimen to one that did not work, leading Cunningham to suffer from anal fissures that defendants refuse to treat.[149]

Cunningham further alleges that defendants' failure to provide proper insulin management has also caused Cunningham to suffer diabetic skin problems, including dry, cracked, and bleeding skin; staph and fungal infections in his genital and anal areas; facial dermatitis; dry-scalp psoriasis; and dry mouth.[150] Defendants have either eliminated or refused to

---

[144] *Id.* at 39 (¶ 238).
[145] *Id.* at 39 (¶ 239).
[146] *Id.* at 39 (¶ 241).
[147] *Id.* at 44 (¶ 262).
[148] *Id.* at 41 (¶¶ 249-50).
[149] *Id.* at 41-42 (¶¶ 251-52).
[150] *Id.* at 42 (¶ 253).

provide various medications that may help Cunningham with these conditions.[151] Cunningham also asserts that defendants have conspired together to prevent "other medical practitioners from prescribing the proper care and treatment," including ordering Barbara and Querves not to order or prescribe Biotene for Cunningham and ordering the optometrist not to prescribe glasses for Cunningham's diabetic photophobia.[152] And on January 22, 2019, defendant Doe 1 "refused to even look at Cunningham's feet, in an attempt to maliciously ignore the medical degradation of plaintiff's severe diabetic foot maladies and thereby deny any treatment for these maladies."[153]

Cunningham next alleges that defendants have failed to provide "adequate pain management alternatives, care or safe, effective and meaningful treatment," by either ending or reducing pain management regimens that worked in favor of those that did not; by denying Cunningham low doses of Tylenol 3 in favor of regular Tylenol, which Cunningham asserts does not work for his pain and "risk[s] life threatening damage to [his] already at risk kidneys"; by failing to timely renew Cunningham's prescriptions; by stopping Cunningham's Cymbalta and Prozac prescriptions to "punish" Cunningham; and by refusing to provide a proper pain management schedule.[154] Cunningham also alleges that defendants have failed to "provide routine maintenance, management and service" or repair and replacement for his various medical equipment by not properly sterilizing his Variable Pressure Air Pump for his sleep apnea; improperly sizing and repairing his braces for his knee, elbow, shoulder, and back; refusing him replacement nightguards; "refusing to provide sterile blue pads for use in the handicapped showers"; refusing to replace his eyeglasses or fix his prescription for stronger lenses; refusing to replace his orthotics, such as heel lifts, insoles, and compression socks; refusing to replace his

---

[151] *Id.* at 42 (¶ 254).
[152] *Id.* at 42-43 (¶ 255).
[153] *Ibid.*
[154] *Id.* at 43 (¶ 256).

abdominal binder and wrist splints; and refusing to replace his resistance bands and stretching straps that Cunningham asserts were "taken by malicious custody staff."[155]

Cunningham finally alleges that defendants have either failed or refused to have him be seen by specialists by preventing examinations, failing to schedule appointments, and refusing to comply with specialist recommendations that Cunningham has actually seen, including those of an endocrinologist, an orthopedist, podiatrists, a neurologist, and a vascular specialist.[156]

### Count Seven - First Amendment retaliation against Dr. Lupis

In Count Seven, Cunningham brings a First Amendment retaliation claim against Dr. Lupis.[157] Cunningham alleges that in August 2020, he wrote a "multi-page letter" to Dr. Lupis "addressing some of the many deficiencies in the care being provided" to him, with citations to a medical textbook.[158] In response, Dr. Lupis made a disciplinary report against Cunningham for "threatening," even though Cunningham asserts that "not a single phrase, twisted to its most extreme, could be seen as or misconstrued to be 'threatening' in nature."[159] Cunningham alleges that Dr. Lupis made the disciplinary report "solely to punish Cunningham for continually writing staff about Dr. Lupis's deficiencies in care and having plaintiff's family members call senior staff within the D.O.C. to complain of that care."[160] Because Dr. Lupis made the disciplinary report, Cunningham was placed into the Restrictive Housing Unit ("RHU") for fifteen days while he was under investigation.[161] Cunningham alleges that this investigation was "improperly 'deferred'" in contradiction to the procedure set forth in AD 9.5 and that Dr. Lupis's disciplinary

---

[155] *Id.* at 43 (¶ 257).
[156] *Id.* at 44 (¶ 258).
[157] *Id.* at 45 (¶ 270).
[158] *Id.* at 45 (¶ 264).
[159] *Id.* at 45 (¶ 265).
[160] *Id.* at 45 (¶ 266).
[161] *Id.* at 45 (¶ 267).

report "should have been dismissed outright."[162] While he was in the RHU, Cunningham asserts

that other DOC staff gave away his items to other inmates, causing Cunningham to lose

"hundreds of dollars in commissary items."[163]

Cunningham seeks compensatory and punitive damages, injunctive relief, and costs and

attorney's fees for each of his seven counts.[164]

DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint

against a governmental entity or governmental actors and "identify cognizable claims or dismiss

the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or

fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a

defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations

of the complaint must be read liberally to raise the strongest arguments that they suggest. *See*

*Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to

evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough

facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*,

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).

### *Deliberate indifference*

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel

and unusual punishment. *See* U.S. Const. amend. VIII. "An Eighth Amendment claim arising out

---

[162] *Ibid.*
[163] *Id.* at 45 (¶ 268).
[164] *Id.* at 9, 17-18, 29, 36, 40, 44, 45 (¶¶ 46, 95, 161, 219, 244, 261, 269).

of inadequate medical care requires a demonstration of 'deliberate indifference to [a prisoner's] serious medical needs.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prevail on such a claim, a plaintiff must prove that "(1) objectively, the alleged deprivation of medical care was 'sufficiently serious,' and (2) subjectively, that the defendants acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'" *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).

To be "sufficiently serious," the deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122. This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Factors to consider include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

As for the subjective prong, in the Second Circuit, "[a]llegations of delayed medical care may support a finding of deliberate indifference to a serious medical need, and allegations that delayed treatment resulted in serious harm may bear on the reasonableness of an inference of a defendant's knowledge of the risks to which he or she subjected the plaintiff." *Dotson v. Fischer*, 613 F. App'x 35, 39 (2d Cir. 2015).[165] Under this prong, the "charged officials must be subjectively reckless in their denial of medical care," that is, they must "act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result." *Spavone v. N.Y. State*

---

[165] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

*Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 280) (emphasis in original). They "need only be aware of the risk of harm, not intend harm." *Ibid.*

But "[m]edical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill*, 657 F.3d at 123 (quoting *Chance*, 143 F.3d at 703). Indeed, the level of recklessness required to meet the subjective prong is more than mere negligence. *See Salahuddin*, 467 F.3d at 280. "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Ibid.* Indeed, "[i]t has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill*, 657 F.3d at 123.

Because Cunningham has made multiple Eighth Amendment deliberate indifference claims, I will consider each of these claims separately.

### *Conspiracy*

In multiple counts, Cunningham makes widespread but undetailed accusations of a vast conspiracy among many defendants to violate his constitutional rights by being deliberately indifferent to his medical needs. For instance, in Count Two, Cunningham alleges that 28 defendants were all in a conspiracy together to ignore Cunningham's habeas settlement agreement and to stop his testosterone therapy regimen.[166] In Count Three, Cunningham alleges that 30 defendants have all conspired together to "den[y], minimize[], refuse and eliminate[]" care and management for Cunningham's diabetes to "save money, for staff convenience to

---

[166] *Id.* at 12 (¶ 68).

simply to punish [him]."[167] Cunningham also alleges in Count Three that five defendants conspired to cancel his endocrinology and vascular surgery consultations without further elaboration on the nature of this conspiracy.[168] Cunningham also alleges that several defendants conspired with Dr. Lupis to cause Cunningham's issues with his diet, exercise, and wheelchair use, again without further elaboration.[169] In Count Four, Cunningham claims that 27 defendants have conspired to "save money off the medical care budget" by refusing to provide Cunningham with a properly sized brace,[170] along with a separate, 26-defendant conspiracy to refuse to treat Cunningham's shoulder issues in order to save money.[171] Finally, in Count Five, Cunningham alleges that defendants have conspired together to prevent "other medical practitioners from prescribing the proper care and treatment."[172]

In order to state a claim for conspiracy under § 1983, a plaintiff must allege: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). But while Cunningham alleges widespread conspiracies involving dozens of defendants, Cunningham pleads little to no facts about the nature of these conspiracies beyond that they exist. These paltry allegations are not sufficient to state a conspiracy claim under § 1983. *See ibid.* at 325 ("complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed"). Accordingly, I will dismiss all of Cunningham's conspiracy claims against

---

[167] *Id.* at 21 (¶ 126).
[168] *Id.* at 26 (¶ 152).
[169] *Id.* at 27-28 (¶ 157).
[170] *Id.* at 30 (¶ 173).
[171] *Id.* at 34 (¶ 202).
[172] *Id.* at 42-43 (¶ 255).

all defendants for lack of anything but conclusory allegations.

### DOC medical care system

In Count One, Cunningham alleges that the DOC has "suffered a systemic deficiency in the provision of medical care to inmates within its custody for many years," and that the State of Connecticut and the DOC have allowed the DOC's medical care services to "remain underfunded, short staffed and improperly managed."[173] As a threshold matter, Cunningham includes the DOC as a defendant. But the DOC is an entity of the State of Connecticut and is, therefore, not a "person" subject to suit for a violation of the Constitution under 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012). Accordingly, I will dismiss each of Cunningham's claims against the DOC itself.

Cunningham's claim in Count One amount to a broad and sweeping allegation that the DOC medical care system as a whole is constitutionally suspect, if not outright unconstitutional. But Cunningham's complaint only offers facts as to his own personal experiences with the DOC medical care system. Cunningham's indictment-style allegations against the entire DOC medical care system—that defendants have failed to adequately fund, staff, and manage medical care in the prison system in order to cut costs and save money—are conclusory in nature. Further, while Cunningham specifically names defendants Dr. Lupis, Furtick, Gallagher, Doran, Castro, Shea, Quiros, Walker, McPherson, Lightner, Anker, Doe 2, Farinella, Grant, Fresten, Lockery, Cook and the DOC as having failed to maintain constitutional levels of medical care,[174] Cunningham does not actually allege any personal involvement on the part of these defendants as to the management of the DOC's medical care system. And while Cunningham does allege that

---

[173] *Id.* at 7 (¶¶ 35-36).
[174] *Id.* at 7-8 (¶ 40).

defendant Governor Lamont is aware of the systemic deficiencies in the DOC's medical care system but has failed to take any corrective measures,[175] Cunningham has not alleged Governor Lamont's personal involvement with the violations of Cunningham's own constitutional rights. Because Count One is stated in a conclusory manner, and because Cunningham does not sufficiently allege the personal involvement of any named defendants, I will dismiss Cunningham's deliberate indifference claim against the DOC medical system in Count One.

### *Testosterone deficiency*

In Count Two, Cunningham alleges that he suffers from a testosterone deficiency and that he requires testosterone therapy. Cunningham further claims that in December 2019, several defendants worked in a conspiracy together to stop his testosterone therapy. As I stated above, Cunningham has not adequately alleged a § 1983 conspiracy on this count. However, Cunningham does make specific allegations against certain defendants, namely that Dr. Lupis ended his testosterone therapy. He further alleges that he filed multiple grievances concerning Dr. Lupis's actions to which Dr. Lupis has only responded dismissively, namely by claiming that Cunningham's testosterone issues are not "medically indicated." Dr. Lupis has also allegedly ignored the recommendations of an endocrinology specialist by discontinuing follow-up care and cancelling the specialist's recommended treatment. Cunningham also makes specific allegations against defendant Walker, claiming that Walker "repeatedly remained deliberately indifferent to [his] need for care and impeded and delayed the receipt of that care by maliciously returning [his] Health Services Reviews" to Cunningham as "Returned Without Disposition, "without any basis."[176]

For the purposes of my initial review order, and in light of Cunningham's allegations of

---

[175] *Id.* at 8 (¶ 41).
[176] *Id.* at 15 (¶ 91).

the serious issues he suffers from and risks he faces as a result of the deficiency, I will assume that Cunningham's testosterone deficiency is sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Cunningham has pleaded sufficient facts against Dr. Lupis as to the discontinuation of his testosterone therapy, as Cunningham has alleged that Dr. Lupis was aware of the problem but has failed to address it.

But Cunningham has failed to allege sufficient facts against any other named defendant, including Walker, as he has failed to make more than conclusory allegations that any of these defendants were either personally involved in the constitutional violation or that they knew of and disregarded a risk of serious harm to Cunningham. Accordingly, I will allow the testosterone therapy deliberate indifference claim in Count Two to go forward against Dr. Lupis, but will dismiss it as to all other defendants.

### Diabetes

In Count Three, Cunningham alleges that several defendants have failed to properly manage and provide treatment for his diabetes. Many of Cunningham's allegations are against the defendants as a whole, but do not often allege the personal involvement of specific defendants. Cunningham does, however, provide some allegations against specific defendants, namely McPherson, Shea, Diaz, Furtick, Walker, and Dr. Lupis.

Cunningham alleges that on multiple occasions, McPherson failed and refused to adequately monitor and treat his diabetes, in spite of Cunningham's multiple written requests and grievances. Cunningham also alleges that McPherson refused to monitor and adjust his insulin. Cunningham alleges that Shea told him that Shea spoke with McPherson and that McPherson was monitoring Cunningham's diabetes adequately. Cunningham then alleges that Diaz told him that Furtick referred him to a follow-up with a provider, in response to a request from

Cunningham. Cunningham also alleges that Walker interfered with Cunningham's attempts to address his diabetes issues by returning one of Cunningham's HSRs as "Returned Without Disposition."

Cunningham also again makes allegations against Dr. Lupis, alleging that Dr. Lupis "continuously ignored his pleas for insulin adjustments," instead responding that Cunningham's insulin resistance was "complicated by your poor dietary habits[,] lack of exercise, chronic use of your wheelchair and decreased use of oral hypoglycemics. Raising insulin is not the immediate answer."[177] Cunningham further alleges that Dr. Lupis ignored Cunningham's concerns and reports of DVT-related symptoms. Finally, Cunningham alleges that Dr. Lupis conspired with other defendants to cancel certain specialist appointments, but as I stated above, Cunningham has not adequately alleged a § 1983 conspiracy on this count.

For the purposes of my initial review, I will assume that Cunningham's diabetes is sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Cunningham has pleaded sufficient facts to allow his deliberate indifference claim to go forward against McPherson and Dr. Lupis, as Cunningham had adequately alleged that McPherson and Dr. Lupis were aware of the risk of serious harm to Cunningham if his diabetes was not appropriately managed and treated, and yet failed to do so. However, Cunningham has failed to state a claim against Shea, Diaz, Furtick, and Walker, as well as the other unspecified defendants, as Cunningham has either failed to allege their personal involvement or has failed to adequately allege that they were deliberately indifferent. Accordingly, I will allow the diabetes-related deliberate indifference claim to go forward against McPherson and Dr. Lupis, but I will dismiss it as to all other defendants.

---

[177] *Id.* at 27 (¶ 156).

### Orthopedic conditions

In Count Four, Cunningham alleges that several defendants were deliberately indifferent to his orthopedic problems with his knee, elbow, and shoulder. Given Cunningham's allegations of the severe pain and lack of mobility he suffers as a result of these conditions, I will assume for the purpose of my initial review order that Cunningham's orthopedic problems are sufficiently serious to satisfy the objective prong of the deliberate indifference standard.

As for his knee, Cunningham again alleges a widespread conspiracy that several defendants have conspired to refuse to provide him with a properly sized knee brace. But as I stated above, Cunningham has failed to adequately plead this claim. Cunningham further alleges that unnamed defendants have refused to provide pain management for his knee, and that Dr. Lupis only "belittle[s]" Cunningham by telling him to "just get up and walk."[178] Cunningham specifically pleads that Dr. Lupis is "without any knowledge or understanding of the disability and extent of the injury."[179] Because Cunningham fails to allege the personal involvement of specific defendants as to the failure to provide pain management for his knee and because Cunningham has only alleged that Dr. Lupis has been demeaning to him with regards to his knee problems but does not actually know the nature of the problem, I will dismiss his deliberate indifference claim as to his knee against all defendants.

As for his elbow, Cunningham alleges that after his elbow was X-rayed, demonstrating the presence of foreign bodies, Dr. Lupis only offered a sling that was too small for Cunningham and failed to give him any pain medications, instead removing the pain medications Cunningham received for his other conditions. Dr. Lupis also allegedly ignored Cunningham's request to compare the 2020 elbow X-ray to the 2015 X-ray to show the difference in its condition, and that

---

[178] *Id.* at 31 (¶ 177).
[179] *Ibid.*

Dr. Lupis ignored Cunningham's request for a consultation with an orthopedic specialist. While Dr. Lupis's alleged actions may arise to the level of medical malpractice, Cunningham has not adequately plead that Dr. Lupis knew of a risk of serious harm to Cunningham and disregarded it. Accordingly, I will dismiss Cunningham's deliberate indifference claim as to his elbow against all defendants.

And as for his shoulder, Cunningham again makes another widespread conspiracy allegation that I have already dismissed. Cunningham further makes only general allegations against defendants as a whole, without making specific allegations as to the personal involvement of any one, individual defendant. Cunningham does make some specific allegations against Dr. Lupis. Cunningham initially asserts that he "attempted to interfere with Cunningham's use" of the strap-brace, but does not elaborate on what Dr. Lupis actually did.[180] Cunningham further alleges that Dr. Lupis cancelled an orthopedic consultation, mocked Cunningham's pain, and failed to treat Cunningham's orthopedic needs. Cunningham also alleges that Walker returned his request for a Health Services Review as "Returned Without Disposition" and told Cunningham to instead go to sick call, despite the fact that Walker knew that Cunningham had already been seen by sick call and his providers repeatedly for these issues. Cunningham also asserts that he wrote to Shea with a request for an orthopedic consultation that Shea ignored and that the "Commissioner of Correction" also ignored Cunningham's requests.

While Dr. Lupis's alleged actions may rise to the level of medical malpractice, Cunningham has not adequately plead that Dr. Lupis knew of a risk of serious harm to Cunningham and disregarded it. Cunningham further fails to allege the personal involvement of specific defendants, instead referring to the defendants as a whole. And finally, Cunningham's

---

[180] *Id.* at 34 (¶¶ 204-05).

claims against Walker and Shea are not sufficient to state a claim for deliberate indifference. Accordingly, I will dismiss Cunningham's deliberate indifference claim as to his shoulder against all defendants.

### *Miscellaneous deliberate indifference claims*

In Count Six, Cunningham makes a number of different allegations and claims of deliberate indifference for various conditions, but for most of these allegations, Cunningham fails to name specific defendants or allege any named defendant's personal involvement.

Cunningham first alleges that defendants' failure to provide adequate treatment for his diabetes has led to chronic constipation, hemorrhoids, and a potential thyroid disorder. But Cunningham fails to allege any named defendant's personal involvement. Accordingly, I will dismiss this deliberate indifference claim.

Cunningham then alleges that defendants' failure to provide proper insulin management has caused him to suffer from various diabetic skin problems and that defendants have further either eliminated or refused to provide various medications for these conditions. In most of these allegations, Cunningham again fails to allege the involvement of any specific defendant. Cunningham does allege that in January 2019, defendant Doe 1 refused to look at his feet "in an attempt to maliciously ignore the medical degradation of plaintiff's severe diabetic foot maladies and thereby deny any treatment for these maladies."[181] But Cunningham does not make any allegations against Doe 1 that rise above the level of medical malpractice. Accordingly, I will dismiss this deliberate indifference claim.

Cunningham next alleges that defendants have failed to provide adequate pain management  by ending his existing pain management regimens, denying him low doses of

---

[181] *Ibid.*

Tylenol 3, failing to timely renew his prescriptions, stopping certain prescriptions to "punish" him, and refusing to provide a proper pain management schedule. Cunningham also alleges that defendants have failed to provide routine maintenance, management, service, repair, or replacement for various pieces of medical equipment he uses. But even if some of these claims may be objectively serious, Cunningham fails to allege the personal involvement of any specific defendant. Instead, Cunningham makes conclusory allegations against defendants as a whole. Because Cunningham has not alleged the personal involvement of any specific defendant in a nonconclusory fashion, I will dismiss this deliberate indifference claim.

Finally, Cunningham alleges that defendants have either failed or refused to have him be seen by specialists by preventing examinations, failing to schedule appointments, and refusing to comply with specialist recommendations that Cunningham has actually seen. Again, while these claims may be objectively serious, and could amount to a deliberate indifference claim, Cunningham has failed to allege the personal involvement of any specific defendant. Accordingly, I will dismiss this deliberate indifference claim.

### Gym access

In Count Five, Cunningham alleges that several defendants have prevented him from gaining access to physical and rehabilitative therapy by withholding or preventing his access to the gym. Cunningham alleges that after filing two habeas petitions and a federal lawsuit, he eventually reached a settlement agreement with the DOC in which the state promised to provide Cunningham with gym access five days a week. Cunningham alleges that because the DOC issued his gym pass with an expiration date, contrary to the settlement agreement, several named defendants have "failed and refused" to address his gym pass issues, though he does not provide any details as to how any of these defendants first became aware of his gym pass issues, whether

he filed grievances about the issues, or whether he spoke with any of the defendants. In particular, Cunningham alleges that while defendant Gallagher acknowledged his "pre-habeas settlement," she did not take any further action to address the gym pass issue. Cunningham similarly alleges that Dr. Lupis refused to restore his gym pass, even though Cunningham told Dr. Lupis about the benefits Cunningham received from exercise. Cunningham further alleges that Alvarez told him he does not have a gym pass.

A claim for a violation of the Eighth Amendment due to conditions of confinement requires (1) an "objectively, sufficiently serious . . . denial of the minimal civilized measures of life's necessitates" and (2) a "sufficiently culpable state of mind" on the part of the responsible official. *Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015). "Courts have recognized that some opportunity for exercise must be afforded to prisoners," *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (collecting cases), and while "deprivations of physical exercise for short periods will not rise to constitutional dimension," claims of a deprivation for as little as six or seven weeks may be viable claims, *ibid.* Even if a prisoner is able to exercise within his cell, that does not necessarily mean that he had a meaningful opportunity to exercise, as courts have permitted such Eighth Amendment opportunity-to-exercise claims to go forward "where those claims exclusively concerned impediments to out-of-cell exercise." *Edwards v. Quiros*, 986 F.3d 187, 194 (2d Cir. 2021).

Based on this standard, for the purposes of my initial review, I will assume that Cunningham has sufficiently pleaded that because his gym pass has not been restored, he has been deprived of a meaningful opportunity to exercise. However, most of Cunningham's allegations are general and conclusory. The only specific defendants that he alleges refused to restore his gym pass are Gallagher and Dr. Lupis, and Cunningham's only allegations are that

36

both defendants took no action to restore his gym pass, despite being aware of his settlement

agreement with the DOC. For the purposes of initial review, I find that Cunningham has

sufficiently stated a claim against Gallagher and Dr. Lupis and will allow that claim to go

forward, but I will dismiss the claim as to all other defendants.

### ADA and Rehabilitation Act

The Second Circuit has explained that in order to establish a *prima facie* violation under

the ADA and Rehabilitation Act, a plaintiff must show that (1) "he is a qualified individual with

a disability"; (2) "[the defendant] is an entity subject to the acts"; and (3) "he was denied the

opportunity to participate in or benefit from [the defendant's] services, programs, or activities or

[the defendant] otherwise discriminated against him by reason of his disability." *Wright v. New*

*York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).[182] Cunningham describes several

medical conditions he suffers from, including a testosterone deficiency, diabetes, and at least

three orthopedic injuries that require him to use braces and a wheelchair. For the purposes of my

initial review order, I will assume that Cunningham is a qualified person with a disability.

Further, the ADA applies to state prisons. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S.

206, 209 (1998) (holding that the ADA "unmistakably includes State prisons and prisoners

within its coverage").

I must therefore determine whether Cunningham has sufficiently alleged that he was

discriminated against because of his disability. There are "three available theories" of

discrimination that can be used to establish the third prong of an ADA and Rehabilitation Act

---

[182] I evaluate Cunningham's ADA and Rehabilitation Act claims using the same analysis because they do not
implicate the subtle distinctions between the statutes, although as discussed below the availability of damages may
vary between the statutes. *See Wright*, 831 F.3d at 72 ("Because the standards under both statutes are generally the
same and the subtle distinctions between the statutes are not implicated in this case, we treat claims under the two
statutes identically.").

claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *see also Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) (explaining that the ADA requires covered entities to make "reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities.").

Cunningham does not describe the nature of his ADA and Rehabilitation Act claims; rather, Cunningham only states that he is bringing ADA and Rehabilitation Act claims for Counts Two, Three, Four, and Five based on the facts alleged in each count. In these four counts, Cunningham merely claims that the actions of the defendants in discontinuing his testosterone therapy (Count Two), denying proper treatment for his diabetes (Count Three), denying proper treatment for his orthopedic conditions (Count Four), and failing to ensure his continued access to the gym (Count Five) violated the ADA and the Rehabilitation Act. These allegations only support a claim that Cunningham's medical treatment is inadequate, which is not sufficient to state a claim under the ADA or Rehabilitation Act. *See Currytto v. Furey*, 2019 WL 1921856, at *4 (D. Conn. 2019) ("Because his complaint goes to the inadequacy of treatment for his disability rather than discriminatory action motivated by his disability, he has failed to allege a plausible claim for relief under the ADA."); *see also Cordero v. Semple*, 696 F. App'x 44, 45 (2d Cir. 2017) (affirming the dismissal of an ADA claim because the prisoner "did not allege that his conditions prevented him from participating in any programs or activities"); *Elbert v. New York State Dep't of Corr. Servs.*, 751 F.Supp.2d 590, 595 (S.D.N.Y. 2010) (noting that courts "routinely dismiss ADA suits by disabled inmates that alleged inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability").

Cunningham does assert that his July 2020 fall and injury to his elbow occurred because his cell did not have "ADA compliant handholds" he could use while attempting to sit down on his bunk. [183] But Cunningham does not explicitly assert a failure to accommodate claim under the ADA. Nor does Cunningham elaborate on the nature of these missing handholds or which defendant is responsible for the fact that his cell does not have them. Without more, this is insufficient to state a failure to accommodate claim.

Accordingly, I will dismiss all of Cunningham's claims under the ADA and Rehabilitation Act against all defendants.

### First Amendment retaliation

Cunningham alleges that both defendants Alvarez and Dr. Lupis retaliated against him for his complaints about their respective failures to either maintain the gym equipment or to address Cunningham's medical needs.

"Prison officials may not retaliate against inmates for exercising their constitutional rights." *Perez v. Cook*, 2020 WL 3893024, at *5 (D. Conn. 2020). "To establish a First Amendment retaliation claim, [Cunningham] must show (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against [him], and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019). The adverse action must have been serious enough to "deter a similarly situated individual of ordinary firmness from exercising [his] constitutional rights." *Fabricio v. Annucci*, 790 F. App'x 308, 311 (2d Cir. 2019). A prisoner has a right under the First Amendment to complain about prison conditions, especially conditions that the prisoner believes endanger his health and safety. "The filing of grievances clearly constitutes protected activity."

---

[183] Doc. #1 at 31 (¶ 179).

*Dehaney v. Chagnon*, 2017 WL 2661624, at *3 (D. Conn. 2017).

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015). For this reason, a prisoner's First Amendment retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.*

In Count Five, Cunningham alleges that Alvarez began to retaliate against him after Cunningham filed several grievances in June 2019 alleging that Alvarez was failing to properly maintain the gym equipment.[184] According to Cunningham, in July 2019, Alvarez persuaded others to discontinue Cunningham's gym pass and in August 2019, Alvarez "maliciously" removed Cunningham from the wellness program because he "could not jump rope or perform jumping jacks" due to his knee, hip, and shoulder disabilities.[185] And in January 2020, after Cunningham showed Alvarez a letter from Gallagher acknowledging the settlement agreement permitting Cunningham gym access, Alvarez allegedly told Cunningham, "I don't give a shit what that says[,] until someone tells me in person, you don't have a gym pass!"[186]

By filing a grievance against Alvarez, Cunningham clearly engaged in protected activity. Because Cunningham alleges that soon thereafter, Alvarez began retaliating against him by preventing his access to the gym and by dropping him from the prison gym's wellness program, I will allow his First Amendment retaliation claim against Alvarez to go forward.

---

[184] *Id.* at 39 (¶¶ 235-36).
[185] *Id.* at 39 (¶¶ 235-36).
[186] *Id.* at 39 (¶ 239).

In Count Seven, Cunningham alleges that Dr. Lupis retaliated against him after Cunningham wrote a "multi-page letter" to Dr. Lupis "addressing some of the many deficiencies in the care being provided" to him, with citations to a medical textbook.[187] According to Cunningham, Dr. Lupis retaliated against him by filing a false disciplinary report claiming that Cunningham was threatening him, and that Dr. Lupis made this report "solely to punish Cunningham for continually writing staff about Dr. Lupis's deficiencies in care and having plaintiff's family members call senior staff within the D.O.C. to complain of that care."[188] As a consequence of the report, Cunningham was placed in the RHU for fifteen days.[189]

By complaining about Dr. Lupis's actions with regard to his medical care, Cunningham engaged in protected activity. And because Cunningham alleges that shortly after he sent the letter, Dr. Lupis retaliated against him by filing a false disciplinary report that put Cunningham into the RHU for fifteen days, I find that Cunningham has sufficiently alleged a First Amendment retaliation claim for the purposes of my initial review. Accordingly, I will allow Cunningham's retaliation claim against Dr. Lupis to go forward.

## CONCLUSION

In accordance with the accompanying ruling, the Court enters the following orders:

(1) The following claims against the following defendants shall proceed:

- Count Two (Eighth Amendment deliberate indifference to testosterone deficiency) shall proceed against Dr. Lupis;

- Count Three (Eighth Amendment deliberate indifference to diabetes) shall proceed against Dr. Lupis and McPherson;

---

[187] *Id.* at 45 (¶ 264).
[188] *Id.* at 45 (¶ 266).
[189] *Id.* at 45 (¶ 267).

- Count Five (Eighth Amendment deliberate indifference to exercise) shall proceed against Dr. Lupis and Gallagher;

- Count Five and Count Seven (First Amendment retaliation) shall proceed against Dr. Lupis and Alvarez.

- To the extent that Cunningham alleges state law claims against those defendants against whom he has alleged valid federal law claims—Dr. Lupis, McPherson, Gallagher, and Alvarez—the Court allows those state law claims to proceed against such defendants to the extent that they are based on the same facts and conduct as alleged as a basis for the remaining federal law claims against such defendants.

- All remaining federal claims and defendants are DISMISSED. To the extent that Cunningham may have any state law claims against defendants against whom he has not alleged a valid federal law claim, the Court declines to exercise supplemental jurisdiction over those state law claims alleged against those defendants.

(2) If the plaintiff believes there are additional facts the plaintiff can allege that will overcome any of the deficiencies identified in this ruling, then the plaintiff may file a proposed amended complaint **within 30 days** of this order.

(3) The Clerk shall verify the current work addresses for the named defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses **within twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by not later than the **thirty-fifth (35) day** after mailing. If any defendant fails to return the waiver request, the Clerk shall

arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(4) The Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshals Service. The U.S. Marshal is directed to effect service of the Complaint on defendants Dr. Lupis, McPherson, Gallagher, and Alvarez at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within twenty-one (21) days from the date of this Order and to file a return of service within thirty (30) days from the date of this Order. It is so ordered.

(5) All defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60) days** from the date fthe notice of lawsuit and waiver of service of summons forms are mailed to them.

(6) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(7) The discovery deadline is extended to **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

(8) The deadline for summary judgment motions is extended to **seven months (210 days)** from the date of this Order.

(9) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion (i.e. a motion to dismiss or a motion for summary judgment) **within twenty-one (21)**

**days** of the date the motion was filed. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

(10) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify defendants or defense counsel of his new address.

(11) Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

It is so ordered.

Dated at New Haven this 6th day of October 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge