### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES E. CUNNINGHAM, SR., | ) | 3:21-cv-00273 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANCESCO LUPIS, *et al.*, | ) | |
| *Defendants*. | ) | February 26, 2024 |

## <u>RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

Sarala V. Nagala, United States District Judge.

Plaintiff James E. Cunningham, Sr., proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 asserting claims relating to his medical treatment while in prison. Following initial review, the Court (Meyer, U.S.D.J), ordered all claims dismissed except for an Eighth Amendment claim for deliberate indifference to testosterone deficiency against Dr. Francesco Lupis; an Eighth Amendment claim for deliberate indifference to diabetes needs against Dr. Lupis and Nurse Chena McPherson; an Eighth Amendment claim for deliberate indifference to exercise needs against Dr. Lupis and Disability Rights Coordinator Colleen Gallagher; First Amendment retaliation claims against Dr. Lupis and Recreation Supervisor Rodolfo Alvarez; and state law claims for intentional and negligent infliction of emotional distress based on the same conduct. *See* Initial Review Order, ECF No. 17 at 41–42. Defendants Dr. Lupis, Gallagher, and Alvarez (together, the "Correctional Defendants") have jointly moved for summary judgment. ECF No. 222. Defendant McPherson, who no longer works within the Department of Correction, filed a separate motion for summary judgment. ECF No. 215. For the following reasons, Defendants' motions are GRANTED.

## I.    FACTUAL BACKGROUND

The following facts are taken from Defendants' Local Rule 56(a)1 Statements and supporting exhibits, as Plaintiff has not complied with Local Rule 56(a).[1]

The incidents underlying this action occurred while Plaintiff was confined at MacDougall-Walker Correctional Institution ("MacDougall") and concern his medical care prior to March 3, 2021, the day he filed this action.  Corr. Defs.' Local Rule ("L.R.") 56(a)1 St., ECF No. 222-2 ¶ 2.

Gallagher, Alvarez, and Dr. Lupis are employed by the Department of Correction ("DOC").  *Id.* ¶ 4.  Gallagher is MacDougall's Disability Rights Coordinator, and Alvarez its recreation supervisor.  *Id.* ¶¶ 5–7.  Dr. Lupis was Plaintiff's primary care physician at MacDougall from June 2020 through September 2022.  *Id.* ¶ 93.  Nurse McPherson is an advanced practice registered nurse ("APRN").  Def. McPherson's L.R. 56(a)1 St., ECF No. 215-2 ¶ 2.  She treated Plaintiff at MacDougall from February 26, 2019, until March 23, 2020, before her transfer to

---

[1] All Defendants provided Plaintiff a notice in compliance with Local Rule 56(b) which informed him of the requirements for filing his papers in opposition to the motion for summary judgment under Local Rule 56.  *See* ECF No. 215-8; ECF No. 222-10.  Local Rule 56(a)1 and 3 provide that:  "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted . . . unless such fact is controverted by the Local Rule 56(a)2 Statement," and "each denial in an opponent's Local Rule 56(a)2 Statement[] must be followed by a specific citation[.]"  Instead of reproducing each statement from Defendants' Local Rule 56(a)1 Statement and indicating whether he admits or denies that statement with a citation to admissible evidence, Plaintiff has (1) simply copied and edited many of the Correctional Defendants' statements to reflect his views; and (2) failed to file a statement in response to Defendant McPherson's motion at all.  *Compare, e.g.*, Corr. Defs.' L.R. 56(a)1 St., ECF No. 222-2 ¶ 15 ("If the inmate is not satisfied with the response . . . the inmate must file a Level 1 grievance[.]"); *with* Pl.'s L.R. 56(a)2 St., ECF No. 232 ¶ 15 ("You cannot file a grievance on health issues[.]"); *see also* Pl.'s Opp. to Def.'s McPherson's Mot. Summ. J., ECF No. 233 (containing no Local Rule 56(a)2 Statement).

Plaintiff consciously disregarded his responsibility to cite admissible evidence in support of his denials, stating "I know you don't have to read.  But if I tried to document each page it would take hundreds of pages."  ECF No. 232 at 5.  He instead submits more than 1,200 disorganized pages of exhibits which include medical records, grievances, emails, internet articles, and disciplinary reports interspersed with his own commentary handwritten in the margins.  *See* ECF Nos. 235–36.  Thus, the facts set forth in Defendants' Local Rule 56(a)1 Statements, where supported by the cited records, are deemed admitted.  *See Jusino v. Barone*, No. 3:22-cv-490 (SRU), 2023 WL 6379342, at *2 n.2 (D. Conn. Sept. 29, 2023) (holding in *pro se* action that "to the extent a party's Local Rule 56(a)2 Statement does not comply with Local Rule 56, I may consider a Local Rule 56(a)1 statement of fact to be admitted if supported by evidence");  *see also Wu v. Nat'l Geospatial Intel. Agency*, No. 3:14-cv-1603 (DJS), 2017 WL 923906, at *2 (D. Conn. Mar. 8, 2017) (similar).

another correctional facility.  *Id.* ¶¶ 2, 4.

Plaintiff has been diagnosed with type 2 diabetes, hypertension, hypotestosteronemia (testosterone deficiency), hyperlipidemia, hypothyroid, morbid obesity, and osteoarthritis.  Corr. Defs.' L.R. 56(a)1 St. ¶ 94.  Plaintiff's claims concern treatment related to his testosterone deficiency, diabetes, and his exercise needs.

A.  <u>Testosterone Deficiency</u>

Testosterone is a steroid hormone that is produced in the adrenal glands of males and females and in the male testes.  *Id.* ¶ 96.  Low testosterone occurs naturally as part of the aging process in men, and can affect mood, sex drive, body and facial hair, muscle and body mass, and teste size—but there is no scientific evidence that low testosterone causes death, serious injury, or physical pain.  *Id.* ¶¶ 97, 105.  In certain circumstances, combined with a decrease in vitamin D and calcium, low testosterone can contribute to an increased risk of osteoporosis.  *Id.* ¶ 98.  Low testosterone is not, however, a definitive cause of osteoporosis and providing testosterone to a patient who has osteoporosis does not cure osteoporosis.  *Id.* ¶¶ 99–100.

Prior to July 18, 2020, Plaintiff was receiving chronic testosterone therapy in the form of 200 milligram shots of depo testosterone every other week.  *Id.* ¶ 106.  On July 18, 2020, Plaintiff asked Dr. Lupis to renew his depo testosterone shots, but Dr. Lupis decided to stop the shots because Plaintiff's April 2020 blood tests created concerns that the shots were elevating Plaintiff's hemoglobin/hemocrit levels and resulting in polycythemia, a condition in which the volume percentage of red blood cells are elevated in a patient's blood.  *Id.* ¶¶ 107–09.  Polycythemia increased Plaintiff's risk of developing deep vein thrombosis and a pulmonary embolism, and his risk of sudden death.  *Id.* ¶ 110.  Plaintiff was at an increased risk of these events because he is morbidly obese, diabetic, and uses a wheelchair instead of walking.  *Id.* ¶ 111.  In addition, Dr.

Lupis found no clear indication that continued testosterone injunctions were necessary and was aware of no scientific or medical evidence that low testosterone could harm Plaintiff. *Id.* ¶ 112.[2]

On September 8, 2020, Plaintiff was seen by an endocrinologist concerning his diabetes, at which the use of exogenous testosterone was considered. *Id.* ¶ 113. The endocrinologist did not recommend that Plaintiff resume testosterone therapy, however. *Id.* ¶ 114. Instead, he recommended that various tests be performed first, and that a decision be made based on those test results. *Id.* ¶¶ 115–16.

On October 6, 2020, Dr. Lupis reviewed the results of new blood tests. *Id.* ¶ 117. He observed that Plaintiff was still not producing sufficient testosterone and that Plaintiff's body was suppressing cortisol production because Plaintiff had been a frequent steroid user in the past. *Id.* ¶ 118. Dr. Lupis decided to stop all forms of steroid medication, in addition to the paused testosterone shots, and repeat the test in six months to determine whether Plaintiff's body would begin to produce testosterone normally. *Id.* ¶ 119.

Dr. Lupis restarted Plaintiff's testosterone injections in early August 2021 at a reduced dosage, based on blood test results which alleviated Dr. Lupis' concerns about Plaintiff suffering from polycythemia. *Id.* ¶ 122. Further, Plaintiff was no longer relying on a wheelchair, which lowered the risk of deep vein thrombosis and pulmonary embolism. *Id.* ¶ 123.

Dr. Lupis continued to monitor Plaintiff's blood work for polycythemia and his testosterone levels. *Id.* ¶ 124. Dr. Lupis is not aware of any evidence suggesting that discontinuing testosterone therapy and restarting it at a lower dose caused Plaintiff to experience decreased muscle mass or osteoporosis. *Id.* ¶ 125. Nor is he aware that it caused Plaintiff to suffer any

---

[2] Plaintiff refers the Court to an article from the American Urological Association concerning low testosterone. *See* Pl.'s Exs., ECF No. 235 at 529–604. Although the article cites studies suggesting that low testosterone can be a contributing factor in various heart conditions, it concluded that there was no definite connection between the two. *Id.* at 562.

injury, physical degeneration, or pain, or placed him at an increased risk of doing so. *Id.* ¶ 126.[3]

### B. Type 2 Diabetes

Type 2 diabetes is an impairment of the way the body uses glucose, or sugar, as fuel and leads to inadequate control of blood glucose levels. *Id.* ¶¶ 126–27. Morbid obesity, a diet of high glycemic foods, and steroid use are aggravating factors for diabetes. *Id.* ¶¶ 131–32.

#### 1. Dr. Lupis

Dr. Lupis' treatment plan for Plaintiff's diabetes included temporarily discontinuing his steroid medication; continuing and adjusting Plaintiff's daily insulin regimen; educating Plaintiff on the importance of diet and exercise; ordering different diets for Plaintiff; monitoring his blood work and insulin levels; replacing Plaintiff's wheelchair with a walker; and consulting with an endocrinologist. *Id.* ¶¶ 133–35.

The reduction in steroid medication and adjustment of Plaintiff's daily insulin therapy regimen had generally been effective in treating Plaintiff's diabetes. *Id.* ¶¶ 137–38, 140. Despite repeated advice to the contrary, however, Plaintiff continued to supplement his diet with foods that increase his overall blood sugar levels and contribute to his morbid obesity. *Id.* ¶ 152. Plaintiff's blood sugar level was tested daily before meals (though Plaintiff refused to have his blood sugar tested on many occasions). *Id.* ¶¶ 145, 154. Plaintiff also received hemoglobin A1C tests, which are used to measure blood glucose levels over a three-month period, less frequently. *Id.* ¶¶ 147, 150. The A1C tests showed that Plaintiff's A1C levels decreased from a high of 10.8% on April 7, 2020, to 7.7% on November 8, 2021. *Id.* ¶ 151. A value of less than 7% shows that blood glucose is well-controlled. *Id.* ¶ 150.

---

[3] In response to these statements of fact, Plaintiff simply states "this is not true" and describes his symptoms without citations to admissible evidence. Pl.'s L.R. 56(a)2 St. ¶¶ 125–26. Thus, the Court continues to rely on Defendant's Local Rule 56(a)1 Statement.

Between June 2020 and March 2021, Plaintiff repeatedly wrote to Dr. Lupis requesting increases to his insulin dosage. *Id.* ¶ 141. Dr. Lupis did not increase the dosage, as the amounts Plaintiff was receiving managed his diabetes and any increase would require that Plaintiff take an oral hypoglycemic first, which he refused to do. *Id.* ¶ 142. On August 25, 2020, Dr. Lupis received a seven-page letter from Plaintiff about Plaintiff's medical care. *Id.* ¶ 160. Plaintiff described Dr. Lupis as vindictive and punitive, claimed Dr. Lupis was bullying him, and said that if Dr. Lupis continued to do these things, Plaintiff would "give it back." *Id.* ¶ 161. Dr. Lupis, who had been attacked by a different inmate the previous month, interpreted this language as a threat to his safety. *Id.* ¶¶ 162–64. Dr. Lupis contacted a custody officer and completed an incident report. *Id.* ¶¶ 165–66. Soon thereafter, Plaintiff was issued a disciplinary report for threats and held in restrictive housing for fifteen days while the report was investigated. *Id.* ¶ 167; *see also* Pl.'s Exs., ECF No. 235 at 491, 700.

### 2. APRN McPherson

APRN McPherson saw Plaintiff several times between February and September of 2019 for issues other than diabetes. Def. McPherson's L.R. 56(a)1 St. ¶¶ 4–8. On October 1, 2019, results from an A1C test that APRN McPherson had ordered in September 2019 showed that Plaintiff had a blood glucose level of 10.4%. *Id*. ¶¶ 10–11. That same day, APRN McPherson ordered an oral hypoglycemic to be taken once a day and recommended changes to Plaintiff's diet and increased exercise. *Id*. ¶¶ 12–13.

Plaintiff testified at his deposition that he stopped taking Glipizide, the hypoglycemic prescribed by APRN McPherson, on his own after three or four doses because he experienced a rash. *Id*. ¶ 14. On October 5, 2019, Plaintiff submitted an inmate request form to APRN McPherson seeking finger sticks to monitor his blood glucose levels. *Id*. ¶ 15. APRN McPherson

agreed and ordered finger sticks on Tuesday and Thursday for eight weeks. *Id.* Plaintiff did not state that he had experienced an adverse reaction to Glipizide or that he has stopped taking it. *Id.* ¶¶ 16–17.

On November 29, 2019, Plaintiff was seen by APRN Viktoriya Stork. *Id.* ¶ 19. Noting Plaintiff's high A1C result from October 1, 2019, and his persistent high blood glucose levels since then, APRN Stork started Plaintiff on insulin therapy. *Id.* She ordered Novolin R insulin and increased blood glucose monitoring to four times per day. *Id.* ¶¶ 19–20. APRN Stork also added a second dose of Glipizide, the medication APRN McPherson had ordered, each day. *Id.* ¶ 20.

After APRN Stork initiated insulin therapy, APRN McPherson regularly monitored Plaintiff's blood glucose levels through the electronic medical record. *Id.* ¶ 21. On December 6, 2019, in response to high blood glucose levels, APRN McPherson adjusted some of Plaintiff's medications, including Glipizide. *Id.* ¶ 22. On December 20, 2019, again in response to high blood glucose levels, APRN McPherson added a second type of insulin, Novolin N, to be taken in the evening and, on December 23, 2019, increased the Novolin N dosage. *Id.* ¶¶ 23–24.

On January 3, 2020, APRN McPherson ordered another A1C test and requested an endocrinology consult. *Id.* ¶¶ 25–26. APRN McPherson did not, however, have any control over the scheduling of the consult. *Id.* ¶ 26. On January 5, 2020, APRN Stork changed the Novolin N insulin prescribed by APRN McPherson to Lantus, a different insulin. *Id.* ¶ 27.

On January 15, 2020, Plaintiff met with APRN Stork to discuss his diabetes management. *Id.* ¶ 28. Plaintiff reported difficulty in keeping his blood glucose levels under control and requested an increase in his long-lasting insulin to better manage his blood glucose levels. *Id.* APRN Stork increased Plaintiff's Lantus dosage, increased his Metformin dosage, and continued his Glipizide prescription. *Id.* ¶ 29.

On January 24, 2020, APRN Stork ordered another A1C test, which showed a blood glucose level of 10.1%. *Id*. ¶¶ 31–32. APRN McPherson saw Plaintiff on January 28, 2020, the day the A1C results came in. *Id*. ¶ 33. Plaintiff reported that he stopped taking Metformin. *Id*. At his deposition, Plaintiff testified that he stopped taking Metformin on his own after learning about possible side effects on his kidney function. *Id*. ¶ 34. As he was not taking Metformin, the prescription was discontinued and APRN McPherson adjusted his other medications; she increased his Lantus dosage and started him on Novolin R four times per day. *Id*. ¶¶ 35–37. On February 6, 2020, in response to ongoing blood glucose monitoring, APRN McPherson ordered the Glipizide discontinued and increased Plaintiff's Lantus dosage. *Id*. ¶ 39.

APRN McPherson ordered another A1C test in February 2020 which showed an increased blood glucose level of 10.5%. *Id*. ¶ 43. In response, APRN McPherson increased Plaintiff's Lantus dosage. *Id*. ¶ 44. On March 4, 2020, she again adjusted the insulin dosages, and on March 20, 2020, ordered another A1C test. *Id*. ¶¶ 45, 47.

On March 23, 2020, APRN McPherson saw Plaintiff for the final time. *Id.* ¶ 51. She determined, based on recent clinical results, that he had noninsulin-dependent diabetes mellitus. *Id.* ¶ 48. She discontinued the Lantus and started Plaintiff on Novolin N in the morning, evening, and with each meal. *Id.* As on previous visits, she also educated Plaintiff regarding diet, exercise, and weight loss. *Id*. ¶ 49. She reviewed his commissary food purchases for the prior three months and explained that these purchases showed poor eating habits that did not comply with her prior instructions regarding his diet. *Id.* Plaintiff was not receptive to her attempts to instruct him on the importance of a healthy diet. *Id.* APRN McPherson offered Plaintiff a diabetic diet, but he refused, stating he preferred to continue receiving a low-residue diet. *Id.*

On April 8, 2020, the A1C test results showed an increased blood glucose level of 10.8%.

*Id.* ¶ 54.  In response, APRN McPherson further adjusted Plaintiff's insulin dosages.  *Id.* ¶ 55.  In April of 2020 APRN McPherson was transferred to Corrigan Correctional Center and no longer treated Plaintiff.  *Id.* ¶ 56.

### C.  Exercise Needs

Finally, Plaintiff alleges in his complaint that he was issued a five-day-per-week gym pass with no expiration date in March of 2019 as part of a settlement agreement in *Cunningham v. Knapp*, 3:16-cv-1235(VLB), but that his gym pass incorrectly expired after 90 days, and Gallagher and Lupis failed to remedy the situation.  ECF No. 1 ¶¶ 228–38.  Further, Plaintiff alleges that Alvarez, as recreation supervisor, failed to properly maintain gym equipment.  *Id.* ¶ 234.

There has been no evidence presented to support any of these claims, such as the existence of any settlement agreement.  *See* ECF No. 232 at 150 (Plaintiff annotating the Correctional Defendants' motion for summary judgment to assert "had gym pass since 2015 habeas was never to end").  At most, there are passing references to a gym pass in two Health Services Review forms ("HSRs") that Plaintiff filed:  (1) on January 23, 2019, Plaintiff filed an HSR appeal stating that "four doctors said I need gym pass rehab"; and (2) on October 22, 2019, Plaintiff filed a HSR "asking for wellness program."  Corr. Defs.' L.R. 56(a)1 St. ¶¶ 77–78; Corr. Defs.' Ex. E, Attach. 3, Grievance Log, ECF No. 222-7 at 29, 32.

## II.    RELEVANT PROCEDURAL HISTORY

Defendant McPherson and the Correctional Defendants each filed separate motions for summary judgment.  ECF Nos. 215 (McPherson), 222 (Correctional Defendants).  The original opposition papers submitted by Plaintiff were indecipherable in part due to poor copying.  Plaintiff had previously submitted illegible documents and was put on notice of the Court's need for legible copies.  *See* ECF No. 32.  On August 2, 2023, the Court ordered Plaintiff to submit legible copies

of the handwritten portions of the opposition documents, or the Court would decide the pending motions based on legible portions.  ECF No. 247.  The Court explicitly stated that "Plaintiff shall submit exact copies of what was previously filed" and that "[t]his is not an opportunity for Plaintiff to revise his arguments."  *Id.*  Although Plaintiff submitted documents in response to the Court's order on August 11, 2023, they were not exact copies, and the copies are still unreadable in large part.  *See* ECF Nos. 249, 250.  As Plaintiff has not followed the Court's instructions, the Court does not consider the documents submitted on August 11, 2023.

### III.   MOTION TO STRIKE AND MOTIONS FOR LEAVE TO FILE SUR-REPLIES

To begin, the Court GRANTS the Correctional Defendants' motion to strike Plaintiff's sur-reply brief and DENIES Plaintiff's motions for permission to file sur-replies.

After Defendants filed their reply briefs to Plaintiff's memoranda in opposition to their motions for summary judgment, Plaintiff filed a sur-reply brief addressing both motions, ECF No. 239.  The Correctional Defendants moved to strike the sur-reply on the grounds that Plaintiff failed to seek permission to file a sur-reply as required by the Court's local rules and that the undersigned's chambers practices do not permit sur-replies.  ECF No. 240.  In response to the motion to strike, Plaintiff has filed motions seeking permission to file sur-replies, ECF Nos. 244–45, and a second sur-reply, ECF No. 246.

Local Civil Rule 7(d) provides:  "No sur-replies may be filed without permission of this Court, which may, in its discretion, grant permission upon a showing of good cause."  If a court has not ordered further briefing, "[s]ur-replies are appropriate only in the exceptional though rare case" where "a party demonstrates to the court that papers to which it seeks to file a reply raise new issues which are material to the disposition of the question before the court."  *Sec. & Exch. Comm'n v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 WL 2784871, at *1 (E.D.N.Y. July 15,

2022) (internal quotation marks and citation omitted).  The Second Circuit recognizes the district court's power to strike an unauthorized sur-reply.  *See Laguerre v. Nat'l Grid USA*, No. 20-3901-cv, 2022 WL 728819, at *5 n. 7 (2d Cir. Mar. 11, 2022) (summary order).

In his motions for leave, Plaintiff merely states that he was unaware of the local rule and wants to reply to inaccurate statements that are not supported by his medical records.  *See* ECF Nos. 244.  This is not a showing of good cause.  By contrast, Plaintiff is describing a routine disagreement amongst parties as to whether facts in dispute preclude summary judgment.  Further, in accordance with the special solicitude afforded *pro se* plaintiffs, the Court has reviewed the sur-replies and determined they indeed consist merely of statements expressing disagreement with Defendants' statements in their reply briefs.  The Court is capable of ascertaining whether Defendants' statements are supported by the medical records cited in support thereof, without the assistance of sur-reply briefing.

In addition, the Federal Rules of Civil Procedure do not authorize litigants to file sur-replies, and this Court's practices specifically prohibit it.  Plaintiff has offered no argument warranting deviating from chambers practices and permitting a sur-reply in this case.  *See Ganim v. United States*, No. 3:08cv1759(JAB), 2009 WL 5216950, at *9 n. 18 (D. Conn. Dec. 30, 2009) (striking sur-reply and noting "Court did not give the Government leave to file a sur-reply, and the Government cites no authority for the proposition that reiteration of a position and clarification of a record provide grounds to file a sur-reply absent leave of the Court").

For these reasons, the Court will not consider Plaintiff's sur-reply briefs.  The Correctional Defendants' motion to strike Plaintiff's sur-reply brief is GRANTED and Plaintiff's motions for permission to file sur-replies is DENIED.

## IV.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with

respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Moreover, the Court bears in mind that a *pro se* litigant's filings must be liberally construed to raise the strongest arguments they suggest. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (collecting cases regarding the "special solicitude" afforded to *pro se* litigants).

## V.   DISCUSSION

The Court holds that Plaintiff may not proceed with his federal claims against Gallagher or Alvarez, nor any federal claim against Dr. Lupis except for deliberate indifference to testosterone deficiency under the Eighth Amendment, because Plaintiff has failed to exhaust his administrative remedies. The remaining Eighth Amendment claims against Dr. Lupis for deliberate indifference to testosterone deficiency, and against APRN McPherson for deliberate indifference to diabetes needs, fail as a matter of law. The Court exercises supplemental jurisdiction over Plaintiff's remaining state law claims for negligent and intentional infliction of emotional distress, but finds the claims are either barred by immunity or fail as a matter of law. Defendants' motions for summary judgment are therefore GRANTED in full.

A. <u>Exhaustion of Administrative Remedies</u>

*1. Legal Standard*

The PLRA mandates that incarcerated plaintiffs exhaust all administrative remedies available to them before filing a complaint in federal court under 42 U.S.C. § 1983 or any other federal law.  42 U.S.C. § 1997e(a).  The PLRA requires "proper exhaustion," meaning that plaintiffs must exhaust all available remedies in "compliance with an agency's deadlines and other critical procedural rules."  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  The requirement of exhaustion of administrative remedies serves "two main purposes."  *Id.* at 89.  First, exhaustion gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures."  *Id.* (cleaned up) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1995)).  Second, exhaustion promotes efficiency because "[c]laims can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court."  *Woodford*, 584 U.S. at 89.  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Because the PLRA only applies to federal claims, however, any failure to exhaust state law claims would not render those claims futile.  *See Nau v. Papoosha*, No. 3:21cv19 (OAW), 2023 WL 8281611, at *6 (D. Conn. Nov. 30, 2023) (collecting cases).

The PLRA requires "proper exhaustion"; the inmate must complete all steps required by the administrative review process applicable to the institution in which he is confined and do so in compliance with the relevant procedural rules.  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir.

2011) (exhaustion necessitates "using all steps that the agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.  Completing the exhaustion process after the complaint is filed does not satisfy the exhaustion requirement. *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002); *see also Girard v. Chuttey*, 826 F. App'x 41, 44–45 (2d Cir. 2020) (holding inmate failed to exhaust administrative remedies because he commenced action in district court before administrative appeal was decided or response period elapsed).

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"); *Timmons v. Schriro*, No. 14-CV-6606 RJS, 14-CV-6857 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

The exhaustion requirement may be excused in limited circumstances, when the administrative remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 578 U.S. 632, 642–43 (2016).  An inmate is required to "to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).  The Supreme Court has noted three circumstances where an administrative procedure is considered unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—

with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44.  In turn, the Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016).  In considering the availability of administrative remedies, however, the Court is guided by these illustrations.  *See Mena v. City of New York*, No. 13-cv-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Exhaustion of administrative remedies is an affirmative defense.  Thus, the defendant bears the burden of proof, though a district court may dismiss a complaint for failure to exhaust "if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *See Williams*, 829 F.3d at 122.  Once a defendant establishes that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must show that the administrative remedies were not available to him under *Ross*, or present contrary evidence that he did in fact exhaust his administrative remedies.  *See McLean v. Harris*, No. 9:19-CV-1227 (BKS/ATB), 2022 WL 1129811, at *4 (N.D.N.Y. Feb. 9, 2022).

### 2.  *DOC's Administrative Directive 9.6*

There are two types of administrative remedies available to Connecticut inmates:  general inmate grievances under Administrative Directive 9.6, and Health Services Reviews ("HSRs") under Administrative Directive 8.9.  HSRs are used to challenge diagnosis and treatment decisions and the actions of health services providers.  The general inmate grievances under A.D. 9.6 are used for all other claims.

As Gallagher and Alvarez are not health care providers, Plaintiff was required to follow

the procedures set forth in A.D. 9.6 to exhaust his administrative remedies with regards to any claims against them.

The general grievance procedure is set forth in A.D. 9.6.  *See* Corr. Defs.' Ex. B, Attachment 1, ECF No. 222-4 at 12–25 (version of A.D. 9.6 in effect at the time Plaintiff filed this action).  An inmate must first attempt to resolve the matter informally.  He may attempt to verbally resolve the issue with an appropriate staff member or supervisor.  A.D. 9.6 ¶ (6)(A).  If attempts to resolve the matter verbally are not effective, the inmate must make a written attempt using inmate request form CN 9601 and send the form to the appropriate staff member or supervisor.  *Id.* If an inmate does not receive a response to the written request within fifteen business days, or the inmate is not satisfied with the response to his request, he may file a Level 1 grievance on inmate request form CN 9602.  A.D. 9.6 ¶ (6)(C).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *Id.*  The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance.  A.D. 9.6 ¶ (6)(I).  The Unit Administrator may extend the response time upon notice to the inmate on the prescribed form.  A.D. 9.6 ¶ (6)(J).

The inmate must appeal the disposition of the Level 1 grievance by the Unit Administrator, or the Unit Administrator's failure to dispose of the grievance in a timely manner, to Level 2.  The Level 2 appeal of a disposition of a Level 1 grievance must be filed on inmate request form CN 9604 within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. A.D. 9.6 ¶ (6)(K).  The Level 2 appeal of the Unit Administrator's failure to dispose of the Level 1 grievance in a timely manner must be filed within sixty-five days from the date the Level 1

grievance was filed by the inmate and is decided by the District Administrator.  A.D. 9.6 ¶ (6)(M).

The response to the Level 2 appeal "shall be in writing within 30 business days of receipt by the

Level 2 Reviewer."  A.D. 9.6 ¶ (6)(K).

Level 3 appeals are restricted to challenges to department policy, the integrity of the

grievance procedure, or Level 2 appeals to which there has been an untimely response by the

District Administrator.  A.D. 9.6 ¶ (6)(L).  Any Level 3 grievance appeal filed as a result of the

inmate not receiving a timely response to his Level 2 grievance appeal must be filed within thirty-

five days of filing the Level 2 grievance.  A.D. 9.6 ¶ (6)(M).

### 3.  Discussion

The Court finds that Plaintiff has failed to exhaust his administrative remedies as to all

federal claims against Gallagher and Alvarez, and all federal claims against Dr. Lupis except for

Plaintiff's Eighth Amendment claim for deliberate indifference to testosterone deficiency.[4]

### a.  Gallagher and Alvarez

Plaintiff claims that Gallagher was deliberately indifferent to his need for exercise because

she failed to take any action to restore his gym pass despite knowledge of Plaintiff's alleged

settlement agreement with the DOC that required him to be afforded gym access five days per

week.  He claims that Alvarez retaliated against him because Plaintiff complained that Alvarez

failed to maintain gym equipment.  Before proceeding on either claim in federal district court,

Plaintiff must have properly exhausted his administrative remedies under A.D. 9.6.  The Court

finds that Plaintiff has not exhausted either claim.

Defendants have put forth evidence that, besides a single grievance concerning a diet tray,

Plaintiff did not file any Level 1 grievances or Level 2 grievances between July 1, 2017, and June

---

[4] Because APRN McPherson does not move for summary judgment on this basis, the Court does not consider whether this affirmative defense would bar Plaintiff's claims against her.

30, 2021, against Alvarez, Gallagher, or any official.  Corr. Defs.' L.R. 56(a)1 St. ¶ 20.  Defendants attach a declaration from administrative remedies coordinator Jessica Bennett that describes her review of all MacDougall grievance logs for grievances filed by Plaintiff between July 1, 2017, and June 30, 2021.  This revealed one Level 1 Grievance dated January 18, 2018, filed by Plaintiff requesting "real meat[,] fish[, and] chicken" instead of processed foods.  Bennett Decl., ECF No. 222-4 ¶¶ 24–30; *see also* Jan. 18, 2018, Level 1 Grievance, ECF No. 222-4 at 314.  There is no evidence in the record that Plaintiff filed an administrative grievance against Gallagher or Alvarez (or anyone else) related to the frequency of his gym access.  Thus, Defendants have provided evidence that there is no dispute Plaintiff wholly failed to exhaust general grievance procedures as to his claims against Gallagher and Alvarez.

At most, there are passing references to a gym pass in two HSRs that Plaintiff filed.  *See* Corr. Defs.' L.R. 56(a)1 St. ¶¶ 77–78; Corr. Defs.' Ex. E, Attach. 3, Grievance Log, ECF No. 222-7 at 29, 32 (showing a January 23, 2019, HSR appeal stating that "four doctors said I need gym pass rehab," and a October 22, 2019, HSR "asking for wellness program").  To begin, HSRs are not the proper mechanism to file grievances against Gallagher and Alvarez as non-medical professionals.  In any event, the October 22, 2019, HSR was returned without disposition and Plaintiff was encouraged to write Alvarez.  Corr. Defs.' L.R. 56(a)1 St. ¶ 79.  Plaintiff failed to do so; accordingly, Alvarez was never contacted in person or in writing regarding Plaintiff's purported issue, nor aware of any HSR until reviewing documents for this action.  *Id.* ¶¶ 80–82.  Further, the Court cannot conclude that either of these HSRs, if received by Gallagher or Alvarez,

would have even put them on notice of the particular claims Plaintiff makes in this suit.[5]

Plaintiff does not offer any evidence to rebut this conclusion. In his Local Rule 56(a)2 Statement, Plaintiff simply states "Alvarez refused to answer informal resolution so you cannot file anything else no remedy available[.]" Pl.'s 56(a)1 St. ¶ 24. Plaintiff is incorrect. A.D. 9.6 clearly states that if an inmate does not receive a response to his request for informal resolution, he may proceed to file a Level 1 grievance and explain on the form why no evidence of informal resolution is attached. Thus, administrative remedies were available to Plaintiff on his claims, but it appears he chose not to use them.[6]

In short, Gallagher and Alvarez have met their burden of showing that Plaintiff has failed to exhaust his administrative remedies on any claim against them. Plaintiff does not submit evidence of any grievance or ADA appeal he filed against Gallagher or Alvarez in response. Gallagher and Alvarez are therefore entitled to summary judgment on the federal claims.

b.   Dr. Lupis

Because Dr. Lupis is a health care provider, Plaintiff was required to exhaust his administrative remedies for claims against him through HSRs, as provided in A.D. 8.9. *See Cruz v. Naqvi*, No. 3:21-cv-8 (SALM), 2022 WL 4225491, at *8 (D. Conn. Sept. 13, 2022) (explaining

---

[5] Because Plaintiff is not bringing a claim under the Americans with Disabilities Act, it is unclear whether he needed to have filed a separate grievance to have exhausted his claim against Gallagher concerning any supposed ADA decision in her role as Disability Rights Coordinator. *See* A.D. 9.6 ¶ 15 ("An ADA decision may be appealed by completing and depositing CN 9602 . . . within 15 calendar days of meeting with the Unit ADA Coordinator."). To the extent any such grievance filing was required, Defendants have submitted evidence that Plaintiff failed to exhaust administrative remedies through this avenue as well. Defendants attach a declaration from Gallagher confirming that, not only did Plaintiff fail to file any Level 1 grievances against her or Alvarez, Plaintiff failed to file an ADA appeal against Gallagher in her role as Disability Rights Coordinator. Gallagher Decl., ECF No. 222-6 ¶¶ 15–17.

[6] Plaintiff also argues that he was told he could not file a grievance against Alvarez for denial of his gym pass because Alvarez is not in charge of issuing passes. Pl.'s L.R. 56(a)2 St. ¶ 23. Plaintiff's claim against Alvarez, however, does not relate to denial of gym passes; rather, it is for retaliation after Plaintiff complained that Alvarez did not maintain gym equipment.

that plaintiffs must exhaust claims against medical staff pursuant to A.D. 8.9, and all other claims pursuant to A.D. 9.6)); Corr. Defs.' Ex. E, Attach. 1, ECF No. 222-7 at 14–18 (version of A.D. 8.9 in effect at the time of the underlying incidents).  There are two types of HSRs.  The first seeks review of a diagnosis or treatment, including a decision to provide no treatment.  A.D. 8.9 ¶ (9).  The second seeks review of an administrative issue, such as a particular practice, procedure, or administrative policy, or improper conduct by a health services provider.  *Id.*

Prior to filing either type of HSR, the inmate must seek an informal resolution of his claim by discussing the claim, face-to-face, with the appropriate staff member or by submitting a written CN 9601 report to a supervisor.  A.D. 8.9 ¶ (10).  Staff shall respond to the inmate within fifteen days of the receipt of a written request.  *Id.*

For the treatment-related type of HSR, the inmate must check the "Diagnosis/Treatment" box on a CN 9602 form and concisely explain the reason for his dissatisfaction.  A.D. 8.9 ¶ (11).  Upon receipt of the form, the HSR Coordinator schedules an HSR appointment with an appropriate medical professional as soon as possible.  *Id.*  If the medical professional determines that the treatment was appropriate, the exhaustion process is concluded.  *Id.*

An inmate filing the administrative type of HSR for review of a practice or procedure must check the "All Other Health Care Issues" box on the form and provide a concise statement of what he believes to be wrong and how he has been affected.  A.D. 8.9 ¶ (12).  The HSR Coordinator evaluates, investigates, and decides each review within thirty days.  Each review must be rejected, denied, compromised, upheld, or withdrawn.  A.D. 8.9 ¶ (12)(A).  If the inmate is dissatisfied with the response, he may appeal the decision within ten business days.  A.D. 8.9 ¶ (12)(B).  HSR appeals are decided by the designated facility health services director or his designee within fifteen business days after receiving the appeal.  A.D. 8.9 ¶ (12)(C).

Plaintiff's claims against Dr. Lupis relate to (1) Dr. Lupis' discontinuation of testosterone therapy; (2) his insulin treatment for Plaintiff's diabetes; (3) his alleged failure to ensure the continued issuance of Plaintiff's gym pass; and (4) his alleged retaliation by initiating a disciplinary report against Plaintiff after Plaintiff wrote a letter to staff about his medical care. The first two claims relate to diagnosis and treatment. The third and fourth claims relate to the actions of a medical provider, which are better characterized as administrative issues. Of these four issues, Plaintiff has only exhausted his administrative remedies as to Dr. Lupis' discontinuation of testosterone therapy.

First, related to discontinuation of testosterone therapy, Defendants have submitted a copy of two diagnosis/treatment HSRs submitted by Plaintiff on September 16, 2020, regarding this decision of Dr. Lupis. *See* Corr. Defs.' Ex. E, Attach. 6, September 16, 2020, HSR, ECF No. 222-7 at 36–40. The first states "I want my testosterone back," and the second repeats this phrase and lists symptoms such as "my body is falling apart," "I'm losing muscle by the minute," and "I only want to lose Fat only." *Id.* at 37, 40. The Court finds these HSRs specific enough to have put Dr. Lupis on notice of, and therefore exhaust, Plaintiff's claim for testosterone deficiency. Dr. Lupis argues that Plaintiff needed to be more specific to put Dr. Lupis on notice of the seriousness of his medical need; but this HSR reflects many of the symptoms Plaintiff complains of in his complaint, such as osteoporosis and cardiac muscle weakness. ECF No. 1 ¶¶ 93–94. The Second Circuit has held a plaintiff is "required to give notice to the defendants about the factual basis of his claim," but "need not specifically articulate his claims in grievances in the exact same manner that he articulates them in federal court." *Edwards v. Melendez*, No. 19-753, 2020 WL 6154890, at *2 (2d Cir. Oct. 21, 2020) (summary order). As this is a diagnosis and treatment issue, Plaintiff was required to do nothing further under A.D. 8.9. The Court therefore considers Plaintiff's claim

against Dr. Lupis regarding testosterone therapy to be exhausted.

Plaintiff did not, however, exhausted his diabetes treatment claim against Dr. Lupis before filing this lawsuit. Plaintiff has not filed any HSRs against Dr. Lupis concerning his monitoring of Plaintiff's insulin. Walker Decl., ECF No. 222-7 ¶¶ 49–60. Defendants have submitted a copy of Plaintiff's grievance log, which contains only two entries related to diabetes. First, on October 1, 2020, Plaintiff requested referral to an orthopedic doctor, but was told "orthopedics will not address your diabetic neuropathy." *See* Corr. Defs.' Ex. E, Attach. 3, Grievance Log, ECF No. 222-7 at 26. This does not concern Dr. Lupis's adjustment of Plaintiff's insulin dosage. Second, there is an April 15, 2021, entry seeking referral to an endocrinologist. *See id.* at 24. As Defendants do not provide a copy of the grievance, the Court will assume that this request is related to Plaintiff's diabetes. Nonetheless, it was made *after* March 3, 2021, the date that Plaintiff filed this suit. As noted above, even assuming this grievance did put Dr. Lupis on notice of Plaintiff's complaints related to his insulin monitoring, completing the exhaustion process after the federal court complaint is filed does not satisfy the exhaustion requirement. *See Neal*, 267 F.3d at 122–23; *Girard*, 826 F. App'x at 44–45. Thus, the Court agrees with Defendant and finds this claim was not exhausted for purposes of deciding this motion.[7]

Third, and for similar reasons it found Plaintiff's gym pass claim unexhausted as to Gallagher and Alvarez, the Court finds that Defendant has not exhausted this claim as to Dr. Lupis. As mentioned, there are only two HSRs that make passing references to a gym pass. *See* Corr. Defs.' L.R. 56(a)1 St. ¶¶ 77–78; Corr. Defs.' Ex. E, Attach. 3, Grievance Log, ECF No. 222-7 at

---

[7] APRN McPherson's motion for summary judgment includes five inmate requests sent between January 24, 2020, and January 26, 2020, complaining about APRN McPherson's management of Plaintiff's diabetes. Def. McPherson's L.R. 56(a)1 St. ¶ 30 (claiming, for example, that "Chena McPherson is refusing to monitor adjust insulin"). The request forms do not involve any of Plaintiff's claims against Dr. Lupis; nor would they suffice to exhaust any claims against him because the forms are distinct from the requisite Level 1 HSR. *See* Corr. Defs.' L.R. 56(a)1 St. ¶¶ 15–16 (explaining Plaintiff may attempt to resolve an issue through inmate request forms before filing a Level 1 HSR).

29, 32.  The first is dated January 23, 2019, eighteen months before Dr. Lupis began treating Plaintiff, and it references Dr. Pillai, not Dr. Lupis.  The second HSR references only a "wellness program."  As Plaintiff has submitted no contrary evidence that he filed an HSR regarding Dr. Lupis' actions regarding his gym pass, he has not exhausted his administrative remedies on this claim.

Last, the Court finds that Plaintiff has not exhausted his claim that Dr. Lupis retaliated against him for writing a letter to staff about his medical care by initiating a false disciplinary report that Plaintiff had threatened him.  Plaintiff did not file any HSRs between January 1, 2020, and March 3, 2021, related to this administrative issue.  *See* Walker Decl., ECF No. 222-7 ¶¶ 49–60; Grievance Log, ECF No. 222-7.  Thus, Plaintiff has failed to exhaust his retaliation claim against Dr. Lupis.

To summarize, the Court considers the deliberate indifference claims relating to testosterone therapy to be exhausted, but not the other deliberate indifference claims nor the retaliation claim.  The Correctional Defendants' motion for summary judgment is therefore granted on deliberate indifference claims related to insulin treatment, the gym pass, and retaliation, and the Court does not address these claims further.

B.  Deliberate Indifference to Medical Needs

The Court proceeds to analyze the remaining exhausted Eighth Amendment claim against Dr. Lupis for deliberate indifference related to his testosterone deficiency, and the Eighth Amendment claim against APRN McPherson for deliberate indifference related to her treatment of his diabetes.  For the following reasons, both Dr. Lupis and McPherson are entitled to summary judgment.

### 1. Legal Standard

To establish an Eighth Amendment claim regarding inadequate medical treatment, Plaintiff must present evidence "showing the offending official's 'deliberate indifference to [his] serious medical needs.'"  *Thomas v. Wolf*,  832 F. App'x 90, 92 (2d Cir. 2020) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)).  There are two elements to a claim for deliberate indifference to medical needs.  The first element is objective.  The inmate must "show that he was 'actually deprived of adequate medical care' by an official's failure 'to take reasonable measures in response to a [sufficiently serious] medical condition.'"  *Id.* (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006)).  Establishing an objectively serious deprivation requires the court to make two separate inquiries.  First, the court must determine whether the inmate "was actually deprived of adequate medical care."  *Salahuddin*, 467 F.3d at 279.  The medical providers are only required to have "act[ed] reasonably."  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)).  The second inquiry requires the court to determine "whether the inadequacy in medical care is sufficiently serious," which "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Id.* at 280.  Thus, although the objective element sometimes is referred to as the seriousness of the medical need, that is only one factor evaluated in determining the seriousness of the deprivation of medical care.  *See id.*

If the claim is for denial of any treatment, the court will consider "whether the inmate's medical condition is sufficiently serious."  *Id.*  A "sufficiently serious" deprivation can exist if the plaintiff suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain.  *See Brock v. Wright*, 315 F.3d 158, 162–63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  A medical condition may not initially be serious, but may become

serious because it is degenerative and, if left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir. 2000).  The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects the individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Courts distinguish claims for denial of treatment from those for delay in treatment.  *See Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019) (summary order).  If the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry is narrower, focusing "on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

The second element of a deliberate indifference claim is subjective.  The inmate must show "that the official acted with a culpable state of mind of 'subjective recklessness,' such that the official knew of and consciously disregarded 'an excessive risk to inmate health or safety.'" *Wolf*, 832 F. App'x at 92 (citations omitted).  Where the claim is for a delay in treatment, a prisoner's Eighth Amendment rights are violated only where the defendant "knowingly or intentionally" delayed medical treatment.  *See Jimenez v. Sommer*, No. 14-cv-5166 (NSR), 2017 WL 3268859, at *8 (S.D.N.Y. July 28, 2017) (citation omitted).  Deliberate indifference claims based on a delay in treatment are "difficult to establish." *Oh v. Saprano*, No. 3:20-CV-237 (SRU), 2020 WL 4339476, at *4 (D. Conn. July 27, 2020).  The Second Circuit has noted that such claims have

typically been reserved for cases where, for, example prison officials deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days or delayed major surgery for over two years. *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (summary order).

Generally, allegations constituting negligence or medical malpractice are insufficient to support an Eighth Amendment deliberate indifference claim. *See Walker*, 717 F.3d at 125 (stating "mere negligence' is insufficient to state a claim for deliberate indifference).

2. *Discussion*

a. Dr. Lupis (Testosterone)

Dr. Lupis discontinued Plaintiff's testosterone therapy in July of 2020 but recommended testosterone therapy in August of 2021. As this claim is for an interruption in treatment, the Court must focus on the effect of the interruption in treatment, and not just on the underlying condition that required testosterone therapy, to determine whether there is a serious medical need.

Dr. Lupis has submitted a declaration stating that he is unaware that low testosterone could cause the dire consequences Plaintiff alleges. Plaintiff points the Court to no evidence suggesting that low testosterone can cause death or serious bodily injury or, more importantly, that *he* suffered any such serious injury as a result of the interruption in his testosterone therapy. Thus, Plaintiff has not presented evidence showing that the interruption in testosterone therapy is a serious medical need. *Accord Calderon v. Wheeler*, No. 9:06-CV-0963 (GTS/DEP), 2009 WL 2252241, at *11 (N.D.N.Y. July 28, 2009) (noting that nothing "in the record reveals that plaintiff's low testosterone levels constituted a condition of urgency which could result in degeneration or extreme pain" and dismissing deliberate indifference claim for failure to establish existence of serious medical need).

Further, Dr. Lupis has provided his medical reasons for the interruption in testosterone therapy; therefore, even if Plaintiff had established a serious medical need, Plaintiff's claim is merely a disagreement with the course of treatment Dr. Lupis undertook.  Dr. Lupis paused the testosterone shots in July of 2020 because he was concerned that the shots were elevating Plaintiff's hemoglobin/hemocrit levels and resulting in polycythemia.   When he reviewed Plaintiff's bloodwork in October of 2020, he was concerned that Plaintiff's body was suppressing cortisol production because Plaintiff had been a frequent steroid user in the past, and wanted to determine whether Plaintiff could begin to produce testosterone normally.   Dr. Lupis recommenced testosterone therapy after Plaintiff's blood test results improved and he was using a walker instead of relying on a wheelchair, thereby alleviating Dr. Lupis' concerns relating to Plaintiff's diabetes.   As Dr. Lupis' decision is supported by his medical judgment, the claim appears to be a disagreement over treatment—even if Plaintiff had established a serious medical need.  Such a claim is not cognizable under section 1983.  *See Gaffney v. Perelmuter*, 805 F. App'x 53, 56 (2d Cir. 2020) (summary order) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." (quoting *Chance*, 143 F.3d at 703)); *Munger v. Cahill*, 792 F. App'x 110, 113 (2d Cir. 2020) (summary order) (same).  Defendants' motion for summary judgment is granted on the claim regarding the interruption in testosterone therapy.

### b.  APRN McPherson (Diabetes)

The Court likewise holds that APRN McPherson is entitled to summary judgment on the deliberate indifference claim brought against her.

Plaintiff's claim that APRN McPherson did not monitor his insulin dosage aggressively enough is a disagreement over treatment rather than a denial of treatment.  *See Gaffney*, 805 F.

App'x at 56; *Munger*, 792 F. App'x at 113; *Chance*, 143 F.3d at 703. Despite Plaintiff's allegations, the record shows that APRN McPherson consistently ordered tests to monitor Plaintiff's blood glucose level and ordered changes to his medication in response to the test results. The record also shows that Plaintiff did not take prescribed medications and never informed APRN McPherson that he had stopped taking the medication. Thus, her prescription decisions were based, in part, on the assumption that Plaintiff was taking all the medications that had been prescribed. Nor was Plaintiff compliant with APRN McPherson's recommendations regarding diet and exercise. Therefore, Plaintiff cannot show that APRN McPherson deprived him of a serious medical need under the first prong of the deliberate indifference analysis, nor that APRN McPherson intentionally disregarded an excessive risk to his health. In short, Plaintiff has submitted no evidence demonstrating the existence of a material issue of fact regarding APRN McPherson's treatment. Absent any evidence showing that the treatment rises to the level of deliberate indifference, APRN McPherson is entitled to summary judgment.

## IV.    STATE LAW CLAIMS

Finally, the Court exercises supplemental jurisdiction over Plaintiff's remaining negligent and intentional infliction of emotional distress claims, and finds that the claims are either barred by immunity or fail as a matter of law.

Federal courts have supplemental jurisdiction over state law claims that "are so related to federal question claims brought in the same action as to 'form part of the same case or controversy[.]'" *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc*., 373 F.3d 296, 308 (2d Cir. 2004) (quoting 28 U.S.C. § 1367(a)). "The fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so"; a district court "may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c)." *Id*. Section 1367(c)

provides that district courts may decline to exercise supplemental jurisdiction over a claim if: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). This determination is within the district court's discretion. *Briarpatch Ltd.*, 373 F.3d at 308.

When one of the four prongs of § 1367(c) is applicable, the Court nonetheless "should not decline to exercise supplemental jurisdiction" unless it also determines that doing so would not promote the values of "economy, convenience, fairness, and comity." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004) (referencing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966)). As a general rule, "when 'all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point towards declining to exercise jurisdiction over the remaining state law claims.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). But even in such a situation, it may be appropriate to exercise supplemental jurisdiction "in long-pending cases presenting no novel issues of state law and where 'discovery has been completed, dispositive motions ha[ve] been submitted, and the case would soon be ready for trial.'" *Id.* at 83 (quoting *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014)).

This is such a case. Plaintiff's case has been pending for three years, discovery is completed, and motions for summary judgment are now before the Court. Were the Court to allow Plaintiff's state law claims to proceed, the case would soon be ready for trial. It would not serve judicial economy or convenience to dismiss Plaintiff's claims without prejudice to refiling them in state court, particularly when multiple years have passed and there is a risk that the claims could

be time-barred.  Further, the claims for negligent and intentional infliction of emotional distress do not present novel issues of state law.  The comity between state and federal courts is therefore not meaningfully advanced by abstaining from this issue.  Rather, it is fair to avoid saddling Plaintiff with the unnecessary burden of relitigating the case in state court (and while incarcerated), and provide Defendants the opportunity to dispose of this long-standing action now.

For these reasons, the Court proceeds to considering Defendants' arguments directed against Plaintiff's state law claims for negligent and intentional infliction of emotional distress.

A.  <u>Negligent Infliction of Emotional Distress</u>

The Court finds that Gallagher, Dr. Lupis, and APRN McPherson[8] are entitled to statutory immunity under Conn. Gen. Stat. § 4–165 to the extent Plaintiff brings his negligent infliction of emotional distress claim against them in their individual capacity, and sovereign immunity under the Eleventh Amendment to the extent Plaintiff brings this claim against them for damages and injunctive relief in their official capacity.

Conn. Gen. Stat. § 4–165 provides that "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment."  Conn. Gen. Stat. § 4–165.  Through this statute, Connecticut "abrogated the previously existing common-law liability of state employees for their negligent acts performed in the course of their duties."  *Miller vs. Egan*, 265 Conn. 301, 333 (2003).  The claim of negligent infliction of emotional distress is one for negligence; not "wanton, reckless, or malicious" behavior.  *See Rutledge v. Krysnski*, No. CV166032664S, 2016 WL

---

[8] On January 14, 2022, the Court (Merriam, then U.S.D.J.), issued an order clarifying that the only state law claims which remain are for negligent and intentional infliction of emotional distress against all Defendants except Alvarez. ECF No. 74 at 14.

7142794, at *5–6 (Conn. Super Ct. Nov. 1, 2016) (holding Conn. Gen. Stat. § 4–165 barred negligent infliction of emotional distress claim because the claim "by definition, is not a claim of wanton, reckless or malicious behavior"); *Barstow v. Shea*, 196 F. Supp. 2d 141, 151 (D. Conn. 2002) (collecting cases).  Further, all acts at issue were performed by Dr. Lupis and APRN McPherson while providing medical treatment to inmates as part of their employment, and by Gallagher in her role as Disability Rights Coordinator.  Because each of these Defendants was acting within the scope of their employment and is accused in the negligent infliction of emotional distress claim of only negligent acts, Conn. Gen. Stat. § 4–165 bars this claim against these Defendants in their individual capacity.[9]

Further, the Eleventh Amendment bars claims for damages and injunctive relief against a state employee acting in his or her official capacity.  *See Vega v. Semple*, 963 F.3d 259, 281–84 (2d Cir. 2020).  "There is a well-known exception to this rule—established by the Supreme Court in *Ex parte Young* and its progeny—by which suits for prospective relief against an individual acting in his official capacity may be brought to end an ongoing violation of federal law."  *Id.* at

---

[9] Although the point is not disputed by Plaintiff, the Court is satisfied that APRN McPherson should be treated as a "state employee" for purposes of Conn. Gen. Stat. § 4–165 despite her status as a contract employee for the DOC. Conn. Gen. Stat. § 4–165 refers to the definition of "state employee" in Conn. Gen. Stat. § 4–141, which in turn defines "state employee" as "every person elected or appointed to or employed in any office, position or post in the state government, whatever his title, classification or function and whether he serves with or without renumeration or compensation . . . ."  *See Hunte v. Blumenthal*, 238 Conn. 146, 152 (1996).  The Connecticut Supreme Court has held that courts should apply the common law "right to control" test to determine whether individuals are considered state employees under Conn. Gen. Stat. § 4–165 or are, instead, independent contractors.  Under this test, "[t]he fundamental distinction between an employee and an independent contractor depends on the existence or nonexistence of the right to control the means and methods of work."  *Id.* at 154 (internal quotation marks and citations omitted).  Unlike an employee, "[an] independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer, except as to the result of his work."  *Id.* (internal quotation marks and citations omitted).  In this case, APRN McPherson began working at MacDougall as a nurse in January of 2019, until she was transferred to another correctional facility in April of 2020.  *See* McPherson Aff., ECF No. 215-4 ¶ 2.  There is no suggestion that a nurse providing healthcare at a correctional facility on a contract basis is subject to less supervision in the means and methods of his or her work than a nurse employed directly by the state, and no evidence that APRN McPherson was somehow outside the control of the DOC while she performed her nursing duties.  Thus, the Court concludes the immunity of Conn. Gen. Stat. § 4–165 can apply to APRN McPherson.

281.  In this action, Plaintiffs seeks damages, injunctive relief, and attorney's fees in each of his seven counts.  *See* ECF No. 1 ¶¶ 46, 95, 161, 219, 244, 261, 269.  Some of Plaintiff's requests for injunctive relief are prospective in nature.  For example, Plaintiff seeks "injunctive relief commanding defendants to reinstate plaintiff's testosterone therapy and continue and maintain the provision of such therapy through the end of plaintiff's sentence of incarceration." *Id.* ¶ 95.  The *Ex parte Young* exception for prospective injunctive relief only applies to claims of federal law, however, not the state law claims at issue here.  *See Vega*, 963 F.3d at 283 ("In *Pennhurst*, the Supreme Court held that sovereign immunity prohibits federal courts from entering injunctions against state officials on the basis of *state* law, notwithstanding the *Ex parte Young* exception to sovereign immunity with respect to violations of *federal* law.").  For these reasons, Plaintiff's claims for negligent infliction of emotional dismiss against Defendants in their official capacities are barred by the Eleventh Amendment.

## B. Intentional Infliction of Emotional Distress

Plaintiff's intentional infliction of emotional distress claims against Gallagher, Dr. Lupis, and APRN McPherson all fail as a matter of law.[10]

A plaintiff claiming intentional infliction of emotional distress must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by plaintiff was severe." *Appleton v. Board of Educ.*, 254 Conn. 205, 210 (2000) (internal quotation marks and citation omitted).  In this case, there is no

---

[10] Only APRN McPherson raises an immunity defense to Plaintiff's intentional infliction of emotional distress claim, arguing that she is immune from suit under Connecticut Executive Order 7V as a healthcare provider acting in good faith while providing services in support of the state's COVID-19 response.  The Court need not reach APRN McPherson's immunity defense, as the claim otherwise fails as a matter of law.

conduct by any Defendant that is possibly so extreme and outrageous, or "atrocious" and "beyond all bounds of decency," to support an intentional infliction of emotional distress claim. *Id.* at 211.

The Court has already found that Plaintiff's claims, at most, concern a mere disagreement over the proper course of treatment for his low testosterone and diabetes. *See supra* section V.B(2). The Court must reach a similar conclusion with regard to Gallagher and Dr. Lupis' alleged failure to provide Plaintiff with a gym pass, despite his need to exercise to address his obesity. The Court is not aware of any cases finding that a failure to provide the plaintiff's preferred medical treatment may constitute extreme and outrageous conduct. *Compare Germano v. Dzuernda*, No. 3:09cv1316, 2011 WL 1214435, at *20 (D. Conn. Mar. 28, 2021) (finding failure to provide a medical mattress is not extreme and outrageous conduct). More generally, Plaintiff's medical treatment claims do not concern outrageous acts, but rather *omissions* such as the failure to prescribe additional testosterone shots or provide a gym pass. In these situations, "Connecticut courts have held that a failure to act does not rise to the level of 'extreme and outrageous behavior.'" *Abrams v. Waters*, No. 3:17-CV-1659 (CSH), 2018 WL 691717, at *16 (D. Conn. Feb. 2, 2018) (collecting cases where plaintiffs' infliction of emotional distress claims failed as a matter of law against defendants who failed to respond to mental health needs).

As for a claim resting on Dr. Lupis' "retaliation," no reasonable jury could find that Dr. Lupis' decision to report what he interpreted to be a threat to his safety is extreme and outrageous conduct. The uncontroverted facts are that after Dr. Lupis declined to increase Plaintiff's insulin dosage, Plaintiff sent him a letter claiming Dr. Lupis was bullying him and said that if Dr. Lupis continued his conduct, Plaintiff would "give it back." Corr. Defs.' L.R. 56(a)1 St. ¶ 161. Without reaching whether Plaintiff's letter was indeed a threat unprotected by the First Amendment, Dr. Lupis' decision to report Plaintiff was plainly reasonable and not "atrocious" or "beyond all

bounds of decency." *Appleton*, 254 at 211.  *Cf. Hinton v. Pearson*, No. 3:21-cv-863 (MPS), 2021 WL 4521994, at *5 (D. Conn. Oct. 4, 2021) ("Prisoners do not have 'a First Amendment right to speak freely and communicate with other inmates and prison officials [ ] without restriction based on legitimate penological concerns.'").  For these reasons, Plaintiff's claims for intentional infliction of emotional distress—the final claims remaining in this action—fail as a matter of law.

## VI.   <u>CONCLUSION</u>

For the reasons explained in this Ruling, Defendants' motions for summary judgment, ECF Nos. 215 and 222, are GRANTED as to all federal and state claims against the Correctional Defendants and APRN McPherson.

The Correctional Defendants' motion for leave to strike Plaintiff's sur-reply, ECF No. 240, is GRANTED, and Plaintiff's motions for leave to file sur-replies, ECF Nos. 244 and 245, are DENIED.  Plaintiff's motion for appointment of counsel, ECF No. 243, is DENIED AS MOOT. The Clerk of Court is directed to close this case.

**SO ORDERED** this 26th day of February, 2024 at Hartford, Connecticut.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE